2023-1550

In The

# United States Court of Appeals for the Federal Circuit

RISEN ENERGY CO., LTD.,

*Plaintiff-Appellee,*

TRINA SOLAR CO., LTD., ET AL.,

*Plaintiffs,*

v.

UNITED STATES, SUNPOWER MANUFACTURING OREGON, LLC,

*Defendants-Appellees.*

Appeal from the United States Court of International Trade in
No: 1:20-cv-03743, Judge Claire R. Kelly.

## NON-CONFIDENTIAL OPENING BRIEF OF PLAINTIFF-APPELLANT RISEN ENERGY CO., LTD.

Gregory S. Menegaz
Alexandra H. Salzman
**DeKieffer & Horgan, PLLC**
1156 Fifteenth Street, NW, Suite 1101
Washington, DC 20005
(202) 783-6900
*Counsel for Plaintiff-Appellant*

May 16, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1550 |
| **Short Case Caption** | Risen Energy Co., Ltd. v. US |
| **Filing Party/Entity** | Plaintiff-Appellant Risen Energy Co., Ltd. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/16/2023

Signature: /s/ Gregory S. Menegaz

Name: Gregory S. Menegaz

FORM 9. Certificate of Interest

| **1. Represented Entities.**<br>Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.**<br>Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.**<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Risen Energy Co., Ltd. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☑    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ......................................................1

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE..................................................................2

SUMMARY OF THE ARGUMENT .......................................................5

ARGUMENT ..........................................................................................6

I.      Standards of Review ...................................................................6

II.     Commerce's Surrogate Value HTS Classification for Backsheet and
        EVA are Unsupported by Substantial Evidence...........................10

III.    Commerce's Surrogate Financial Ratio Calculation was Not Supported
        by Substantial Evidence..............................................................20

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...............................27

## CONFIDENTIAL MATERIAL OMMITTED

The material omitted on page 12 describe the confidential specific

characteristics of Plaintiff-Appellant's backsheet input.   This information on

page 12 and in the Addendum contains business proprietary information

released by the U.S. Department of Commerce to parties under administrative

protective order ("APO").   The APO provides that such information cannot be

shared with any party not approved under the APO.

# TABLE OF AUTHORITIES

**Cases**

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ...................7

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) ........................ 18-19

*Citic Trading Co. v. United States*, 27 C.I.T. 356 (Ct. Int'l Trade 2003) .. 5, 9-10, 18

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938) ..........................7

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (1983) ...................8

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997)........................8

*Lasko Metal Prods. Inc. v. United States*, 810 F. Supp. 314 (1992) ......................10

*Longkou Haimeng Mach. Co. v. United States*, 581 F. Supp. 2d 1344 (Ct. Int'l Trade 2008) ...................................................................................................... 9-10

*Shandong TTCA Biochemistry Co., Ltd. v. United States*, 774 F. Supp. 2d 1317 (Ct. Int'l Trade 2011)........................................................................................... 8-9

*Shakeproof Assembly Components v. United States,* 268 F.3d 1376 (Fed. Cir. 2001) ...............................................................................................................5, 20, 27

*Timken US Corp. v. United States*, 318 F. Supp. 2d 1271 (March 5, 2004) ...........10

*Torrington Co. v. United States*, 19 C.I.T. 403 (1995),
aff'd, 127 F.3d 1077 (Fed. Cir. 1997) ......................................................................8

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .......................................7

*USX Corp. v. United States*, 655 F. Supp. 487 (Ct. Int'l Trade 1987) .....................8

**Statutes**

19 U.S.C. § 1516a ......................................................................................................1

19 U.S.C. § 1516a(b)(l)(B) .......................................................................................7

19 U.S.C. § 1677b(c) ........................................................................................*passim*

28 U.S.C. § 1295(a)(5).............................................................................................1

28 U.S.C. § 1581(c) ................................................................................1

**Administrative Decisions**

*Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Intent to Rescind the Review, in Part, and Preliminary Determination of No Shipments; 2018-2019*, 85 Fed. Reg. 23,947 (April 30, 2020) ................................................21

*Certain Quartz Surface Products From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 83 Fed. Reg. 58,540 (November 20, 2018) .................21

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2015*, 82 Fed. Reg. 29033 (June 27, 2017) ................................................................................................ 14-15

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2013-2014*, 81 Fed. Reg. 39905 (June 20, 2016) ................................................................................................15

**Other Legal Authority**

Adolph Matz & Milton F. Usry, <u>Cost Accounting Planning & Control</u>, 19-21 (7th ed. 1980) ...............................................................................................24

<u>Cost of Goods Sold Statement</u>, <https://learn.financestrategists.com/explanation/cost-accounting/cost-of-goods-sold/cost-of-goods-sold-statement> ......................................................24

## STATEMENT OF RELATED CASES

In response to Federal Circuit Rule 47.5(a), Plaintiff-Appellant is not aware of any other appeal in or from the same civil action or proceeding in the lower court that was previously before this Court or any other appellate court. Pursuant to Federal Circuit Rule 47.5(b), Plaintiff-Appellant is not aware of any case pending that will directly affect or be directly affected by this appeal.

## JURISDICTIONAL STATEMENT

This court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1295(a)(5), as an appeal from the U.S. Court of International Trade. The Trade Court had jurisdiction under 28 U.S.C. § 1581(c), which gives the Trade Court jurisdiction over any action commenced with respect to final Commerce Department determinations under 19 U.S.C. § 1516a.

This appeal is timely. Plaintiff-Appellant filed its notice of appeal on February 21, 2023, within 60 days of the lower court's final judgment issued on December 20, 2022, in *Risen Energy Co., Ltd., et al. v. United States*, Slip Op. 22-148.

## STATEMENT OF THE ISSUES

This case presents the following issues:

Whether the Commerce Department's surrogate value selection for Risen's

backsheet and EVA input as the "best available information" was supported by substantial evidence?

Whether the Commerce Department's calculation of the surrogate financial ratios was supported by substantial evidence or otherwise in accordance with the law?

## STATEMENT OF THE CASE

This appeal arises from the final results of the sixth administrative review of *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from China*. Plaintiff-Appellant was selected as one of the mandatory respondents. Plaintiff-Appellant was also a mandatory respondent in the fifth administrative review.

Because this review was conducted of a nonmarket economy ("NME") order, Commerce does not use a respondent's actual cost records to value its inputs, home market sales, and financial statements for the purposes of calculating the normal value. Rather, Commerce selects surrogate values from a surrogate country to construct a normal value cost. In this review, Commerce selected Malaysia as the primary surrogate country. In all of the prior reviews, Commerce had relied upon Thailand as the primary surrogate country, which has the same ASEAN tariff schedule as Malaysia.

2

For most inputs, Commerce relies upon import values into the surrogate country for a particular HTS code most specific to the respondent's input. Commerce valued Risen's backsheet and EVA inputs using a different HTS code than Commerce had previously used to value this input in prior reviews.   Risen also submitted information that these inputs should be classified as a film, consistent with Commerce's past classification.   Nonetheless, in the Preliminary and Final Results, Commerce classified these two inputs under an HTS code that covers sheet, and not film.   Commerce's basis for its classification of both of these inputs was an unsubstantiated difference between the thickness or flexibility of film or sheet.

Commerce relied upon the surrogate financial statement of Hanhwa Q Cells ("Hanwha") to value overhead, SG&A, and profit ratios.   The surrogate financial ratios are applied at multiple stages of the surrogate cost buildup, and are particularly impactful to the accuracy of the normal value.   In the Preliminary Results, Commerce calculated the ratios in one manner.   In the Final Results, Commerce adopted petitioner's suggested ratio calculation.   Risen argued this calculation was contrary to past practice and accounting principles and resulted in an inaccurate margin by overstating overhead.   At the lower court, the government raised substantial new explanation in their brief for this calculation, none of which

was actually part of the agency's decision.   Moreover, Commerce's explanation contradicts the segregation of expenses in the financial statement and the basic understanding of cost of goods sold and inventories.   Despite this explanation and the lack of justification in the agency's actual decision, the lower court found that Commerce's calculation was reasonable and upheld the determination.

For backsheet and EVA, the lower court found that Commerce's classification was not supported by substantial evidence, finding that Commerce's definition between film or sheet lacked record support and Commerce ignored Risen's record evidence.   On remand, Commerce opened the record and placed generic specifications regarding plastic sheeting on the record to support its classification for these inputs.   Risen argued these specifications are not related to defining between film or sheet, backsheet or EVA, or the solar industry, and thus are not informative of this classification unlike the solar industry information Risen placed on the record.   Nonetheless, the lower court affirmed Commerce's Remand Results finding this additional justification for its classification was substantial evidence.   This appeal ensued.

## SUMMARY OF THE ARGUMENT

Commerce is required to "determine the normal value of the subject merchandise . . . the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate. . . ." 19 U.S.C. § 1677b(c)(1)(B).   while the statute "'grants to Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis.' . . . [t]his discretion . . . is constrained by the underlying objective of [19 U.S.C. § 1677b(c)]; to obtain the most accurate dumping margins possible. *Citic Trading Co. v. United States*, 27 C.I.T. 356, 365 (Ct. Int'l Trade 2003) n.12 (citations omitted).   "'This objective is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents.'" *Id*.; *see also Shakeproof Assembly Components v. United States,* 268 F.3d 1376, 1382 (Fed. Cir. 2001) (Above all, the statute requires Commerce to "establish[ ] antidumping margins as accurately as possible.").   In this case, Commerce failed to rely on the best available information for Risen's backsheet and EVA inputs and the financial ratios.

Contrary to past practice, Commerce decided that Risen's backsheet and EVA inputs should be classified as "sheets" instead of "films" because the thickness of each is above 0.25mm.   Commerce's differentiation between sheet and film based on this thickness is not supported by the record.   Commerce relied on information not relevant to this inquiry or the solar industry, while ignoring the record evidence from Risen's own experience and the solar industry which used the term film used for these inputs.

Commerce calculated the surrogate financial ratios in a manner unsupported by the record. Contrary to accounting principles, Commerce's usual understanding of ratio calculations, and the information in the financial statement itself, Commerce determined that the inventories note in the financial statement covered all raw material, labor, and energy expenses.   The resulting calculation significantly overstated the overhead costs.

A reasonable mind, upon consideration of the record as a whole, could not find that the HTS codes relied upon for the two inputs and the financial ratio calculation method are the best available information and therefore the resulting margin is not the most accurate dumping margin possible.

# ARGUMENT

## I.    Standards of Review

When reviewing the Court of International Trade's judgment concerning a final result of Commerce, this Court reapplies the Court of International Trade's standard of review. In reviewing Commerce's antidumping determinations, this court's review consists of a *de novo* review of the agency's actions rather than merely reviewing the adequacy of the lower court's decision.

This Court also invalidates determinations, findings or conclusions of Commerce that were "unsupported by substantial evidence on the record, or otherwise not in accordance with law."    *See* 19 U.S.C. § 1516a(b)(l)(B). "[S]ubstantial evidence is more than a mere scintilla.    It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (*quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938)). Furthermore, "substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is

7

substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161, 572 F. Supp. 883, 888 (1983) (*quoting Universal Camera*, 340 U.S. at 488).

Moreover, Commerce's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987). The substantial evidence standard "requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (*quoting Universal Camera*, 340 U.S. at 487).

However, in reviewing the agency's decision, "the Court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Torrington Co. v. United States*, 19 C.I.T. 403, 409 (1995), aff'd, 127 F.3d 1077 (Fed. Cir. 1997). The "reviewing court may not, 'even as to matters not requiring expertise ... displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Shandong TTCA*

*Biochemistry Co., Ltd. v. United States*, 774 F. Supp. 2d 1317, 1321 (Ct. Int'l Trade 2011).

In cases involving non-market-economy ("NME") countries, although "the standard of review precludes the court from determining whether Commerce's choice of surrogate value was the best available on an absolute scale, the court may determine the reasonableness of Commerce's selection of surrogate prices."[1]     And while the statute "'grants to Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis.' . . . [t]his discretion . . . is constrained by the underlying objective of [19 U.S.C. § 1677b(c)]; to obtain the most accurate dumping margins possible.[2]     "'This objective is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents."'[3]

Speaking of Commerce's role in assigning values to factor inputs for NME respondents, the lower court has reasoned consistently that "{s}hould this practice somehow produce less accurate results, Commerce's use of this information may

---

[1] *Citic Trading Co. v. United States*, 27 C.I.T. 356, 366 (Ct. Int'l Trade 2003).

[2] *Citic Trading Co. v. United States*, 27 C.I.T. 356, 365 (Ct. Int'l Trade 2003) n.12 (citations omitted).

[3] *Id.* (citations omitted).

be deemed unreasonable." *Longkou Haimeng Mach. Co. v. United States*, 581 F. Supp. 2d 1344, 1363 (Ct. Int'l Trade 2008) citing *Lasko Metal Prods. Inc. v. United States*, 810 F. Supp. 314, 317 (1992).   It is well established that "[t] he antidumping duty statute requires Commerce to calculate dumping margins as accurately as possible. . . ." *Timken US Corp. v. United States*, 318 F. Supp. 2d 1271, 1275 (March 5, 2004) (citations omitted).

## II.    Commerce's Surrogate Value HTS Classification for Backsheet and EVA are Unsupported by Substantial Evidence.

The law imposes a special burden of care on Commerce in selecting surrogate values.   Congress used the extreme superlative "best" uniquely in the section of the statute dealing with constructed normal value in NME cases like this one.   *See* 19 U.S.C. 1677b(c)(1)(B).   In other words, Commerce does not have discretion to use any merely "reasonable" choice among reasonable data alternatives.   Rather, Commerce must establish, supported by substantial evidence on the record, that its choice is the "best" information on the record for the valuation of that factor.   Commerce failed to establish that the HTS classification for Risen's backsheet and EVA inputs was the best available information. Commerce based its HTS classification on an unsupported definition of the thickness difference between film and sheet.

Risen's backsheet input is a thin, flexible film that protects the cells on the backside of the solar module.   Risen's ethyl vinyl acetate (EVA) input is likewise a thin, flexible film; it is a lamination material placed between the cells and the top and back surface, that when heated bonds the module together.   The potential HTS codes applicable to these two inputs breakdown in a very similar manner.

For backsheet, HTS 3920.62 covers "Other plates, sheets, film, foil and strips, of plastic, non- cellular and not reinforced, laminated, supported or similarly combined with other materials; of poly (ethylene terephthalate)."   Risen Final SVs at Exhibit SV2-4; **App6471-6473**.   The HTS is further delineated under more specific HTS 3920.62.1000 which covers "plate and sheets" and 3920.62.9000 which covers "Other.".   The parties all agree from the tariff schedule that "plates and sheets" would be classified under 3920.62.1000 and "film" would be classified under 3920.62.9000.

For EVA, HTS 3920.10 covers "Other plates, sheets, film, foil and strips, of plastic, non- cellular and not reinforced, laminated, supported or similarly combined with other materials; of polymers of ethylene."   *Id*. at **App6471**.   The HTS is further delineated under more specific HTS 3920.10.1900 which covers "Other plates and sheets" and 3920.10.9000 which covers "Other."   The parties all agree from the tariff schedule that "plates and sheets" would be classified under

11

3920.10.1900 and "film" would be classified under 3920.10.9000. Therefore, to classify both of these inputs, whether the input should be considered a film or a sheet would control which specific HTS is most specific to the input, and therefore is the best available information to value the input. Or, if the record cannot establish which 10-digit specific HTS, then averaging the two HTS together would be the appropriate alternative such that the surrogate value would include both sheet and film.

Risen provided specification sheets for its backsheet and EVA inputs. Risen used different backsheets with a thickness ranging from [[*thickness*]] μm, or [[ *thickness* ]] cm, or approximately 0.3 cm. Risen Exhibit D-38; **Appx2765-2793**. The specification sheets show it packaged and delivered in rolls. *Id*. On remand, Risen placed additional information on the record from various solar manufacturers or groups describing the backsheet used in the solar industry in the exact same way as Risen—i.e., as "film." Risen Remand NFI (May 2, 2022) at Exhibit 8; **Appx10711-10730**. The materials also discuss solar backsheet film with thickness over 0.25mm and over the thickness of Risen's backsheet. Among these materials was specification information from 3M on its solar backsheet film, with thicknesses in excess of 0.25mm. Notably, 3M operates in Malaysia, i.e., the primary surrogate country, and the United States. This record information

specific to Risen's own experience and the solar industry generally demonstrates that backsheet used in the solar industry for solar modules is described as (1) film even when it (2) has thickness in excess of 0.25mm.   Accordingly, Risen advocated that Commerce classify this input as a film under HTS 3920.62.90.00.

Risen's EVA input is specifically called "EVA film" as delineated on the specification sheet.   Exhibit SV2-12; **Appx6774-6783**.   The thickness of the EVA film is 0.45-0.9 mm.   *Id*.   The specification sheet shows it packaged and delivered in rolls.   *Id*.   Risen submitted materials from various solar groups describing the EVA used in the solar industry in the exact same way as Risen, as "film."   Risen Remand NFI at Exhibit 7; **Appx10699-10709**.   The materials also discuss EVA film with thickness over 0.25mm and over the thickness of Risen's EVA.   Among these materials, Risen also submitted the EVA film specification sheet for use in solar modules from an international company that operated in Malaysia, 3M, which likewise calls this input "film" and signifies the thickness between 0.42-0.65mm. *Id*.   This record information specific to Risen's own experience and the solar industry generally demonstrates that EVA used in the solar industry for solar modules is described as (1) film even when it (2) has thickness in excess of 0.25mm.   Accordingly, Risen advocated that Commerce classify this input as a film under HTS 3920.10.9000.

13

The HTS that Risen advocated for these inputs were also consistent with Commerce's classification of these inputs in the prior reviews for Risen as well as for other solar manufacturers that consumed the same materials.    Exhibit SV2-7; **Appx6623-6633**.    Risen submitted to the record Commerce's surrogate value summary sheets from the fifth and fourth review of this Order.    *Id*.    In the fifth review, Commerce classified Risen's same exact backsheet input under HTS 3920.62.90.090 for "Other" and classified Risen's same exact EVA input under HTS 3920.10.00.090 for "Other" – in other words, Commerce classified them both under the HTS for film[4].    Likewise in the fourth review, for a different Chinese solar manufacturer, Commerce classified both of these inputs under the same HTS for "Other" or film.    *Id*.    Commerce classified these inputs in the same manner in earlier reviews as well.    *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2015*, 82 Fed. Reg. 29033

---

[4]  Both Thailand and Malaysia are members of ASEAN and have the same tariff schedules and definitions, except that the Thai schedule places zeros in the last 5-digits in a different location (i.e. 9000 compared to 00090, but otherwise has no actual difference in the HTS and the definition is exactly the same.    These HTS are the "Other" HTS at the end of a section of HTS where it includes all other HTS not delineated more specifically above.    Thus Commerce relied on the same exact HTS in Thailand in the two prior reviews as Risen advocated should be relied upon in this sixth administrative review.

(June 27, 2017) and accompanying IDM at Comment 11 (Third administrative review where Commerce relied on the "Other," i.e. not plate or sheet, HTS to value EVA and backsheet.   The Thai schedule changed at this time so it was not the same HTS, but had the same coverage); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2013-2014*, 81 Fed. Reg. 39905 (June 20, 2016) and accompanying IDM at Comment 14 (second administrative review where Commerce valued PET backsheet using HTS 3920.62.000.90 "Other" and EVA using HTS 3920.10.00090 "Other.").

However, in this review, Commerce departed from its prior understanding and relied upon the HTS for sheet for both of these inputs.   IDM at Comment 9 & 10; **Appx7129-7130**.   Commerce originally justified its classification for backsheet stating that "A backsheet serves to protect solar cells in a solar module. Film refers to a lighter, less rigid product than plates and sheets, and thus would not serve as a protective backsheet." **Appx7130**.   Commerce originally justified its classification for EVA stating the classification was "consistent with Risen's description of the EVA as over 0.5mm thick, which indicates it is sheet, rather than film.   Sheets and plates are more rigid, and thicker than film.   Risen itself noted that plates and sheets are more rigid than flexible film." **Appx7130**.   Commerce

15

also stated that "Risen's comparison with a prior SV source does not outweigh the record evidence showing the input is sheet rather than film." *Id*. Notably, Commerce cited to no source for its understanding that 0.5mm indicates an object is a sheet and not a film. Nor did Commerce cite to any evidence that a protective backsheet cannot be flexible or light. Moreover, as described above, Risen did demonstrate that both its backsheet and EVA inputs were not rigid, but flexible; both are packaged in rolls, demonstrating flexibility rather than in rigid flat sheets.

The lower court agreed that Commerce's classifications lacked record support and also found that the classifications would be arbitrary "[a]bsent an explanation for Commerce's deviation from its historical treatment" of both inputs. Slip. Op 22-33 at 30-31; **Appx0050-0051**. On remand, Commerce came up with a new definition for the difference between film and sheet, asserting that a film is under 0.25mm in thickness and a sheet is above 0.25mm in thickness. Remand Results at 13; **Appx10769**. Commerce claimed the difference was supported by the record evidence it submitted. However, the record information submitted by Commerce bears no reasonable relationship to the inputs in question or defining film and sheet.

To support its new definition of the difference between film and sheet, Commerce submitted a summary of two American Society for Testing and

Materials ("ASTM") specifications to the record.   Commerce New Factual Information (April 22, 2022) at Attachment 2; **Appx7416-7424**.   The first standard, ASTM D6988, is entitled "Standard Guide for Determination of Thickness of Plastic Film Test Specimens."   The standard is a "guide" for measuring the thickness of plastic films where the thickness is used to test for various properties.   **Appx7418**.   The guide merely notes that "film" is an "*optional* term for sheeting having a nominal thickness no greater than 0.25 mm." **Appx7418** (emphasis added).   The guide is not about defining a film compared to a sheet, but is about how to measure the thickness of plastic.   The second standard, ASTM D4801 is entitled "Standard Specification for Polyethylene Sheeting in Thickness of 0.25 mm (0.010 in.) and Greater."   *Id*.   This describes the standard for a very particular type of extruded and compression-molded sheeting made from low-, medium-, high-density polyethylene and copolymers that has a thickness of 0.25mm.   It does not discuss that all polyethylene sheets must be over 0.25mm or anything about the terms film versus sheet.   This is merely the specification for that particular product, which is not the same product as used by Risen or in the solar industry at all.

Neither of these specifications are defining the difference between the term sheet and film.   Neither of these specifications are for the actual inputs in

question.    The ASTM specifications are not informative of when the term sheet or film is used to describe backsheet or EVA, when the terms are used in the solar industry, or when the terms are used in the Malaysian HTS schedule. Accordingly, Commerce's decision that these ASTM standards can define the terms bears no "rational and reasonable relationship to the factor of production it represents.'" *Citic Trading Co.*, 27 C.I.T. at 365.

Further, Commerce's determination to rely upon the ASTM information is not supported by substantial evidence when considering the record as a whole. As described above, Risen's own purchasing experience and the other information specific to the solar industry (including a Malaysian manufacturer) demonstrate that EVA and backsheet used in the solar industry is referred to as "film" even when it has a thickness in excess of 0.25mm.    Commerce criticizes that the information provided by Risen are not technical definitions, but rather just merely use the term "film" for this product.    Remand Results at 19; **Appx10775**. However, again, the information provided by Commerce is also not a definition and not even related to the solar industry.    Surely, the terms used in the actual industry are the most informative "best available information" for that industry. The record taken as a whole, including the information most specific to Risen's purchases, supports a finding that these inputs are films.    *Burlington Truck Lines*

18

*v. United States*, 371 U.S. 156, 168 (1962) (The agency must "articulate any rational connection between the facts found and the choice made."); *Atlantic Sugar, Ltd.*, 744 F.2d at 1562 (Commerce is obligated to support its determination based on the record as a whole, including whatever "fairly detracts" or is "evidenced opposed to its view." ).   Therefore, the "best available" information to value Risen's backsheet input is HTS 3920.62.90.00 and Risen's EVA input is HTS 3920.10.9000, both of which include "film".

Alternatively, if the Court finds that the record is ambiguous as to whether these inputs are films or sheets, then the best available information would still not be to value them as sheets, as Commerce did.   The HTS Commerce relied upon are specific to "plates and sheets" only and thus any products considered a film would definitively not be included under these HTS.   If the record shows that the inputs may be a sheet or film, then the most specific HTS would include both film and sheet.   In other words, Commerce can average the two competing HTS together to appropriately account for this ambiguity, if perceived.   This Court should find that Commerce's determination of the best available information to value Risen's backsheet and EVA inputs is not supported by substantial evidence.

19

**III.    Commerce's Surrogate Financial Ratio Calculation was Not Supported by Substantial Evidence.**

In cases involving NME Orders, Commerce calculates a normal value based on surrogate values for the "factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1)(B).   Commerce relies on financial statements from producers of identical or comparable merchandise in the surrogate country to calculate the manufacturing overhead, general expenses, and profit which are then applied in the normal value build-up.   19 C.F.R. 351.408(c)(4).   In this case, Commerce relied upon the financial statement from Hanwha, a Malaysian manufacturer of identical merchandise.   Risen supports the reliance on this financial statement as the best available information; however, Commerce's calculation of the financial ratios are inaccurate.   Commerce's calculation does not reasonably interpret the record information in the financial statement and resulted in a significant overvaluation of overhead costs, and thus an inaccurate margin.   *Shakeproof Assembly Components v. United States,* 268 F.3d 1376, 1382 (Fed. Cir. 2001) (Above all, the statute requires Commerce to "establish[ ] antidumping margins as accurately as possible.").

Typically, when calculating financial ratios, Commerce will take the "Cost

of Sales" or "Cost of Goods Sold" line item from the Profit & Loss statement and subtract various detailed costs from the notes of the financial statement that would be included as a "Cost of Sales."    After subtracting such costs, there is a remaining amount of "Cost of Sales" that must then be allocated to a type of expense.    Given materials, labor, and energy ("MLE") expenses are the overwhelming majority of the "Cost of Sales," Commerce normally allocates any remaining "Cost of Sales" costs to the MLE denominator.    *See*, e.g., *Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Intent to Rescind the Review, in Part, and Preliminary Determination of No Shipments; 2018-2019*, 85 Fed. Reg. 23,947 (April 30, 2020) and accompanying SV Memo at 10 (allocating remaining Cost of Sales to MLE denominator) (unchanged calculation in Final); *Certain Quartz Surface Products From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 83 Fed. Reg. 58,540 (November 20, 2018) and accompanying SV Memo at Attachment 7 (allocating remaining Cost of Sales to MLE denominator) (unchanged in Final).

However, in the Final Results, Commerce allocated the remaining "Cost of Sales" to the overhead costs.    This allocation is contrary to Commerce's practice

and contrary to the notes of the statement.   Hanwha' Profit & Loss Statement has a line item of 2,000,338 RM for the total "Cost of Sales".   Risen Final SVs at Exhibit SV2-8; **Appx6648**.   Commerce allocated 1,648,000 RM for the "Cost of Raw Materials" to the raw materials columns, which will be part of the MLE denominator.   **Appx7149**.   Commerce allocated 6,767 RM and 93,326 RM for depreciation of property and depreciation of plant and equipment to the overhead column, which will be part of the overhead numerator in accordance with standard practice.   Then Commerce subtracted these three expenses from the 2,000,338 RM Cost of Sales, and calculated a remaining 257,063 Cost of Sales.   Rather than allocating this to the MLE denominator, with the understanding it covered energy or labor expenses, Commerce allocated that remainder to overhead in the numerator.   IDM at Comment 11; **Appx7131-7133**.   Commerce explained that it understood that labor and energy were already included in the denominator because the "Inventories" line item included these expenses.   Ministerial Error Memo at 5; **Appx7166**.   However, this is contrary to the evidence in Hanwha's financial statement and contrary to basic accounting.

The lower court criticized Commerce's lack of clear explanation for its ratio calculation, but nonetheless upheld the calculation observing that Commerce's mere citation to Hanwha notes 2.12 and 17 must infer that the fact the statement

was prepared in accordance with the International Financial Reporting Standards Foundation ("IFRS") was Commerce's reasoning for finding labor and energy were included in inventories.    Slip. Op. 22-33 at 34; **Appx0054**.    The lower court cites from IFRS that the cost of inventories includes all costs to bring the inventories to their present location and condition, including direct labor and production overhead.    *Id*.    Not only was this explanation definitively not part of Commerce's decision, but the Court misinterprets the meaning of inventories, whether using IFSR standards or otherwise.

The line item that Commerce entitled "Cost of Raw Materials" in its financial ratio calculation is from note 17, where the statement reads: "during the year, the amount of inventories recognized as an expense in cost of sales of the Group and of the Company were RM 1,648 million."    **Appx6688**.    The reliance on this note as the cost of raw materials is misplaced.

This figure in the inventories note does not allow Commerce to bifurcate the materials, labor, and energy ("MLE") costs from overhead costs.    The standard calculation of Cost of Goods Sold/Cost of Sales for a manufacturing company is as follows:

- Direct materials + Direct labor + Factory overhead (which includes energy costs) = Total Manufacturing Costs

- Total Manufacturing Costs - Change in work in process inventory (WIP) (beginning WIP inventory – ending WIP inventory) - Change in finished goods inventory (beginning finished goods inventory – ending finished goods inventory) = Cost of Goods Sold

*See* Adolph Matz & Milton F. Usry, Cost Accounting Planning & Control, 19-21 (7th ed. 1980); *see also* Cost of Goods Sold Statement, <https://learn.financestrategists.com/explanation/cost-accounting/cost-of-goods-sold/cost-of-goods-sold-statement>.

Based upon this standard calculation of Cost of Goods Sold ("COGS"), the reference in note 17 to "the amount of inventories recognized as an expense in cost of sales" can only refer to raw material inventories.    **Appx6688**.    By definition, WIP and finished goods inventories are not "recognized as an expense in cost of sales."    Rather, the WIP and finished goods inventories are precisely those items that are not sold during the period and the change in these inventories is factored out of the Cost of Goods Sold calculation (per above bullets).

Furthermore, the raw materials inventories clearly would not contain labor and manufacturing overhead costs (including energy).    Rather, as note 2.12 to the Hanwha financial statements expressly states, raw materials are based on "purchase costs."    **Appx6666**.    The labor and manufacturing overheads are only taken into consideration in the valuation of work in process and finished goods inventories (i.e. not for all inventories).

24

Commerce also appears to base its understanding of the inventories in the
Hanwha statement on note 2.12 where it states that finished goods and WIP
inventories includes "costs of direct materials and labour and a proportion of
manufacturing overheads." **Appx6666**.    First, this note only refers to finished
goods and WIP.    Second, it also clearly states that "manufacturing overheads" are
included in this inventory expenses.    Even if this note meant something closer to
what Commerce argues it means, it still absolutely does not allow Commerce to
separate out MLE from overhead costs.

Moreover, the very fact that this inventories expense item of RM 1,648
million is not the same as the COGS total of RM 2,003 million demonstrates this
fact on the record.    If this inventories figure included all of the costs to produce
goods during the year, it would match the COGS total.    The difference between
the 2,003,400,000 RM COGS reported in the Hanwha financial statements and the
1,648,000,000 RM raw material costs referenced in note 17 is attributable to the
normal elements that make up COGS such as direct labor, energy, and other
factory overhead.    The only numerator factory overhead clearly identified in the
Hanwha financial statements is depreciation and only this amount can be deducted
from the COGS when determining the proper amount for the MLE denominator.

The fact that Commerce's calculation is incorrect and overstates overhead is

also corroborated by an analysis of the other Malaysian financial statements on the

record.    The majority of the costs that are generally allocated to overhead are the

depreciation of property, plant, and equipment, which have *already* been clearly

delineated and allocated to the overhead ratio by Commerce in Hanwha's ratio

calculation.    For example, among the other four Malaysian financial statements

on the record, the manufacturing depreciation costs represented 96% of the

overhead costs.    *See* Risen Reply Brief at Attachment 1 (analyzing the overhead

costs in the record Malaysian statements); **Appx7345**.    But Commerce's

calculation of Hanwha's ratios presumes that depreciation is only 28.03% of the

total overhead costs.    *Id*.    Therefore, the record only supports Risen's argument

that the majority of the overhead costs have already been assigned to the overhead

numerator and thus the remaining COGS is primarily MLE denominator expenses.

Indeed, recognizing that MLE expenses are the overwhelming majority of the

"Cost of Sales," in less detailed financial statements likes this where raw materials,

labor, and energy are not separately delineated, Commerce normally allocates any

remaining COGS/Cost of Sales costs to the MLE denominator.    *See* Risen Reply

Brief at Attachment 2 (examples of Department ratio calculations); **Appx7344-

7373**.

　　　　In sum, the inventories line item does not allow Commerce to segregate out

MLE expenses from overhead expenses in the COGS for Hanwha's financial ratios.    Commerce has calculated inaccurate ratios not based on substantial evidence, resulting in an inaccurate margin.    *Shakeproof Assembly Components v. United States,* 268 F.3d 1376, 1382 (Fed. Cir. 2001) (Above all, the statute requires Commerce to "establish[ ] antidumping margins as accurately as possible."). Accordingly, the Court should find its ratio calculation is not supported by substantial evidence and is not the "best available information" for Risen's surrogate financial ratio costs.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

In light of the foregoing, Plaintiff-Appellant requests that this Court enter judgment in its favor and find Commerce's determination of the best available information for backsheet and EVA and Commerce's financial ratio calculation are not supported by substantial evidence.

Respectfully submitted,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
**DEKIEFFER & HORGAN, PLLC**
1156 Fifteenth Street, NW Suite 1101
Washington, DC 20005
(202) 783-6900
*Counsel for Plaintiff-Appellant*

May 16, 2023

## UNITED STATES COURT OF INTERNATIONAL TRADE

RISEN ENERGY CO., LTD.,

     **Plaintiff,**

**and**

TRINA SOLAR CO., LTD. ET AL.,

     **Consolidated Plaintiffs,**

**and**

SHANGHAI BYD CO., LTD. ET AL.,

     **Plaintiff-Intervenors,**

**v.**

UNITED STATES,

     **Defendant,**

**and**

SUNPOWER MANUFACTURING
OREGON, LLC,

     **Defendant-Intervenor and
Consolidated Defendant-
Intervenor.**

Before: Claire R. Kelly, Judge

Consol. Court No. 20-03743

### <u>JUDGMENT</u>

This case having been duly submitted for decision, and the court, after due deliberation, having rendered its opinion, and now in conformity with that opinion, it is

<u>**Appx0001**</u>

Consol. Court No. 20-03743                                                                 Page 2

**ORDERED** that the U.S. Department of Commerce's final determination in its 2017–2018 administrative review of the antidumping duty ("ADD") order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, ("solar panels") from the People's Republic of China ("China"), see [Solar Panels from China], 85 Fed. Reg. 62,275 (Dep't Commerce Oct. 2, 2020) (final results of ADD admin. review and final deter. of no shipments; 2017–2018), and accompanying Issues and Decision Mem., A-570-979 (Sept. 28, 2020), ECF No. 49-5, is sustained, except for the matters remanded by Risen Energy Co. v. United States, 569 F. Supp. 3d 1315 (Ct. Int'l Trade 2022); and it is further

**ORDERED** that the U.S. Department of Commerce's first remand redetermination, see Final Results of Redetermination Pursuant to Court Remand, A-570-979 (July 5, 2022), ECF Nos. 137-1, 138-1, is sustained and judgment is accordingly entered for defendant United States.

                                                                   /s/ Claire R. Kelly
                                                                   Claire R. Kelly, Judge

Dated:          December 20, 2022
                New York, New York

**Appx0002**

Slip Op. 22-148

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| RISEN ENERGY CO., LTD., | |
|     Plaintiff, | |
| and | |
| TRINA SOLAR CO., LTD. ET AL., | |
|     Consolidated Plaintiffs, | |
| and | |
| SHANGHAI BYD CO., LTD. ET AL., | |
|     Plaintiff-Intervenors, | Before: Claire R. Kelly, Judge |
| v. | Consol. Court No. 20-03743 |
| UNITED STATES, | **PUBLIC VERSION** |
|     Defendant, | |
| and | |
| SUNPOWER MANUFACTURING OREGON, LLC, | |
|     Defendant-Intervenor and Consolidated Defendant-Intervenor. | |

## OPINION

[Sustaining the U.S. Department of Commerce's remand determination in the 2017–2018 administrative review of the antidumping duty order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.]

Dated: December 20, 2022

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, DeKieffer &
Horgan, PLLC, of Washington, D.C., for plaintiff Risen Energy Co., Ltd.

Jonathan M. Freed, Trade Pacific PLLC, of Washington, D.C., for consolidated
plaintiffs Trina Solar Co., Ltd., Trina Solar (Changzhou) Science & Technology Co.,
Ltd., Yancheng Trina Guoneng Photovoltaic Technology Co., Ltd., Turpan Trina Solar
Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., Trina Solar (Hefei) Science &
Technology Co., Ltd., and Changzhou Trina Hezhong Photoelectric Co., Ltd.

Jeffrey S. Grimson, Sarah M. Wyss, Bryan P. Cenko, and Jacob M. Reiskin, Mowry
& Grimson, PLLC, of Washington, D.C., for consolidated plaintiffs and plaintiff-
intervenors JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology
Co., Ltd., and JingAo Solar Co., Ltd.

Jonathan T. Stoel and Craig A. Lewis, Hogan Lovells US LLP, of Washington, D.C.,
for consolidated plaintiff and plaintiff-intervenor Shanghai BYD Co., Ltd. and
plaintiff-intervenors Canadian Solar Inc., Canadian Solar International Limited,
Canadian Solar Manufacturing (Changshu), Inc., Canadian Solar Manufacturing
(Luoyang), Inc., CSI Cells Co., Ltd., and Canadian Solar (USA) Inc.

Joshua E. Kurland, Trial Attorney, and Reginald T. Blades, Jr., Assistant Director,
Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of
Washington, D.C. for defendant United States. Also on the brief were Brian M.
Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy,
Director. Of counsel was Leslie M. Lewis, Attorney, Office of the Chief Counsel for
Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington,
D.C.

Kelly, Judge: Before the court is the U.S. Department of Commerce's

("Commerce") remand determination pursuant to the court's remand order, see Risen

Energy Co. v. United States, 569 F. Supp. 3d 1315 (Ct. Int'l Trade 2022) ("Risen I"),

on Commerce's final determination in its 2017–2018 administrative review of the

antidumping duty ("ADD") order covering crystalline silicon photovoltaic cells,

whether or not assembled into modules, ("solar cells") from the People's Republic of

China ("China").  See Final Results of Redetermination Pursuant to Court Remand,

A-570-979 (July 5, 2022), ECF Nos. 137-1, 138-1 ("Remand Results"); see generally

[Solar Cells from China], 85 Fed. Reg. 62,275 (Dep't Commerce Oct. 2, 2020) (final

results of [ADD] admin. review and final deter. of no shipments; 2017–2018) ("Final

Results") and accompanying Issues and Decision Mem., A-570-979 (Sept. 28, 2020),

ECF No. 49-5 ("Final Decision Memo"); Order on Consent Mot. to Consol. Cases, Dec.

16, 2020, ECF No. 44 (consolidating Ct. Nos. 20-03757, 20-03761, 20-03797, 20-03802,

20-03804, and 20-03743).  For the following reasons, the court sustains Commerce's

determination on remand.

## BACKGROUND

The court presumes familiarity with the facts of this case as set out in its

previous opinion ordering remand to Commerce, see Risen I, 569 F. Supp. 3d 1315,

and now recounts only those facts relevant to the court's review of the Remand

Results.  In the underlying review of the ADD order covering solar cells from China

for a period of review covering December 1, 2017 through November 30, 2018,

Commerce selected Risen Energy Co., Ltd. ("Risen") and Trina as mandatory

respondents.[1]  Mem. Re: Resp't Selection, PD 101, bar code 3830533-01 (May 6, 2019);

---

[1] Commerce determined that Risen (Wuhai) New Energy Co., Ltd.; Zhejiang Twinsel

(footnote continued)

see also Risen I, 569 F. Supp. 3d at 1319 nn.1–2, 1321.  Commerce selected Malaysia

as the primary surrogate country.  Risen I, 569 F. Supp. 3d at 1321.  The parties

moved for judgment on the agency record, challenging Commerce's selection of

Malaysia as the primary surrogate country, certain surrogate values for inputs, the

surrogate financial ratio calculations, the partial application of facts otherwise

available with an adverse inference, and calculation of the separate rate.  Id. at 1320.

In Risen I, the court remanded Commerce's final determination on this ADD

administrative review.  569 F. Supp. 3d at 1338.  Specifically, the court remanded

Commerce's: (i) decision to rely on the Malaysian import value for silver paste, id. at

1327–30; (ii) application of facts otherwise available with an adverse inference to

---

Electronic Technology Co., Ltd.; Risen (Luoyang) New Energy Co., Ltd.; Jiujiang
Shengchao Xinye Technology Co., Ltd.; Jiujiang Shengzhao Xinye Trade Co., Ltd.,
Ruichang Branch; Risen Energy (Hong Kong) Co., Ltd.; and Risen Energy
(Changzhou) Co., Ltd. ("the Risen Entities") were affiliated and treated the entities
as a single collapsed entity for the purpose of the dumping margin calculation.
Affiliation and Single Entity Status of [the Risen Entities] at 1–2, PD 411, bar code
3938677-01 (Jan. 31, 2020).  Risen Energy Co., Ltd. challenges Commerce's final
determination independently.  See Compl. ¶¶ 1, 4–5, Oct. 28, 2020, ECF No. 7.
Commerce determined that Trina Solar Co., Ltd. (formerly, Changzhou Trina Solar
Energy Co., Ltd.) (TCZ); Trina Solar (Changzhou) Science and Technology Co., Ltd.
(TST); Yancheng Trina Guoneng Photovoltaic Technology Co., Ltd (formerly,
Yancheng Trina Solar Energy Technology Co., Ltd.) (TYC); Changzhou Trina Solar
Yabang Energy Co., Ltd. (TYB); Turpan Trina Solar Energy Co., Ltd. (TLF); Hubei
Trina Solar Energy Co., Ltd. (THB); Trina Solar (Hefei) Science and Technology Co.,
Ltd. (THFT); and Changzhou Trina Hezhong Photoelectric Co., Ltd. (THZ)
(collectively, "Trina") were affiliated and treated the entities as a single collapsed
entity for the purposes of Commerce's dumping margin calculation.  Mem. Re:
Affiliation and Single Entity Status of [Trina] at 1–2, PD 410, bar code 3938672-01
(Jan. 31, 2020).

Risen and Trina's review responses, <u>id.</u> at 1335–37; (iii) valuation for backsheet, <u>id.</u> at 1330–32; (iv) valuation for ethyl vinyl acetate ("EVA"), <u>id.</u>; and (v) calculation of the weighted-average antidumping margins for Risen and Trina for application to the separate rate respondents, <u>id.</u> at 1337–38.

Commerce filed its Remand Results on July 5, 2022. In the Remand Results, Commerce: (i) values silver paste using Malaysian import data for HTS 7106.92.00 rather than HTS 7115.90.1000, Remand Results at 9–11; (ii) under protest, applies partial neutral facts available instead of applying an adverse inference when selecting facts otherwise available in calculating Trina and Risen's dumping margins,[2] <u>id.</u> at 5–7; (iii) continues to value Risen's backsheet using import data from Malaysia's HTS 3920.62.1000, <u>id.</u> at 12–15; (iv) again values Risen's EVA using Malaysia's HTS 3920.10.1900, <u>id.</u> at 20–22; and (v) recalculates the dumping margins of the mandatory respondents and revises the weighted-average dumping margin for separate rate respondents, in light of the Court's remand order, <u>id.</u> at 27–28.

No party objects to Commerce's determination on remand regarding silver paste or its application of partial neutral facts available. <u>See</u> Remand Results at 7, 11. Risen argues that Commerce's surrogate value HTS classifications for backsheet

---

[2] Under respectful protest in light of the court's remand order, Commerce determines not to apply an adverse inference on remand in selecting among the facts otherwise available for the missing factors of production consumption rates to calculate Risen and Trina's dumping margins. Remand Results at 5. Instead, Commerce applies partial neutral facts available, using the average consumptions rates reported by Risen and Trina for each input, to calculate the dumping margins. <u>Id.</u>

**PUBLIC VERSION**

and EVA are unsupported by substantial evidence. Pl.'s Comments on Remand

Redetermination at 1–7, Aug. 4, 2022, ECF No. 142 ("Risen's Comments"). JA Solar,

Canadian Solar, and BYD agree with Risen that Commerce's determinations on

remand valuing backsheet and EVA are unsupported by substantial evidence and do

not comply with the court's remand order. Comments on Final Remand

Redetermination of Consol. Pls. & Pl.-Intervenors JA Solar Tech. Yangzhou Co., Ltd.,

Shanghai JA Solar Tech. Co., Ltd., & JingAo Solar Co., Ltd. at 2, Aug. 4, 2022, ECF

No. 141; Shanghai BYD Co., Ltd. & Canadian Solar Inc. et al.'s Comments on Final

Results of Remand Redetermination at 5–9, Aug. 4, 2022, ECF No. 143. No party

objects to Commerce's separate rate calculation based on changes Commerce made to

the mandatory respondents' dumping margins on remand. Defendant United States

argues that Commerce's determinations on remand are supported by substantial

evidence in accordance with law and should be sustained. Def.'s Resp. Pls.'

Comments on Remand Results at 5–16, Oct. 6, 2022, ECF Nos. 146–47.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction pursuant to section 516A of the Tariff Act of 1930,[3]

as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2018), which

grant the court authority to review actions contesting the final determination in an

administrative review of an ADD order. "The court shall hold unlawful any

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant
provisions of Title 19 of the U.S. Code, 2018 edition.

Consol. Court No. 20-03743                                                                 Page 7
**PUBLIC VERSION**

determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."   19 U.S.C.

§ 1516a(b)(1)(B)(i).   "The results of a redetermination pursuant to court remand are

also reviewed for compliance with the court's remand order."   Xinjiamei Furniture

(Zhangzhou) Co. v. United States, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014)

(internal quotation marks omitted).

## DISCUSSION

## I.    Valuation of Silver Paste

On remand, Commerce reconsiders its valuation of silver paste using

Malaysian import data for HTS 7115.90.1000, and instead values silver paste using

Malaysian import data for HTS 7106.92.00.   Remand Results at 9–11.   No party

objects to Commerce's determination on remand.   The court sustains Commerce's

determination on remand to value silver paste using HTS 7106.92.00.

In Risen I, the court remanded Commerce's final determination regarding its

valuation of silver paste, for further explanation or reconsideration in light of

detracting evidence that the value is aberrant.[4]   569 F. Supp. 3d at 1327–30.

Commerce disregards aberrational data because it is unreliable.   Antidumping

Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19,

---

[4] Commerce values the factors of production from the primary surrogate country and
resorts to a secondary surrogate country only if data from the primary surrogate
country is unavailable or unreliable.  19 C.F.R. § 351.408(c)(1)–(2).

**Appx0009**

Consol. Court No. 20-03743                                                    Page 8
**PUBLIC VERSION**

1997) (final rule).  In determining whether an input's surrogate value is aberrational,

Commerce "typically compares the prices for an input from all countries found to be

at a level of economic development comparable to the [nonmarket economy] whose

products are under review from the [period of review] and prior years."  Final Decision

Memo at 21.  Commerce disregards "small quantity import data . . . when the per-

unit value is substantially different from the per-unit values of the larger quantity

imports of that product from other potential surrogate countries."  SolarWorld

Americas, Inc. v. United States, 962 F.3d 1351, 1358 (Fed. Cir. 2020) (quoting

Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v. United States,

59 F. Supp. 2d 1354 (Ct. Int'l Trade 1999)) (internal quotations marks and brackets

omitted).

    Commerce's determination on remand must be supported by substantial

evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  Universal Camera Corp. v. N.L.R.B.,

340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229

(1938)) (internal quotation marks omitted).  "The substantiality of evidence must take

into account whatever in the record fairly detracts from its weight."  Id. at 488.  In

providing its explanation, Commerce must articulate a "rational connection between

the facts found and the choice made."  Burlington Truck Lines, Inc. v. United States,

371 U.S. 156, 168 (1962).  An agency's decision is arbitrary when, inter alia, it

deviates from an established practice followed in similar circumstances and does not

provide a reasonable explanation for the deviation.  See Consol. Bearings Co. v. United States, 348 F.3d 997, 1007 (Fed. Cir. 2003); see also SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

On remand, Commerce reopened the record and included data for Malaysian Harmonized Tariff Schedule ("HTS") number 7106.92.00.  Remand Results at 2–3.  Commerce values silver paste using the average unit import value ("AUV") of Malaysian import data using HTS 7106.92.00 because its description is more specific than HTS 7115.90.1000 to the silver paste Risen and Trina use and because the AUV of imports using that subheading is more consistent with the record benchmark data.  Id. at 9.  Commerce concludes HTS 7106.92.00 is more specific because HTS 7106.92.00 only covers forms of silver while HTS 7115.90.1000 covers other precious metals in addition to silver, including gold and platinum.  Id.  Additionally, Commerce determines that Malaysian customs officials classify the silver paste used in solar cell product under HTS 7106.92.00 instead of HTS 7115.90.1000.  Id. at 9– 10.  Commerce also determines that the AUV of imports using Malaysia's HTS 7106.92.00 is reliable because the AUV of imports is consistent with the prices of silver paste in the market research report.[5]  Id. at 10–11.  Thus, Commerce's

---

[5] During the period of review, the AUV for imports into Malaysia using HTS 7106.92.00 is 582.75 USD/kg while the AUV of imports into Malaysia using HTS 7115.90.1000 is 8,645.31 USD/kg.  Prices of silver paste during the period of review

(footnote continued)

Consol. Court No. 20-03743                                                    Page 10
**PUBLIC VERSION**

determination on remand is consistent with the court's remand order, is supported

by substantial evidence, and is in accordance with law.

## II.    Application of Facts Available

On remand, Commerce reconsiders applying partial facts otherwise available

with an adverse inference to calculate Risen and Trina's dumping margins. Remand

Results at 5–7. Instead, Commerce, under respectful protest, revises its calculation

of Risen and Trina's weighted-average dumping margins by applying partial neutral

facts available. Id. at 7. No party objects to Commerce's determination on remand.

Id. For the following reasons, the court sustains Commerce's application of partial

neutral facts available.

When necessary information is not available on the record or a party or other

person fails to provide requested information, Commerce uses the facts otherwise

available to make its determination. 19 U.S.C. § 1677e(a); Nippon Steel Corp. v.

United States, 337 F.3d 1373, 1380–81 (Fed. Cir. 2003). If Commerce finds that an

interested party failed to cooperate to the best of its ability, Commerce may use an

inference that is adverse to the interests of that party when selecting the facts

otherwise available. 19 U.S.C. § 1677e(b). A party cooperates to the best of its ability

when it does "the maximum it is able to do." Nippon, 337 F.3d at 1382. However,

---

in potential surrogate countries range from 599.60 USD/kg to 644.60 USD/kg for
Brazil, from 614.90 USD/kg to 637.50 USD/kg for Malaysia, from 563.70 USD/kg to
584.30 USD/kg for Mexico, and from 563.70 USD/kg to 911.90 USD/kg for Russia. Id.
at 10.

**PUBLIC VERSION**

under 19 U.S.C. § 1677e(a) Commerce may use adverse inferences against a cooperative respondent, if doing so will yield an accurate rate, promote cooperation, and thwart duty evasion.  Mueller Comercial de Mexico v. United States, 753 F.3d 1227, 1232–36 (Fed. Cir. 2014).  When using the facts available with an adverse inference under Mueller, the predominant interest when determining the antidumping rate must be accuracy.  Id. at 1235.

The court remanded Commerce's application of facts available with an adverse inference for reconsideration or additional explanation.  Risen I, 569 F. Supp. 3d at 1335.  Specifically, Commerce failed to demonstrate that Risen and Trina did not put forth the maximum effort to provide full and complete responses to inquiries from Commerce.  Id.  Commerce also failed to demonstrate that Risen and Trina have leverage to induce their non-cooperative unaffiliated suppliers to cooperate, that the non-cooperative unaffiliated supplies are evading their own duties by exporting subject merchandise through Risen or Trina, or that using the highest factor of production consumption rates on the record results in an accurate dumping margin. Id.

On remand, Commerce reconsiders its findings and under respectful protest revises its calculation of Risen and Trina's weighted-average dumping margins by applying partial neutral facts available instead of applying facts otherwise available

with an adverse inference.[6]  Remand Results at 7.  Specifically, Commerce uses Risen

and Trina's average reported consumption rates for each input as a substitute for the

missing factor of production consumption rates to calculate their dumping margins.

Id.  Thus, Commerce's determination on remand is consistent with the remand order,

is supported by substantial evidence, and is in accordance with law.

## III.    Valuation of Backsheet

On remand, Commerce continues to value backsheet using HTS 3920.62.1000,

covering polyethylene in plates and sheets (not including film) rather than HTS

3920.62.9000 covering polyethylene in non-plates and sheets (including film) because

the thickness of Risen's backsheets is consistent with sheet, rather than film.

Remand Results at 12–15, 17–20.  Risen objects and argues backsheet should be

---

[6] Commerce revises its determination under protest and argues that Risen and Trina
are both experienced respondents that are aware of the importance of factor of
production information to the accuracy of Commerce's dumping calculation.  Remand
Results at 6.  Further, Commerce maintains that Risen and Trina did not cooperate
to the best of their ability because the record contains no indication either company
attempted to ensure reporting of necessary factor of production data by securing
cooperation of unaffiliated suppliers prior to purchasing their products.  Id. at 6.
As the court previously explained in Risen I however, none of Commerce's
questionnaires to Risen and Trina asked either respondent to discuss whether they
stopped doing business with a supplier because the supplier refused to provide them
with the supplier's factors of production.  569 F. Supp. 3d at 1336 n.36.  The best of
its ability standard requires a respondent to "put forth its maximum effort to provide
Commerce with full and complete answers to all inquiries in an investigation."
Nippon, 337 F.3d at 1382.  Here, Commerce may not determine that a respondent
failed to cooperate to the best of its ability because it did not provide information that
Commerce did not request.  Commerce could have requested information from the
respondents on their efforts to leverage their suppliers into complying.  Instead,
Commerce chose to rely on partial neutral facts available.  Remand Results at 5–7.

valued using the HTS heading that includes film. Risen Comments at 2–4. For the reasons that follow, the court sustains Commerce's remand decision to value backsheet using HTS 3920.62.1000 covering non-film polyethylene.

The court remanded Commerce's use of Malaysia's HTS 3920.62.1000 to value Risen's backsheet as not supported by substantial evidence and instructed Commerce to address evidence that detracted from its conclusion. Risen I, 569 F. Supp. 3d at 1331. The court also remanded Commerce's decision as arbitrary and requested Commerce explain why it considers backsheet to be a "sheet" using import data for Malaysia's HTS 3920.62.1000 in light of its past decisions to value backsheet using HTS descriptions comparable to Malaysia's HTS 3920.62.9000 (Poly(Ethylene Terephthalate): Other Than Plates And Sheets). Id. at 1331–32.

On remand, Commerce reopened and placed on the record ASTM abstracts from ASTM D4801 and ASTM D6988 relating to film and sheet. Remand Results at 13; see Joint Appendix at REM JA 8, Mem. Reopening the Record, Att. II (pdf 197-205), A-570-979, REM PD 3–4, bar code 4234679-01 (Apr. 22, 2022), ECF Nos. 148–49. Commerce relies upon the ASTM abstracts to support its view that polyethylene sheets are those that are 0.25 mm and thicker; in contrast, film is a type of sheeting less than 0.25 mm thick. See Remand Results at 13. Commerce concludes that, under these definitions, Risen's backsheet constitutes sheet rather than film.[7] Id. at 13–14.

---

[7] Risen's backsheets during the POR have [[                    ]] and thus are [[                                        ]]. Id.

No party submitted evidence rebutting the ASTM abstracts on sheet and film thickness or evidence regarding the meaning of plates, sheets, and film in Malaysia's HTS. Id. at 14.

Commerce's determination on remand that Risen's backsheet constitutes sheet is reasonable. The court asked Commerce to explain why backsheet is not film, despite it being thin and flexible. Risen I, 569 F. Supp. 3d at 1331. The ASTM abstracts support Commerce's analysis based on thickness, not flexibility. See Remand Results at 13. Although Risen provided marketing materials demonstrating that some companies in the solar power industry describe thicker backsheet as "film," see id. at 16, these materials provide a competing definition at best; they do not rebut Commerce's definition of sheet as plastic products 0.25 mm thick and greater, nor do they demonstrate that Commerce's determination is unreasonable.

Furthermore, Commerce's use of Malaysia's HTS 3920.62.1000 on remand is not arbitrary. The court asked Commerce to explain its determination when, in its prior administrative review, Commerce valued backsheet using import data for headings comparable to Malaysia's HTS 3920.62.9000 that included the description "other than sheet." Risen I, 569 F. Supp. 3d at 1331–32. Commerce may change its practice in similar circumstances if it provides a reasonable explanation for its deviation. See Consol. Bearings Co., 348 F.3d at 1007. Here, Commerce explains that it did not have the ASTM definition of film on the record in the previous administrative review in this proceeding. Remand Results at 19–20. Commerce has

**PUBLIC VERSION**

explained its deviation from its prior determination and supported its determination

with record evidence.  Its determination regarding backsheet is sustained.

## IV.    Valuation of EVA

On remand, Commerce continues to value Risen's EVA using HTS

3920.10.1900 (Polymers of Ethylene: Plates And Sheets: Other Than Rigid) rather

than HTS 3920.10.9000 (Polymers Of Ethylene – Other) because Risen's EVA does

not meet the ASTM definition of film.  Remand Results at 20–22, 24–27.  For the

following reasons, the court sustains Commerce's remand decision to value EVA

using HTS 3920.10.1900 covering polyethylene other than rigid plates and sheets.

The court remanded for reconsideration or further explanation Commerce's

decision to value its EVA using Malaysia's HTS 3920.10.1900.  Specifically, the court

requested Commerce address the evidence Risen submitted demonstrating that its

EVA is flexible and described as film.  Risen I, 569 F. Supp. 3d at 1332.  The court

also requested Commerce explain why its treatment of EVA differs from its historical

treatment of EVA.  Id.

On remand, Commerce concludes that no characteristics of EVA support

defining it as film instead of sheet.  Risen reported that its EVA is over 0.5 mm thick—

over twice as thick as the maximum thickness for film in the ASTM description.[8]

---

[8] Risen claims that the ASTM standard does not define film and sheet based on
thickness and only suggests the term "sheet" may be used when addressing generic

(footnote continued)

**PUBLIC VERSION**

Remand Results at 21. Risen describes its EVA as flexible; however, Commerce

determines that, because the description of HTS 3920.10.1900 is "Other than Rigid,"

it contains flexible plastic products such as Risen's EVA. Id. Although Risen

submitted marketing materials that Risen argues show the term "film" to be broader

than how Commerce defines it, see Risen Comments at 5, Commerce determines

Risen's marketing materials describe the product as both "EVA film" and "EVA

sheets." Remand Results at 22.

Commerce's determination on remand that Risen's EVA constitutes "sheet" is

reasonable. Commerce explains the ASTM abstracts provide definitions of sheet and

film based on thickness, not flexibility, and under this definition EVA is sheet because

it is over 0.25 mm thick. See Remand Results at 21. The marketing materials, which

Commerce determines use the terms "film" and "sheet" inconsistently, id. at 22, at

best provide a competing definition and do not rebut Commerce's definition of sheet

as a plastic product 0.25 mm or greater in thickness or Commerce's finding that EVA

meets the definition of sheet.

---

plastic product over 0.25 mm thick and is not specific to the solar industry. Risen
Comments at 5. Contrary to Risen's argument, Commerce determines that the
abstract defines film as sheeting no greater than 0.25 mm thick, which is in fact a
definition of film based on thickness. Remand Results at 24–25. Commerce also
determines there is no indication this standard is limited to certain types of plastics
or does not cover products in the solar industry. Id. Risen's arguments ask this court
to reweigh the evidence. The court will not do so.

Consol. Court No. 20-03743                                                                 Page 17
**PUBLIC VERSION**

Furthermore, Commerce's use of HTS 3920.10.1900 is consistent with its past practice. In its remand order, the court requested that Commerce explain its departure from its historical treatment of EVA. <u>Risen I</u>, 569 F. Supp. 3d at 1332. However, here Commerce explains that in the past it used Thai HTS 3920.10.000.90, an "other" HTS category, covering "plates, sheets, film, foil and strips of polymers of ethylene." Remand Results at 25–26. Thus "Commerce did not use a Thai HTS category that covered film, and not plates and sheets." <u>Id.</u> at 26. Commerce further explains that Malaysia, unlike Thailand, has separate HTS categories for polyethylene in plates and sheets and for polyethylene in other forms such as film. <u>See id.</u> at 26–27. Based on the ASTM definitions, Commerce concludes that Risen's EVA does not meet the definition of film and thus values EVA using import data for plates and sheets. <u>Id.</u> Because Commerce now values EVA using Malaysia's HTS covering plates and sheets and in the past valued EVA using Thailand's HTS covering plates, sheets, film, foil, and strips, Commerce's reliance on Malaysia's HTS 3920.10.1900 is not inconsistent with its past practice.

**V.    Calculation of the Separate Rate**

On remand, Commerce recalculates the separate rate in light of the changes made to the mandatory respondents' dumping margins. Remand Results at 27–28. No party objects to Commerce's determination on remand. <u>See id.</u> at 28. For the following reasons, the court sustains Commerce's recalculation of the separate rate on remand.

Consol. Court No. 20-03743                                              Page 18
**PUBLIC VERSION**

Specifically, the court requested Commerce recalculate the separate rate consistent with the rate it calculates for Risen and Trina on remand.  See Risen I, 569 F. Supp. 3d at 1337–38.  The separate rate is "the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under [19 U.S.C. § 1677e]."  19 U.S.C. § 1673d(c)(5)(A); see also Final Results, 85 Fed. Reg. at 62,276 n.6.

On remand, Commerce assigns a dumping margin to the separate rate respondents equal to the weighted average of the dumping margins Commerce calculates for the mandatory respondents.  Remand Results at 27–28.  Thus, Commerce's determination on remand is consistent with the court's remand order, is supported by substantial evidence, and is in accordance with law.

## CONCLUSION

For the foregoing reasons, the Remand Results are supported by substantial evidence, are in accordance with law, comply with the court's order in Risen I, and, therefore, are sustained.  Judgment will enter accordingly.

                                                    /s/ Claire R. Kelly
                                                    Claire R. Kelly, Judge

Dated:          December 20, 2022
                New York, New York

Slip Op. 22-33

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **RISEN ENERGY CO., LTD.,** | |
| **Plaintiff,** | |
| **and** | |
| **TRINA SOLAR ENERGY CO., LTD. ET AL.,** | |
| **Consolidated Plaintiffs,** | |
| **and** | |
| **SHANGHAI BYD CO., LTD. ET AL.,** | **Before: Claire R. Kelly, Judge** |
| **Plaintiff-Intervenors,** | **Consol. Court No. 20-03743** |
| **v.** | **PUBLIC VERSION** |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **SUNPOWER MANUFACTURING OREGON, LLC,** | |
| **Defendant-Intervenor and Consolidated Defendant-Intervenor.** | |

<u>**OPINION AND ORDER**</u>

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the 2017-2018 antidumping administrative review of crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.]

Consol. Court No. 20-03743                                                    Page 2
**PUBLIC VERSION**

Dated: April 4, 2022

Gregory S. Menegaz and Alexandra H. Salzman, DeKieffer & Horgan, PLLC, of Washington, D.C., argued for plaintiff Risen Energy Co., Ltd. Also on the brief were J. Kevin Horgan and Judith L. Holdsworth.

Ronald M. Wisla, Lizbeth R. Levinson, and Brittney R. Powell, Fox Rothschild LLP, of Washington, D.C. for plaintiff-intervenor Anji DaSol Solar Energy Science & Technology Co., Ltd.

Jeffrey S. Grimson, Sarah M. Wyss, and Bryan P. Cenko, Mowry & Grimson, PLLC, of Washington, D.C. for consolidated plaintiffs and plaintiff-intervenors JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd. and JingAo Solar Co., Ltd.

Jonathan M. Freed, Trade Pacific PLLC, of Washington, D.C. argued for consolidated plaintiffs Trina Solar Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd., Yancheng Trina Guoneng Photovoltaic Technology Co., Ltd., Turpan Trina Solar Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., Trina Solar (Hefei) Science & Technology Co., Ltd., and Changzhou Trina Hezhong Photoelectric Co., Ltd. Also on the brief was Robert G. Gosselink.

William E. Perry and Adams C. Lee, Harris Bricken Sliwoski, LLP, of Seattle, WA for consolidated plaintiffs Shenzhen Sungold Solar Co., Ltd. and Wuxi Tianran Photovoltaic Co., Ltd.

Craig A. Lewis, Hogan Lovells US LLP, of Washington, D.C. argued for consolidated plaintiff and plaintiff-intervenor Shanghai BYD Co., Ltd. and plaintiff-intervenors Canadian Solar Inc., Canadian Solar International Limited, Canadian Solar Manufacturing (Changshu), Inc., Canadian Solar Manufacturing (Luoyang), Inc., CSI Cells Co., Ltd., and Canadian Solar (USA) Inc. Also on the brief were Jonathan T. Stoel and Lindsay K. Brown.

Joshua E. Kurland, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C. argued for defendant United States. Also on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director and Reginald T. Blades, Jr., Assistant Director. Of counsel was Leslie M. Lewis, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, of Washington D.C.

Consol. Court No. 20-03743                                                                                    Page 3
**PUBLIC VERSION**

Kelly, Judge:  Before the court are several Rule 56.2 motions for judgment on

the agency record challenging various aspects of the U.S. Department of Commerce's

("Commerce") final determination in its 2017-2018 administrative review of the

antidumping duty ("ADD") order covering crystalline silicon photovoltaic cells,

whether or not assembled into modules, from the People's Republic of China ("China")

("Solar Cells from China").  Pl.'s Mot. For J. on Agency R., Apr. 29, 2021, ECF No. 62

("Risen's[1] R. 56.2 Mot.") and accompanying Pl.'s R. 56.2 Memo. in Supp. of Mot. for J.

Upon Agency R., Apr. 29, 2021, ECF Nos. 63, 64 ("Risen's Br."); Pl.-Intervenor's 56.2

Mot. for J. on Agency R., Apr. 29, 2021, ECF No. 65 ("Anji DaSol's R. 56.2 Mot."); R.

56.2 Mot. for J. on Agency R. of Consol. Pls. & Pl.-Intervenors JA Solar Technology

Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd., and Jingao Solar Co.,

---

[1] Commerce selected Risen Energy Co., Ltd. as a mandatory respondent, Memo. Re: Resp't Selection, PD 101 bar code 3830533-01, (May 6, 2019) ("Resp't Selection Memo."), and subsequently determined that Risen (Wuhai) New Energy Co., Ltd.; Zhejiang Twinsel Electronic Technology Co., Ltd.; Risen (Luoyang) New Energy Co., Ltd.; Jiujiang Shengchao Xinye Technology Co., Ltd.; Jiujiang Shengzhao Xinye Trade Co., Ltd. Ruichang Branch; Risen Energy (Hong Kong) Co., Ltd.; and Risen Energy Co., Ltd. (the "Risen Entities") were affiliated and treated the entities as a single collapsed entity for the purpose of the dumping margin calculation.  Affiliation and Single Entity Status of [the Risen Entities] PD 411 bar code 3938677-01 (Jan. 31, 2020).  Commerce refers to the Risen Entities collectively as "Risen" in the preliminary and final decision memoranda, but issued questionnaires to, and received responses from, Risen Energy Co., Ltd., which Commerce applied to all the Risen Entities.  See, e.g., Request for Information, [ADD] Admin. Review, Risen Energy Co., Ltd. [Solar Cells from China], PD 103 bar code 3830975-01 (May 7, 2019); Letter Re: [Solar Cells from China] Risen Case Br., PD 446 CD 464 bar codes 3954395-01, 3954393-01 ("Risen's Admin. Br.").  Risen Energy Co., Ltd. ("Risen") challenges Commerce's final determination independently.  Compl., Oct. 28, 2020, ECF No. 7.

Consol. Court No. 20-03743                                              Page 4
**PUBLIC VERSION**

Ltd. (collectively, "JA Solar"), Apr. 29, 2021, ECF No. 66 ("JA Solar's R. 56.2 Mot.")

and accompanying Memo. of Points and Authorities in Supp. of R. 56.2 Mot. for J. on

Agency R. of Consol. Pls. & Pl.-Intervenors [JA Solar], Apr. 29, 2021, ECF No. 67 ("JA

Solar's Br."); Consol. Pls.' R. 56.2 Mot. for J. on Agency R., Apr. 29, 2021, ECF No. 68

("Trina's[2] R. 56.2 Mot.") and accompanying Memo. in Supp. Mot. of Trina for J. on

Agency R., Apr. 29, 2021, ECF Nos. 69, 70 ("Trina's Br."); Consol. Pls.' 56.2 Mot. for

J. on Agency R., Apr. 29, 2021, ECF No. 71 ("Shenzen and Wuxi's R. 56.2 Mot.");

Consol. Pl. and Pl.-Intervenors Shanghai BYD. Co., Ltd. ("Shanghai") and Canadian

Solar, et al.'s[3] R. 56.2 Mot. for J. on Agency R., Apr. 29, 2021, ECF No. 72 ("Shanghai's

and Canadian Solar's R. 56.2 Mot.") and accompanying Consol. Pl. and Pl.-

Intervenors [Shanghai] and [Canadian Solar's] Memo. in Supp. of R. 56.2 Mot. for J.

on Agency R., Apr. 29, 2021, ECF No. 72-2 ("Shanghai's and Canadian Solar's Br.");

see generally [Solar Cells from China], 85 Fed. Reg. 62,275 (Dep't Commerce Oct. 2,

2020) (final results of [ADD] admin. review and final deter. of no shipments; 2017-

---

[2] Commerce determined that Trina Solar Co., Ltd.; Trina Solar (Changzhou) Science
& Technology Co., Ltd.; Yancheng Trina Guoneng Photovoltaic Technology Co., Ltd.;
Turpan Trina Solar Energy Co., Ltd.; Hubei Trina Solar Energy Co., Ltd.; Trina Solar
(Hefei) Science & Technology Co., Ltd.; and Changzhou Trina Hezhong Photoelectric
Co., Ltd. (collectively, "Trina") were affiliated and treated the entities as a single
collapsed entity for the purposes of Commerce's dumping margin calculation. Memo.
Re: Affiliation and Single Entity Status of [Trina] PD 410, bar code 3938672-01 (Jan.
31, 2020).
[3] Canadian Solar Inc., Canadian Solar International Limited; Canadian Solar
Manufacturing (Changshu), Inc.; Canadian Solar Manufacturing (Luoyang), Inc.; CSI
Cells Co., Ltd.; and Canadian Solar (USA) Inc. are collectively identified as "Canadian
Solar."

2018) ("<u>Final Results</u>") and accompanying Issues and Decision Memo., A-570-979,

Sept. 28, 2020, ECF No. 49-5 ("Final Decision Memo."); Order on Consent Mot. to

Consol. Cases, Dec. 16, 2020, ECF No. 44 (consolidating Ct. Nos. 20-03757, 20-03761,

20-03797, 20-03802, 20-03804 and 20-03743).

Plaintiff, consolidated plaintiffs, and plaintiff-intervenors (collectively,

"Plaintiffs") challenge Commerce's selection of Malaysia as the primary surrogate

country, certain surrogate values for inputs, the surrogate financial ratio

calculations, and the partial application of adverse facts available as unsupported by

substantial evidence and contrary to law. <u>See</u> Risen's Br.; JA Solar's Br.;[4] Trina's Br.;

Anji DaSol's R. 56.2 Mot.;[5] Shenzen and Wuxi's R. 56.2 Mot.;[6] Shanghai's and

Canadian Solar's Br. at 11–13.[7] Shanghai, Canadian Solar, Shenzen, Wuxi, JA Solar,

and Anji DaSol also challenge Commerce's calculation of the separate rate as

unsupported by substantial evidence and contrary to law. Shanghai's and Canadian

Solar's Br. at 5, 13; <u>see</u> Shenzen and Wuxi's R. 56.2 Mot.; Anji DaSol's R. 56.2 Mot.;

JA Solar's Br. at 8. For the following reasons, Commerce's selection of Malaysia as

---

[4] Incorporating the arguments contained in Risen's and Trina's briefs.
[5] Incorporating the arguments contained in JA Solar's Br. and arguments from other
consolidated plaintiffs common to the claims raised in Shanghai's complaint.
[6] Incorporating the arguments contained in Risen's Br., Trina's Br., JA Solar's Br.,
and Shanghai's and Canadian Solar's Br. and arguments from other consolidated
plaintiffs common to the claims raised in Risen's, Trina's, Canadian Solar's and
Shanghai's complaints.
[7] Incorporating the arguments contained in Risen's and Trina's briefs challenging the
rates received as mandatory respondents.

the primary surrogate country and its calculation of the surrogate financial ratios are sustained. Commerce's decision to value silver paste using the Malaysian import value, its valuation of Risen's EVA and backsheet, its use of partial facts available with an adverse inference to value the missing factor of production information, and its separate rate calculation are remanded for reconsideration or additional explanation consistent with this opinion.

## BACKGROUND

On March 14, 2019, Commerce initiated an administrative review of the ADD order covering Solar Cells from China for a period of review covering December 1, 2017 through November 30, 2018. Initiation of [ADD] and Countervailing Duty Admin. Reviews, 84 Fed. Reg. 9,297, 9,299 (Dep't Commerce Mar. 14, 2019) ("Initiation Notice"); see also [Solar Cells from China], 85 Fed. Reg. 7,531 (Dep't Commerce Feb. 10, 2020) (prelim. results of [ADD] admin. review and prelim. deter. of no shipments; 2017-2018) ("Prelim. Results") and accompanying Prelim. Decision Memo at 1, A-570-979, Jan. 31, 2020, PD 409 bar code 3938660-01 ("Prelim. Decision Memo.").[8] Commerce limited its individual examination to two mandatory

---

[8] On January 8, 2021, Commerce filed indices to the public and confidential administrative records underlying Commerce's Final Results. These indices are located on the docket at ECF Nos. 49-2 and 49-3. All references to documents from the public and confidential record are identified by the numbers assigned by Commerce in the January 1st indices, see ECF Nos. 49-2 & 49-3, and preceded by "PD" or "CD" to denote public or confidential documents, respectively.

respondents, Trina and Risen.  Prelim. Decision Memo. at 1–2, 4–5; <u>see also</u> Resp't

Selection Memo. at 4–5.

Commerce published the <u>Final Results</u> on October 2, 2020, selecting Malaysia

as the primary surrogate country, explaining that Malaysia is economically

comparable to China, a significant producer of comparable merchandise, and has the

best information to value the respondents' factors of production.  Final Decision

Memo. at 31; <u>Final Results</u>.  Commerce calculated the overhead, general and

administrative expenses, and profit ratios using non-proprietary financial statements

from Hanwha Q Cells ("Hanwha"), because Hanwha's financial statements identify

it as a producer of subject merchandise during the period of review, do not show

evidence of countervailable subsidies, and have been audited.  Prelim. Decision

Memo. at 27–28; Final Decision Memo. at 31, 39.  Between the <u>Preliminary Results</u>

and the <u>Final Results</u>, Commerce adjusted its surrogate financial ratios to reflect

certain financial statement notes.  Final Decision Memo. at 47; Memo Re: Allegations

of Ministerial Errors in the Final Results at 5, PD 501 bar code 4060860-01 (Nov. 2,

2020) ("Ministerial Error Memo.").

Despite Trina's and Risen's responses to numerous supplemental

questionnaires, the record was still missing factor of production information from

Trina's and Risen's unaffiliated suppliers.  Final Decision Memo. at 10.  No party

disputes that the factor of production information from the non-cooperative,

unaffiliated suppliers is missing from the record.  <u>Id.</u>  Commerce concluded that the

non-cooperative unaffiliated suppliers, Trina, and Risen failed to cooperate to the best

of their abilities, warranting the use of partial adverse facts available to fill in the

missing factor of production data.  Id.  Between April 29, 2021 and November 19,

2021 parties fully briefed the issues.[9]  On January 19, 2022 the court heard oral

argument.  See Order, Dec. 3, 2021, ECF No. 93; Closed Remote Oral Argument, Jan.

19, 2022, ECF No. 109.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff

Act of 1930, as amended,[10] 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c)

(2018), which grant the court authority to review actions contesting the final

determination in an administrative review of an ADD order.  The court will uphold

Commerce's determination unless it is "unsupported by substantial evidence on the

record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

---

[9] Def.'s Opp. To Pls.' R. 56.2 Mots. For J. Upon Agency R., Sept. 24, 2021, ECF Nos. 79, 80 ("Def.'s Br."); Pl.'s Reply Br., Nov. 5, 2021, ECF Nos. 83, 84; Reply Br. of Consol. Pls. and Pl. Intervenors [JA Solar] in Supp. of R. 56.2 Mot. for J. on Agency R., Nov. 5, 2021, ECF No. 85; Pl-Intervenor's Reply Br., Nov. 5, 2021, ECF No. 86; Reply Br. of Consol. Pl. and Pl.-Intervenor [Shanghai and Canadian Solar], Nov. 5, 2021, ECF No. 87; Pl. Trina's Reply to Def.'s Resp. to Trina's Mot. for J. on Agency R., Nov. 5, 2021, ECF No. 88; Joint Appendix, Nov. 19, 2021, ECF Nos. 89, 90.

[10] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

## DISCUSSION

### I. Selection of Malaysia as the Surrogate Country

Commerce reasonably chose Malaysia as the primary surrogate country to use in calculating normal value as record evidence supports its determination that Malaysia is economically comparable, a significant producer of comparable merchandise, and has the best data with which to value the factors of production. Commerce addresses Plaintiffs' arguments that Bulgaria is economically comparable to China and a significant producer of comparable merchandise, Romania is a significant producer of comparable merchandise, and the record evidence detracting from its determination.

When Commerce determines whether and to what extent merchandise "is being, or is likely to be sold in the United States at less than fair value," Commerce compares the "normal value" of the merchandise to the U.S. price. 19 U.S.C. § 1677b(a). Normal value is the price for which a producer or exporter sells the subject merchandise in the ordinary course of trade in its home country or, in certain circumstances, a third country. Id. § 1677b(a)(1). In a non-market economy ("NME"), Commerce bases normal value not on sales, but on "the value of the factors of production utilized in producing the merchandise . . . [together with] an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." Id. § 1677b(c)(1). Commerce shall value the factors of production "based on the best available information regarding the values of such factors in a market

economy country or countries considered to be appropriate by the administering authority." Id.  Moreover, to the extent possible, Commerce shall use "the prices or costs of factors of production in one or more market economy countries that are—(A) at a level of economic development comparable to that of the [NME] country, and (B) significant producers of comparable merchandise." Id. § 1677b(c)(4).

Commerce prefers to "value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2).  In selecting a primary surrogate country, Commerce considers (1) the potential surrogate countries' economic comparability with the NME country, (2) whether the potential surrogate countries produce comparable merchandise, (3) whether the potential surrogate countries that produce comparable merchandise are significant producers of comparable merchandise, and (4) the quality and availability of the factor of production data for the countries.  Import Admin., U.S. Dep't Commerce, [NME] Surrogate Country Selection Process, Import Administration Policy Bulletin 04.1 (Mar. 1, 2004), available at https://enforcement.trade.gov/policy/bull04-1.html (last visited Mar. 30, 2022) ("Policy Bulletin").  Economic comparability is determined by the Office of Policy Enforcement and Compliance ("Office of Policy") which assembles a list of countries that are economically comparable.  Policy Bulletin at 2; see also Memo Re: Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information at 1, PD 166 bar code 3872206-01 (July 31, 2019) ("Surrogate Value Memo.");  Prelim. Decision Memo. at 15–16; Antidumping Methodologies in

Proceedings Involving [NME] Countries, 72 Fed. Reg. 13,246, 13,246–247 (Dep't Commerce Mar. 30, 2017) (surrogate country selection and separate rates).  The statute does not define what a "significant" or "comparable" producer of subject merchandise is, but Commerce's practice is to "determine whether merchandise is comparable on a case-by-case basis" "and evaluate whether production is significant based on characteristics of, and trade in comparable merchandise."  Prelim. Decision Memo. at 16; see also Policy Bulletin at 2–3.

A country qualifies as a producer of comparable merchandise if identical merchandise is produced in the country.  Prelim. Decision Memo. at 16; see also Policy Bulletin at 2.   Where there is no evidence that a country produces identical merchandise, Commerce evaluates whether merchandise is comparable by examining the "similarities in physical form and the extent of processing or on the basis of production factors (physical and non-physical) and factor intensities."  Prelim. Decision Memo. at 16; see also Policy Bulletin at 2–3.  If more than one country is a significant producer of merchandise comparable to the subject merchandise and is economically comparable to the NME, Commerce selects "the country with the best factors data" as the surrogate country.[11]  Policy Bulletin at 4; see also Prelim. Decision Memo. at 14.  Commerce may also consider other countries on the record that are not

---

[11] In assessing the factors data Commerce's practice is to use "review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of . . . review, and publicly available data."  Policy Bulletin at 4.

economically comparable "that are significant producers of comparable merchandise if the record provides [Commerce] with adequate information to evaluate them." Surrogate Value Memo. at Att. I p. 2.

Commerce's surrogate country selection must be supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. of N.Y. v. N.L.R.B., 305 U.S. 197, 229 (1938)). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Id. at 488. In providing its explanation, Commerce must articulate a "rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962). The court will "uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp. v. Ark.-Best Freight Sys., 419 U.S. 281, 286 (1974). An agency's decision is arbitrary when, inter alia, it deviates from an established practice followed in similar circumstances and does not provide a reasonable explanation for the deviation. See Consol. Bearings Co. v. United States, 348 F.3d 997, 1007 (Fed. Cir. 2003); see also SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

Commerce selects Malaysia as the primary surrogate country because Malaysia is economically comparable to China, a significant producer of identical merchandise, and has the best factors data. Final Decision Memo. at 31. The Office

**PUBLIC VERSION**

of Policy identified Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia as

countries economically comparable to China based on per capita GNI data from the

2017 World Development Report.   Prelim. Decision Memo. 15–16; Surrogate Value

Memo. at Att. I.  Commerce determined that Malaysia, Brazil, Kazakhstan, Mexico,

Romania, and Russia are significant producers of comparable merchandise and

Malaysia as a significant producer of identical merchandise based on export data

from UN Comtrade.   Prelim. Decision Memo. at 16–17.   Commerce reasonably

explains that Malaysia has the best factors data because Malaysia is the only country

on the record that produces both solar cells and solar modules and has a complete

financial statement from a producer of both solar cells and solar modules.   Final

Decision Memo. at 31.   After examining the import data submitted by the parties,

Commerce determined that the import data for Malaysia, Brazil, Bulgaria and

Romania are publicly available, contemporaneous with the review period, represent

broad-market averages, tax- and duty-exclusive, and input specific.  Prelim. Decision

Memo. at 17.  In support of its selection of Malaysia as the primary surrogate country,

Commerce emphasizes that the surrogate data from Malaysia will contain imports of

inputs from Hanwha[12] for the purpose of the production of subject merchandise.  See

Final Decision Memo. at 31.  Furthermore, Commerce explains that the quality of the

financial statement is a significant consideration in the selection of the surrogate

---

[12] Hanwha is a large Malaysian company whose sole line of business is the production
of solar cells and solar modules.  Final Decision Memo. at 31–32.

country because Commerce relies on the financial statement to calculate the

surrogate financial ratios accounting "for over 30 percent of total normal value." Id.

Although Risen proposes an alternative, it fails to show why Commerce's

decisions are unreasonable. Commerce declined to find Bulgaria economically

comparable to China explaining Bulgaria's 2017 per capita GNI was $7,760, falling

outside of the per capita GNI range of economically comparable countries.[13] Prelim.

Decision Memo. at 15–16; see Surrogate Value Memo. at Att. I. Commerce published

the Surrogate Value Memo. on July 31, 2019 and invited interested parties to

comment on the surrogate country list and submit information to rebut, clarify, or

correct the list before August 12, 2019, explaining that the surrogate country would

be announced in the preliminary results. Surrogate Value Memo. at 1. No party

submitted the 2018 GNI data because it was not available at the time. See Resp. to

Request for Surrogate Value Information at 2, Ex. 16, PD 220, bar codes 3891946-01,

-16 (Sept. 19, 2019) ("Trina's SV Submission") (placing the 2018 GNI data on the

record. In Fresh Garlic from [China], 85 Fed. Reg. 2,400 (Dep't Commerce Jan. 15,

2020) (prelim. results, prelim. rescission and final rescission, in part, of the 24th

---

[13] Risen argues that Commerce should have considered Bulgaria economically comparable because the Office of Policy issued a new surrogate country list based on the 2018 GNI data containing Bulgaria and a majority of the review period occurred in 2018. Risen's Br. at 36. Risen points to no law or practice requiring that Commerce change the surrogate country upon receipt of a new surrogate country list from the Office of Policy.

[ADD] Admin. Review; 2017-2018) ("Fresh Garlic") and accompanying Issue and

Decision Memo. A-570-831, Jan. 8, 2020 bar code 3928012-01 ("Fresh Garlic Prelim."),

Commerce requested information and comment from parties on the potential

surrogate countries using the 2017 and 2018 GNI data on August 24, 2019 and

September 9, 2019.[14]  Fresh Garlic Prelim. at 4.  Commerce's decision to determine

economically comparable countries using the 2017 and 2018 GNI data in Fresh Garlic

is distinguishable from this review because in this review the 2018 GNI data was not

available until after the period to submit information and comments on the surrogate

country list had already closed.  Compare Surrogate Value Memo. at 1 ("Comments

on the [surrogate country] list itself and information to rebut, clarify or correct it are

due by 5:00 pm EST on August 12, 2019") with Fresh Garlic Prelim. at 4, 4 n. 26 ("On

August 28 and September 9, 2019, Commerce requested information and comments

from interested parties relating to the selection of a surrogate country" in Fresh

Garlic, placing the 2018 GNI data on the record on August 28, 2019).  Therefore,

Commerce's decision to find Bulgaria economically comparable to China in this

review is not arbitrary.

Commerce reasonably rejects Risen's and Trina's arguments that Bulgaria is

a significant producer of subject merchandise.  Commerce explains that evidence

---

[14] In Fresh Garlic, the Office of Policy provided a list of economically comparable countries based on the 2017 and 2018 GNI data and Commerce relied on both the 2017 and 2018 GNI data to select a surrogate country.  Fresh Garlic Prelim. at 4, 28. The 2018 GNI list contained Bulgaria.  Id.

showing Malaysia produced both solar cells and solar modules is vital to its selection
of Malaysia as the surrogate country. Final Decision Memo. at 31–32. The record
evidence shows that Bulgaria is not a significant producer of solar cells or solar
modules. See id. at 32. Commerce points to surveys on the record from the
International Energy Agency and the U.S. Department of Energy which did not
identify Bulgaria as a producer of solar cells or solar modules. Id. Furthermore,
Commerce points to the financial statements for New Energy Systems[15] indicating
that its "main business lines involve water heaters, boilers, collectors and trade in
heating goods" which Commerce does not consider to be comparable to solar cells and
solar modules. Id. Therefore, Commerce's determination that Bulgaria could not be
the primary surrogate country, because it is not a significant producer of comparable
merchandise, is supported by substantial evidence.

Commerce reasonably concludes that Romania is not a significant producer of
comparable merchandise. Although Commerce determined that Romania was a
significant producer of comparable merchandise in the Prelim. Results based on
export data from UN Comtrade, see Prelim. Decision Memo. at 16–17, it explains in
the Final Decision Memo. that record evidence indicates that Romania does not
produce solar cells or modules. Final Decision Memo. at 32–33 (Romania was not

---

[15] New Energy Systems is a Bulgarian company which Risen and Trina argue produce
subject merchandise. Final Decision Memo. at 31–32; see Trina's Surrogate Value
Submission at Ex. 14, PDs 232–234 bar codes 3891946-13–15 (Sept. 19, 2019).

identified as a solar cell or solar module producer in surveys by the International
Energy Association and the U.S. Department of Energy).  It is apparent from
Commerce's explanation that, to the extent possible, it preferred to select a primary
surrogate country that produced both solar cells and modules, rather than a surrogate
country that exported them.  See id. at 31.  Plaintiffs fail to explain why Commerce's
preference is unreasonable. Furthermore, despite determining that Bulgaria and
Romania were not significant producers of comparable merchandise, Commerce
reviewed available financial statements from Bulgaria and Romania on the record.
Id. at 31–32.  Commerce found that data for both countries was missing or incomplete;
therefore, the information for those countries could not constitute the best available
data.[16]  See id. at 31–33.

Although Commerce's reasoning could be clearer, it is reasonably discernible
that Commerce considered and addressed the National Renewable Energy
Laboratory's Crystalline Silicon Photovoltaic Module Manufacturing Costs and
Sustainable Pricing: 1H 2018 Benchmark and Cost Reduction Map ("NREL Report")
placed on the record by Trina.  See Final Decision Memo. at 22–23, 31, 33; see also
Trina's Rebuttal to Petitioner's Comments on the Selection of Surrogate Values at

---

[16] Commerce notes that there is no Romanian financial information on the record and
one Bulgarian financial statement from New Energy Systems.  Final Decision Memo.
at 31–33.  Commerce reviewed the Bulgarian financial statement and determined
that the English translation is incomplete and does not mention solar cells.  Id. at
31–32.

Ex. 2, PD 244, bar code 3894536-01 (Sept. 26, 2021) ("NREL Report"). Plaintiffs

contend that Commerce failed to address the NREL Report demonstrating that

Malaysian surrogate values are not the best available information because their use

results in production costs much higher than costs reported by the NREL Report both

globally and in Malaysia. Trina's Br. at 26–32; Risen's Br. at 8–14. Explaining its

decision to rely on the Malaysian import value for silver paste, Commerce states that

it "evaluated the respondents' benchmark comparisons and finds them

unpersuasive." Final Decision Memo. at 22. Commerce elaborates by addressing

each benchmark placed on the record, one of which is the NREL Report. Id. at 23.

Commerce again references the NREL Report in its explanation regarding the quality

of the available data. Id. at 32 ("we are similarly unconvinced by Risen's and Trina's

other contentions that the data of Bulgaria or Romania are of higher quality"

explaining that the NREL Report emphasizes the importance of polysilicon as an

input). It is discernible from Commerce's explanation that it reviewed and considered

the NREL Report, yet when viewing the record as a whole, selected Malaysia because

it had the best available data.

The alleged unreliability of the Malaysian import value for silver paste does

not render Commerce's selection of Malaysia as the primary surrogate country

unreasonable. Trina argues that the value for silver paste is unreliable, a factor

weighing against selecting Malaysia as the primary surrogate country. Trina's Br.

at 38. Commerce explains that there are over 200 inputs involved in the production

of the subject merchandise and the Malaysian data was superior to other data on the

record.   See Final Decision Memo. at 31.   It is reasonably discernable from

Commerce's explanation that Commerce bases its primary surrogate country

selection on the overall quality and availability of the data, rather than data for an

individual input.  See id.

The statute and Commerce's regulation support its selection of Malaysia

despite the alleged unreliability of silver paste.  Both allow Commerce to select a

primary surrogate country that is appropriate for most of the inputs and select

additional surrogate countries if data from the primary surrogate country is

unreliable or unavailable.  See 19 U.S.C. § 1677b(c)(2)(B); 19 C.F.R. § 351.408(c)(1).

Although the Malaysian import value for silver paste may be unreliable, all parties

agree that silver paste is a relatively minor input for the subject merchandise.  Final

Decision Memo. at 31; Trina's Br. at 20–21; Risen's Br. at 10.  Therefore, in this case,

it would not be unreasonable for Commerce to select a primary surrogate country and

select another surrogate country for silver paste.  See SolarWorld Americas, Inc. v.

United States, 962 F.3d 1351 (Fed. Cir. 2020) (upholding Commerce's primary

surrogate country selection but remanding due to the aberrancy of one input).

Indeed, Commerce reasonably relies on a secondary surrogate country to value solar

glass, explaining that Romania's HTS classification was more specific than Malaysia's HTS classification.[17]  Final Decision Memo. at 26–27.

## II.   Surrogate Values

Plaintiffs challenge Commerce's surrogate value for silver paste, EVA and backsheet.  Plaintiffs argue that the Malaysian import value for silver paste is not the best available information to value silver paste because it is unreliable.  Trina's Br. at 18–25; Risen's Br. at 8–28.  Risen argues that Commerce's Malaysia HTS valuation of its EVA and backsheet are not supported by substantial evidence and arbitrary.  Risen's Br. at 32–35.  Defendant argues that the Malaysian import value for silver paste is the best available information to value silver paste because Commerce values factors of production from a single surrogate country unless the data is unavailable or unreliable and the Malaysian value is not aberrant or unreliable.  Def.'s Br. at 33–39. Defendant argues that Commerce's valuation of EVA and backsheet is not arbitrary and is supported by substantial evidence.  Id. at 27–30.  For the following reasons, the court remands Commerce's surrogate values for silver paste, backsheet, and EVA for reconsideration or further explanation consistent with this opinion.

---

[17] Plaintiffs argue that Bulgaria should have been selected as the primary surrogate country because it has the best input data for solar glass.  Trina's Br. at 36; Risen's Br. at 38.  Commerce explains that Bulgaria is not economically comparable, does not have a producer of subject merchandise, and the financial statement on the record is incomplete.  Final Decision Memo. at 31–32.

Consol. Court No. 20-03743                                           Page 21
**PUBLIC VERSION**

A.    **Silver Paste**

Plaintiffs challenge Commerce's decision to rely on the Malaysian import value for silver paste arguing the import value is unreliable because it is aberrant, does not reflect the commercial reality of solar cell and module production in China, and the Malaysia HTS classification is not specific to silver paste.  See Risen's Br. at 8–28; Trina's Br. at 18–25.  Defendant argues that Commerce's choice of the Malaysian import value for silver paste is reasonable.  Def.'s Br. at 33–39.

Commerce values the factors of production from the primary surrogate country and resorts to a secondary surrogate country only if data from the primary surrogate country is unavailable or unreliable.   19 C.F.R. § 351.408(c)(1)–(2).   Commerce disregards aberrational data because it is unreliable.   Antidumping and Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997) (final rule) ("We agree that 'aberrational' surrogate input values should be disregarded," citing as an example Certain Cased Pencils from [China], 59 Fed. Reg. 55,625, 55,630 (Dep't Commerce Nov. 8, 1994) (final deter. of sales at less than fair value) (disregarding Indian input values because they were aberrational, valuing the inputs with Pakistani import statistics)).   In determining whether an input's surrogate value is aberrational, Commerce "typically compares the prices for an input from all countries found to be at a level of economic development comparable to the NME whose products are under review from the [period of review] and prior years." Final Decision Memo. at 21.  Commerce disregards "small-quantity import data . . .

Consol. Court No. 20-03743                                                    Page 22
**PUBLIC VERSION**

when the per-unit value is substantially different from the per-unit values of larger

quantity imports of that product from different countries." <u>SolarWorld</u>, 962 F.3d at

1358.

Commerce fails to provide a sufficient justification for its conclusion that the

Malaysian import value for silver paste is reliable in light of detracting evidence that

the value is aberrant.  UN Comtrade Import Data for HTS 711590 for each of the

economically comparable potential surrogate countries identified by Commerce is

reproduced below.  <u>See</u> Risen Rebuttal Surrogate Values at SVR-2, PDs 242–243 bar

codes 3894478-01, -02 (Sept. 26, 2019) ("Risen's SV Rebuttal"); Risen's Br. at 13; Final

Decision Memo. at 22 n.91 ("Percentage of Total Quantity" and "Total" calculated by

the court).

| Country | Trade Value (USD) | Total Import Quantity (KG) | Average Import Value (USD/KG) | % of Total Quantity |
|---------|-------------------|----------------------------|-------------------------------|---------------------|
| Mexico | 42,909,979.00 | 320,755 | 133.78 | 83.54% |
| Malaysia | 478,950,097.00 | 56,578 | 8,645.31 | 14.73% |
| Brazil | 336,519.00 | 6,179 | 54.46 | 1.61% |
| Kazakhstan | 76,862.00 | 347 | 221.50 | 0.09% |
| Russia | 632,695.00 | 106 | 5,968.82 | 0.03% |

Consol. Court No. 20-03743                                    Page 23
**PUBLIC VERSION**

| Romania | No import quantity | | | |
|---|---|---|---|---|
| Total | 522,906,152.00 | 383,965 | | 100% |

Commerce explains that although the Malaysian import value for silver paste is higher than other countries on the record, it is not aberrant because it is comparable to the Russian import value of silver paste. Final Decision Memo. at 21. However, the Russian data is the smallest quantity of import data on the record (.03%) and its per-unit value ($5,968.82/KG) is substantially higher than the per-unit value of three other countries with larger import quantities (Mexico, Brazil, and Kazakhstan). Commerce cannot rely upon the Russian import value for silver paste as that value itself represents a small-quantity, large per-unit seemingly aberrational value. See SolarWorld, 962 F.3d at 1358. Nor can Commerce rely on the Malaysian historical import value data it placed the record to support its determination because it failed to provide parties an opportunity to submit factual information in response to that data. See 19 C.F.R. § 351.301(c)(4). Although Defendant correctly asserts that Commerce may place information on the record at any time, Def.'s Br. at 37, Commerce is required to provide parties with an "opportunity to submit factual information to rebut, clarify, or correct factual information placed on the record of the

proceeding by [Commerce] by a date specified by the Secretary."[18] 19 C.F.R.

§ 351.301(c)(4).  Commerce placed the historical import value data on the record after

the record closed and did not reopen the record, denying the parties an opportunity

to submit information to rebut, clarify, or correct the information.[19]  See id.

§ 351.302(d) (explaining Commerce will reject untimely filed information); Id.

Appendix IV to Part 351.  If Commerce wishes to continue using the historical import

value data on remand, it can reopen the record for parties to place additional

information on the record rebutting, clarifying, or correcting the historical import

---

[18] Risen argues it was improper for Commerce to place the historical import value data on the record.  Risen's Br. at 19–20.  Risen is incorrect.  See 19 C.F.R. § 351.301(c)(4).

[19] 19 C.F.R. Appendix IV to Part 351 provides the approximate deadlines for parties in antidumping administrative reviews; however, the actual deadline for a review segment may be set by the Secretary.  19 C.F.R. Appendix IV to Part 351 at n.1. Commerce required parties to place surrogate value information on the record for consideration in the Preliminary Results by September 9, 2019 and rebuttal comments by September 16, 2019.  Surrogate Value Memo. at 2.  Commerce placed the historical Malaysian silver paste import values on the record in conjunction with the Preliminary Results on January 31, 2020 and did not reopen the record for the submission of additional factual information.  See Factor Valuation Memo. at Att. I, PR 426 bar code 3939852-01 (Jan. 31, 2020).  Contrary to Defendant's argument, in this case, the interested parties could not have adequately responded to the historical Malaysian import value data placed on the record by Commerce in their agency briefs unless Commerce reopened the record and allowed parties to place rebuttal information on the record to aid in their response.

value data placed on the record by Commerce, consistent with its regulation.[20]  Id.
§ 351.301(c)(4).

Commerce also fails to provide a sufficient justification for its conclusion that

the Malaysian import value for silver paste is reliable in light of detracting evidence

that the value is not reflective of the commercial reality of solar cell and module

production.  Commerce's "surrogate value must be as representative of the situation

in the NME country as is feasible" and result in a dumping margin as accurate as

possible.  Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir.

1999) (quoting Nation Ford Chem. Co. v. United States, 21 C.I.T. 1371, 1375–76

(1997).  Plaintiffs placed several benchmark metrics on the record which they argue

demonstrate that the Malaysian import value for silver paste is inconsistent with

import values from other market economies.  See Trina's Section D Questionnaire

Appendix XII Resp. at Ex. D-6, PD 157–158 CD 112–132 bar codes 3855927-01,-02,

3855903-01–17, 3856027-01–04 (July 1, 2019) ("Trina's DQR") (providing information

on Trina's market economy purchases of silver paste during the period of review);[21]

NREL Report at 37; Risen's SV Rebuttal at Ex. SVR-2 (the Turkish import value for

---

[20] In relying on the Malaysian historical import value for silver paste, Commerce also
fails to address the possibility that when compared to other countries, the Malaysian
import value for silver paste is regularly aberrant.  On remand, if Commerce wishes
to continue to rely on the Malaysian import value to value silver paste, it should
explain why the historical and present Malaysian import value data are not regularly
aberrant when compared to other countries on the record.
[21] Trina purchased [[          ]] KG of silver paste at a price of [[          ]] USD/KG.
Trina's DQR at Ex. D-6.

the period of review is $214.76 USD/KG and the Bulgarian import value for the period

of review is $390.27 USD/KG) (collectively, "Benchmark Data"). Commerce explains

why it declines to value silver paste using each of the benchmark data sets on the

record but it does not explain why, when considered collectively, these benchmark

data sets do not indicate the Malaysian import value for silver paste is unreliable.[22]

See Final Decision Memo. at 22–23.

Furthermore, Commerce's rationale for rejecting the NREL Report benchmark

data for silver paste is not supported by substantial evidence. The NREL Report

demonstrates that the screen-printing of silver and aluminum paste ("metallization")

cost for monocrystalline PERC cell fabrication in urban China accounts for 24% of the

total cost for cell conversion, or $0.015 ± $0.002/watt. Id. Metallization costs range

from $0.013 and $0.049 across all solar cells studied by the NREL Report. Id. at 37.

The silver paste costs using Malaysian data are multiples higher than the combined

metallization costs reflected in the NREL report.[23] Commerce explains it declined to

rely on the NREL Report to assess the reasonableness of the Malaysian import value

---

[22] Excluding the Malaysian and Russian import values for silver paste, the remaining import values of silver paste on the record range from $54.56 (Brazil) to $792.84 (Thailand). Benchmark Data; Final Decision Memo. at 22 n.91.
[23] Using the Malaysian import value for silver paste, Commerce calculated Risen's and Trina's silver paste costs at [[          ]] and [[          ]] per watt respectively. Risen's
Br. at 13; Trina's Br. at 22; see also Amended Final Analysis Memorandum-Trina, PD 502 CD 494–496 bar code (Dec. 2, 2020). The silver paste cost accounts for [[          ]] of Risen's manufacturing costs and [[          ]] of Trina's material costs. Risen's Br. at 13; Trina's Br. at 24.

**PUBLIC VERSION**

for silver paste because the NREL Report "groups the silver paste costs with many

other costs." Final Decision Memo. at 23. However, the NREL Report combines the

cost of silver paste with one other cost: the cost of aluminum paste.[24]  NREL Report

at 26. Combining the cost of silver and aluminum paste leads to a cost greater than

the cost of silver paste alone, resulting in an overestimation of the cost of silver paste

in the NREL Report. See Oral Argument at 32:30–35:45; see also Risen's Br. at 11–

15; NREL Report at 5–6 (explaining variable costs are calculated based on standard

accounting practices). The court cannot discern why Commerce believed that it was

reasonable to disregard the NREL Report's metallization cost as a benchmark if the

benchmark overestimates the value of silver paste, and the values used by Commerce

are multiples higher than the NREL Report's value.

Finally, Commerce fails to address Risen's argument that its reliance on

Malaysia HTS 7115.90.10.00 covering other articles or catalysts of gold or silver is

improper because it is not specific to silver paste. In its agency brief, Risen argued

that Malaysia HTS 7115.90.10.00 is not a reasonable classification for silver paste

because it is too broad. Risen's Admin. Br. at 3. Commerce does not address this

argument in the Final Decision Memo. On remand, if Commerce wishes to continue

---

[24] The NREL Report and record evidence show that silver paste accounts for a
majority of the combined cost of silver and aluminum pastes. See NREL Report at
26 (77% of the metallization costs for monocrystalline PERC cell fabrication in urban
China is due to silver paste and 23% is due to aluminum paste); see also Risen's
Admin Br. at 14–15; Risen's Br. at 13–14.

**PUBLIC VERSION**

to rely on the Malaysian import value for silver paste, Commerce should explain why

its decision to do so is reasonable in light of Risen's specificity argument.

### B. Backsheet and Ethyl Vinyl Acetate

Risen argues that Commerce's choice of Malaysia HTS classifications to value

its backsheet and EVA inputs are not supported by substantial evidence because

Commerce based its choice in both instances on an "unsubstantiated difference

between the flexibility of a 'film' or a 'sheet.'" Risen's Br. at 32–35. Risen also argues

that these determinations are arbitrary because they deviate from Commerce's prior

treatment of identical inputs without an adequate explanation. Id. Defendant argues

that Commerce's determinations are supported by substantial evidence and not

arbitrary because Commerce based its determinations on the inputs, Risen's

descriptions, and the available HTS subheadings. Def.'s Br. at 27–28. For the

following reasons, Commerce's valuations for backsheet and EVA are remanded for

reconsideration or additional explanation consistent with this opinion.

Substantial evidence is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." Universal Camera Corp., 340 U.S. at 477

(quoting Consol. Edison Co., 305 U.S. at 229). "The substantiality of evidence must

take into account whatever in the record fairly detracts from its weight." Id. at 488.

In providing its explanation, Commerce must articulate a "rational connection

between the facts found and the choice made." Burlington, 371 U.S. at 168. An

agency's decision is arbitrary when, inter alia, it deviates from an established practice

**PUBLIC VERSION**

followed in similar circumstances and does not provide a reasonable explanation for

the deviation.  See Consol. Bearings Co., 348 F.3d at 1007; see also SKF USA Inc, 263

F.3d at 1382.

Commerce's use of Malaysia HTS 3920.62.1000 to value Risen's backsheet is

arbitrary and not supported by substantial evidence.  Commerce values Risen's

backsheet using Malaysia HTS 3920.62.1000 covering Poly(Ethylene Terephthalate):

Plates And Sheets.  Final Decision Memo. at 46.  In support of its determination,

Commerce explains that the purpose of backsheet is "to protect solar cells in a solar

module."  Id.  Since film is a "lighter, less rigid product than plates and sheets"

treating Risen's backsheet as a film is improper because film is not protective.  Id.

Risen placed evidence on the record demonstrating that its backsheet input is thin

and flexible.[25]  Risen's Section D Resp. at Ex. D-36, PD 160 CD 134 bar codes 3856982-

01, 3856915-14 (July 3, 2019) ("Risen's Section D Resp.").  Commerce does not address

the evidence placed on the record by Risen or explain why its determination is

reasonable in light of the evidence showing that Risen's backsheet satisfies

Commerce's definition of film.  To the extent that Commerce wishes to continue

valuing Risen's backsheet using Malaysia HTS 3920.62.1000, Commerce should

address the record evidence detracting from its determination.

---

[25] Risen's backsheet is [[        ]] mm thick and sold in rolls.  Risen's Section D Resp.
at Ex. D-36, PD 160 CD 134 bar codes 3856982-01, 3856915-14 (July 3, 2019).

Commerce's determination is also arbitrary. Risen proffered evidence that Commerce has historically valued backsheet under HTS classifications comparable to Malaysia HTS 3920.62.9000 covering Of Poly(Ethylene Terephthalate): Other Than Plates And Sheets and that Risen's backsheet is the same as the backsheet used by respondents in past reviews. Risen Final Surrogate Value Submission–Part I at Ex. SV2-7, PD 365 bar code 3926048-03 (Jan. 1, 2020) ("Risen's Final SVs Part I"). Commerce addresses Risen's argument in passing, stating "Risen's reference to a prior SV selection does not outweigh the record evidence showing that the input is a sheet," Final Decision Memo. at 46, yet Commerce does not explain how the record as a whole supports its determination that backsheet is a sheet. Absent an explanation for Commerce's deviation from its historical treatment of backsheet, Commerce's determination is arbitrary. If Commerce wishes to continue valuing backsheet using Malaysia HTS 3920.62.1000 on remand, it should explain its departure from its historical treatment.

Commerce fails to support its valuation of Risen's EVA with substantial evidence. Commerce values Risen's EVA input using Malaysia HTS 3920.10.1900 covering Polymers of Ethylene: Plates And Sheets: Other Than Rigid. In support of this determination Commerce explains that it considers Risen's EVA a sheet rather than a film because it is over .5mm thick and sheets and plates are thicker and more rigid than film. Id. Commerce's explanation fails to address record evidence submitted by Risen demonstrating that the product is flexible and described as a film.

**PUBLIC VERSION**

Risen Final Surrogate Value Submission–Part II at Ex. SV2-12 PD 374, CD 412

barcodes 3926074-01, 3926060-01 (Jan. 2, 2020) ("Risen's Final SVs Part II").  On

remand, if Commerce wishes to continue valuing Risen's EVA using Malaysia HTS

3920.10.1900, it should address the evidence detracting from its determination and

explain its departure from its historical treatment of EVA.[26]  <u>See</u> Risen Final SVs

Part I at Ex. SV 2-7.

## III.  Surrogate Financial Ratios

Although Commerce's reasoning could be clearer, its surrogate financial ratio

calculations are supported by substantial evidence, consistent with its practice, and

do not double count labor and energy costs.  Plaintiffs argue that the proportion of

Hanwha's cost of sales currently allocated to materials, labor, and energy ("MLE")

only includes costs for raw materials.  Risen's Br. at 28–30.  Therefore, Commerce's

allocation of the remaining cost of sales amount to overhead rather than to MLE costs

fails to allocate any line item costs for labor and energy to the MLE costs, inflating

overhead expenses and distorting the overhead ratio.  <u>Id.</u> at 30–32.  Plaintiffs argue

that Commerce's allocation to overhead is contrary to Commerce's practice and the

financial statement notes accompanying Hanwha's financial statement.  <u>Id.</u> Further

they argue, as a result of Commerce's allocations, Commerce double counts energy

---

[26] Defendant provides several reasons supporting Commerce's deviation from its historical treatment of backsheet and EVA in its brief.  Def.'s Br. at 30–32.  Those reasons are absent from Commerce's Final Decision Memo., <u>see</u> Final Decision Memo. at 46, and the court will not rely on them.

and labor costs by including labor and energy costs in both the numerator of the

overhead ratio and as separate factors of production.  Id. at 30–32.  Defendant argues

that Commerce's surrogate ratio calculations are consistent with the notes of the

financial statement and that Commerce's MLE costs include both labor and energy

costs.  Def.'s Br. at 39–43.  Defendant further contends that Commerce enjoys broad

discretion to select its methodology to calculate surrogate financial ratios and

Plaintiffs have failed to demonstrate that Commerce has a consistent practice of

excluding energy and labor costs from the factors of production under these

circumstances.  Def.'s Br. at 43.  For the following reasons, Commerce's surrogate

ratio calculations are sustained.

In antidumping investigations and reviews involving NME countries

Commerce determines "the normal value of subject merchandise on the basis of the

value of the factors of production utilized in producing merchandise and to which

shall be added an amount for general expenses and profit plus the cost of containers,

coverings, and other expenses."  19 U.S.C. § 1677b(c)(1)(B).  "[T]he factors of

production utilized in producing merchandise include, but are not limited to— (A)

hours of labor required, (B) quantities of raw materials employed, (C) amounts of

energy and other utilities consumed, and (D) representative capital cost, including

depreciation."  Id. § 1677b(c)(3).  For the purpose of determining the normal value of

subject merchandise, "the Secretary normally will use non-proprietary information

gathered from producers of identical or comparable merchandise in the surrogate

country" when calculating the manufacturing overhead, general expenses, and profit amounts. 19 C.F.R. § 351.408(c)(4).

Here, Commerce uses solar cell and module producer Hanwha's financial statement to value general expenses, profit, and representative capital costs using surrogate financial ratios. See Final Decision Memo. at 47–49. Commerce uses manufacturing, labor, and energy ("MLE") costs as part of the denominator in its calculation of the overhead ratio, the sales, general, and administrative costs ("SG&A") ratio, and the profit ratio.[27] Id. Commerce explains that it is relying on the total inventories cost identified in Note 17 of the financial statement to calculate MLE. Id. Note 17 identifies the total inventories cost as "RM 1.648 million (2017: RM2,142 million)."[28] See Risen Final Surrogate Value Submission–Part I at Ex. SV2-8 at 51, PD 365 bar code 3926048-03 (Jan. 1, 2020) ("Hanwha Financial Statement"); Final Decision Memo. at 47–48. Commerce points to the language in Note 2.12 explaining that it relied in part on the valuation of finished inventory and work-in-progress inventory as evidence that labor and energy costs are included in the

---

[27] Commerce calculates the overhead ratio as overhead costs/(MLE + change in inventory). It calculates the SG&A ratio as total SG&A/(total MLE-traded goods + manufacturing overhead). Final Decision Memo. at 49. The profit ratio is profit/(MLE + manufacturing overhead – change in finished goods + SG&A). Id.

[28] In the preliminary results, Commerce constructed Hanwha's MLE cost by reducing the entire amount of the cost of sales line of Hanwha's Financial Statement by the deductions listed in Note 9 of Hanwha's financial statements to arrive at a raw materials cost. Final Decision Memo. at 47. Commerce then added labor and energy costs. Id. Commerce explains that its preliminary MLE cost failed to take Note 2.12 and Note 17 from Hanwha's financial statement into account. Id.

**PUBLIC VERSION**

valuation of these inventories.  Id. at 47; Ministerial Error Memo. at 5.  Commerce's

reliance is reasonable because Hanwha's financial statement indicates that it is

prepared in accordance with International Financial Reporting Standards ("IFRS").[29]

See Hanwha Financial Statement at 16 ("The financial statements . . . have been

prepared in accordance with Malaysian Financial Reporting Standards ("MFRS"),

[IFRS] and the Companies Act 2016 in Malaysia").  IFRS Standard IAS 2[30] requires

that IFRS-compliant financial statements expense all variable costs in the cost of

inventory.    International Financial Reporting Standards Foundation, IAS 2

Inventories, About,  https://www.ifrs.org/issued-standards/list-of-standards/ias-2-

inventories/ (last accessed Mar. 30, 2022).[31]  Thus, the court can reasonably discern

from Commerce's citation to both Notes 2.12 and 17 that Commerce believes that

because Hanwha's financial statement is compliant with IFRS, it must include labor

---

[29] IFRS "is a not-for-profit international organization responsible for developing a single set of high-quality accounting and sustainability disclosure standards" ("IFRS Standards" or "IFRS Standard") to promote transparency, accountability and efficiency in global financial markets.  International Financial Reporting Standards Foundation, About Us, https://www.ifrs.org/about-us/ (last accessed Mar. 30, 2022).

[30] "IAS 2 provides guidance for determining the cost of inventories and the subsequent recognition of the cost as an expense. . . . The cost of inventories includes all costs of purchase, costs of conversion (direct labour and production overhead) and other costs incurred in bringing the inventories to their present location and condition." International Financial Reporting Standards Foundation, IAS 2 Inventories, About, https://www.ifrs.org/issued-standards/list-of-standards/ias-2-inventories/ (last accessed Mar. 30, 2022).

[31] Commerce selected Hanwha's financial statement in part because it had been audited.  Prelim. Decision Memo. at 27–28.  The audit confirmed that Hanwha's financial statement complied with IFRS Standards.  Hanwha Financial Statement at 6.

and energy costs in inventories cost.[32]  IAS 2; <u>see</u> Final Decision Memo. at 47–48;

<u>compare</u> IAS 2 <u>with</u> Hanwha Financial Statement at 29 (significant linguistic

overlap).  After determining that the inventories cost included MLE costs, Commerce

reduced the inventories cost by the change in finished goods inventories, isolating the

MLE costs and included them as part of the denominator of the surrogate financial

ratios.[33]  Final Decision Memo. at 48.  Having accounted for MLE, depreciation, and

the change in finished goods balance, Commerce reasonably allocated the remaining

amount of the cost of sales balance to overhead.

Plaintiffs argue that Commerce double counts labor and energy costs by

including labor and energy costs in the overhead ratio's numerator and separately

valuing labor and energy as factors of production when calculating normal value.

Risen's Br. at 30–32.  Plaintiffs contend that when energy or labor costs are not

specifically broken out in the financial statement and assigned to the MLE

denominator, Commerce does not separately value labor and energy in the factors of

production because they are accounted for in the numerator of the overhead financial

---

[32] Note 2.12 further explains Hanwha's calculation of costs associated with "bringing the inventories to their current location or condition," includes labor and energy costs. Hanwha Financial Statement at 29.

[33] To isolate the MLE costs for inventories produced and sold in 2018, Commerce reduced the inventories costs included in the cost of sales by the decrease in finished goods balance.  <u>See</u> Final Decision Memo. at 48.  The decrease in finished goods balance is the difference between the finished goods beginning balance (valued at both cost and net realizable value) and the finished goods ending balance (valued at both cost and net realizable value).  <u>See</u> <u>id.</u>  No party disputes the downward adjustment for finished goods.

**PUBLIC VERSION**

ratio.[34] Id. Yet Plaintiffs' argument assumes that Commerce did not isolate the labor

and energy costs and account for them in the MLE denominator when calculating the

surrogate financial ratios. However, Commerce explains that it isolates the labor and

energy costs using the notes in Hanwha's Financial Statement and includes those

costs in the surrogate ratios' denominator. Final Decision Memo. at 48; Ministerial

Error Memo. at 5. Since Commerce isolates and removes the MLE costs from

Hanwha's cost of sales before calculating the surrogate financial ratios, labor and

energy costs are not included in total overhead and thus are not included in the

---

[34] Hand Trucks and Certain Parts Thereof From [China], 80 Fed. Reg. 33,246 (Dep't Commerce June 11, 2015) (Final Results of [ADD] Admin. Review and Rescission of Review in Part; 2012-2013) and accompanying Issues and Decision Memo. at 8, A-570-891, June 4, 2015, bar code 3282119-01 ("it is the Department's recent practice to set energy factors of production inputs to zero if there is not a separate line item for energy factors on the financial statements"); [Solar Cells from China], 83 Fed. Reg. 35,616 (Dep't Commerce July 27, 2018) (final results of [ADD] admin. review and final deter. of no shipments; 2015–2016) and accompanying Issues and Decision Memo. at 47, A-570-979, July 11, 2018, bar code 3729972-01 ("if Commerce valued a respondent's FOPs, including energy, and calculated financial ratios using energy costs (because they could not be removed from the surrogate company's expenses), it would be double counting energy expenses."); 1,1,1,2-Tetrafluroethane From [China], 79 Fed. Reg. 30,817 (Dep't Commerce May 29, 2014) ([ADD] investigation, prelim. deter. of sales at less than fair value, affirmative prelim. deter. of critical circumstances, in part, and postponement of final deter.) and accompanying Issues and Decision Memo. at 22, A-570-998, May 21, 2014, bar code 3203506-01 ("Here, we will not disregard energy or labor in the normal value calculation because, except for depreciation, all of Thai-Japan's cost of sales is treated as material, labor and energy in the surrogate financial ratio calculation, therefore, we are not double counting these expenses when we include energy and labor in our normal value calculation").

numerator of the overhead ratio.[35]  Therefore, the inclusion of labor and energy costs

in the factors of production does not double count the labor and energy costs and is

consistent with the determinations cited by Plaintiffs.

## IV.    Application of Partial Adverse Facts Available

Commerce's use of facts available with an adverse inference is unsupported by

substantial evidence.  Commerce fails to demonstrate that Risen and Trina did not

cooperate to the best of their ability.  Commerce also fails to demonstrate that Risen

and Trina have leverage to induce the cooperation of their non-cooperative

unaffiliated suppliers; the non-cooperative unaffiliated suppliers are evading their

own duties by exporting subject merchandise through Risen and Trina; or using the

highest factor of production consumption rates on the record results in an accurate

dumping margin.  Commerce's application of facts available with an adverse

inference is remanded for reconsideration or additional explanation consistent with

this opinion.

When Commerce is missing information necessary to make an ADD

determination, it uses facts otherwise available to fill the gap in the record created

---

[35] Commerce calculates total overhead by subtracting total MLE costs from the cost of sales line from Hanwha's Financial Statement.  Final Decision Memo. at 48. Commerce calculates the overhead ratio by dividing total overhead by the sum of MLE and the change in inventory.  Id. at 49.  Overhead is a representative capital cost; thus, if Commerce could not isolate the MLE costs, those costs would be accounted for in both the factors of production for amounts of energy and other utilities consumed and representative capital cost.  See 19 U.S.C. § 1677b(c)(3); 19 C.F.R. § 351.408(c).

**PUBLIC VERSION**

by the missing information.  See 19 U.S.C. § 1677e(a); <u>Nippon Steel Corp. v. United States</u>, 337 F.3d 1373, 1380–81 (Fed. Cir. 2003).  If a gap exists because a party failed to cooperate to the best of its ability, Commerce may use an adverse inference when selecting facts available to fill the gap.  19 U.S.C. § 1677e(b).  A party cooperates to the best of its ability when it does "the maximum it is able to do."  <u>Nippon</u>, 337 F.3d at 1380–81 (Fed. Cir. 2003).  However, under 19 U.S.C. § 1677e(a) Commerce may use adverse inferences against a cooperative respondent, if doing so will yield an accurate rate, promote cooperation, and thwart duty evasion.  <u>Mueller Comercial De Mexico v. United States</u>, 753 F.3d 1227, 1232–36 (Fed. Cir. 2014).  When using facts available with an adverse inference under <u>Mueller</u>, the predominant interest when determining the antidumping rate must be accuracy.  <u>Id.</u> at 1235.

Commerce fails to demonstrate that Trina and Risen did not put forth the maximum effort to provide full and complete responses to inquiries from Commerce.  Risen placed evidence on the record demonstrating that it contacted each of its non-cooperative unaffiliated suppliers on at least two occasions asking them to provide the factor of production data and threatening to cease doing business with the suppliers if they failed to cooperate.  Risen's Section D Resp. at Ex. D-21.  Risen also sent the factor of production questionnaires issued by Commerce to the non-cooperative unaffiliated suppliers.  <u>Id.</u>  Further attempting to induce the cooperation of the non-cooperative unaffiliated suppliers, Risen offered to provide the non-cooperative unaffiliated suppliers access to Risen's legal and accounting teams.  <u>Id.</u>

Trina placed evidence on the record that it began making formal written requests to

its non-cooperative unaffiliated suppliers requesting their cooperation in supplying

the factor of production data in May 2019. Trina's Section D Questionnaire Resp. at

Ex. D-2, CD 112-132 bar code 3855903-01 (July 1, 2019) ("Trina's Section D. Resp.").

Trina subsequently made several additional requests for the non-affiliated suppliers'

cooperation via letter and telephone. Id.

      Commerce fails to demonstrate that Trina and Risen did not cooperate to the

best of their ability by continuing to do business with the non-cooperative unaffiliated

suppliers. Commerce argues that Trina's supplier relationships are longstanding and

although it does not know the length of the relationships between Risen and its

suppliers, it is unlikely that all the relationships are new. Final Decision Memo. at

12. Commerce further argues that there is no record evidence showing that Trina or

Risen have followed through with threats to end relationships with unaffiliated

suppliers who were uncooperative in prior reviews.[36] Id. Commerce's argument

assumes, without evidence, that the non-cooperative unaffiliated suppliers in the

---

[36] Commerce states that "neither Trina or Risen have cited to one instance where they stopped doing business because parties refused to provide them with [factors of production]." Final Decision Memo. at 16. Yet, none of Commerce's questionnaires to Trina and Risen asked either respondent to provide such evidence. The best of its ability standard requires a respondent to "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." Nippon, 337 F.3d at 1382. Commerce may not determine that a respondent failed to cooperate to the best of its ability because it did not provide information that Commerce did not request.

present review are the same suppliers who were uncooperative in prior reviews.  <u>Id.</u>

Commerce must support its determinations with substantial evidence on the record.

Commerce could have, but did not, issue questionnaires asking respondents to

provide Commerce with a list of non-cooperative unaffiliated suppliers from past

reviews and compared it to a list of current non-cooperative unaffiliated suppliers to

determine if there is any overlap.  <u>See</u> <u>id.</u> at 15 n.57.

     Commerce also fails to show that Trina or Risen have sufficient leverage to

induce the cooperation of their non-cooperative unaffiliated suppliers and has not

shown that there is a threat of duty evasion by the non-cooperative unaffiliated

suppliers absent the use of facts available with an adverse inference.  Commerce

asserts that Trina and Risen had leverage over their non-cooperative unaffiliated

suppliers because they were large exporters to the U.S. and could threaten to cease

doing business with the non-cooperative unaffiliated suppliers in order to induce their

cooperation.  <u>Id.</u> at 14–15.  Indeed, record evidence shows that Trina and Risen did

make such threats and those threats did not induce the cooperation of the suppliers.

Risen's Section D Resp. at Ex. D-21 p. 14 ("if your company refuse [sic] to cooperate

by providing the requested data, Risen would be forced to refuse to purchase any

products from your company"); Trina's Section D Resp. at Ex. D-2 ("your cooperation

is significantly important both for our response to the antidumping duty

administrative review as well as our long-term business relationship").

Nor has Commerce shown a possibility of duty evasion by the non-cooperative unaffiliated suppliers. Commerce speculates that the suppliers' consumption rates may be higher than Risen's and Trina's rates; therefore, by withholding information, the non-cooperative unaffiliated suppliers will not receive a separate rate and can sell their merchandise through Risen and Trina. Final Decision Memo. at 13–14. The record does not support Commerce's speculation. None of the non-cooperative unaffiliated suppliers are mandatory respondents or named Chinese exporters of subject merchandise; therefore, there is no rate for the non-cooperative unaffiliated suppliers to evade. Mueller, 753 F.3d at 1235 ("here is the possibility that Ternium could evade its own AFA rate of 48.33 percent by exporting its goods through Mueller if Mueller were assigned a favorable dumping rate.") Compare Initiation Notice 84 Fed. Reg. at 9,299 (listing named Chinese exporters to be reviewed) with Risen's Section A Questionnaire Resp. at Exs. A-14 & A-15, PD 130 CD 54 bar code 3846332-01 (June 10, 2019) (listing unaffiliated solar cell and solar module suppliers); Trina's DQR at Ex. DA-36 (listing Trina's non-cooperative unaffiliated suppliers). Finally, Commerce fails to explain why the use of the highest factor of production consumption rates result in a more accurate dumping margin. Mueller, 753 F.3d at 1232–33.

On remand, if Commerce wishes to use facts available with an adverse inference, Commerce should address the evidence detracting from its determination that Trina and Risen have leverage over their non-cooperative suppliers and support

their speculation of duty evasion with substantial evidence from the record. Commerce should also explain how the adverse facts it selected lead to an accurate dumping margin.

## V.    **Commerce's Separate Rate Calculation**

Commerce's determination in the <u>Final Results</u> to apply the weighted-average antidumping margins calculated for Risen and Trina to the separate rate respondents is not supported by substantial evidence. The separate rate is "the weighted average of the estimated weighed average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins and any margins determined entirely under [19 U.S.C. § 1677e]." 19 U.S.C. § 1673d(c)(5)(a); <u>see also</u> <u>Final Results</u> at 62,278 n.6. Thus, because the separate rate is determined by, and derivative of, the rate calculated for Risen and Trina, and the court has found that those rates are not supported by substantial evidence, Commerce's separate rate calculation is also not supported by substantial evidence and is remanded for reconsideration consistent with this opinion.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's determinations with respect to its selection of Malaysia as the primary surrogate country and its surrogate financial ratio calculations. Commerce's surrogate values for silver paste, EVA, and backsheet, its application of facts available with an adverse inference, and its separate rate calculation are remanded. In accordance with the foregoing, it is

Consol. Court No. 20-03743                                                    Page 43
**PUBLIC VERSION**

**ORDERED** that Commerce's <u>Final Results</u> are remanded for further

explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the

court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days to file comments on the remand

redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to the

comments on the remand redetermination; and it is further

**ORDERED** that the parties shall file the Joint Appendix within 14 days after

the filing of replies to the comments on the remand redetermination; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days

of the date of filing its remand redetermination.

/s/ Claire R. Kelly<br>
Claire R. Kelly, Judge

Dated:          April 4, 2022
                New York, New York

Import Administration Policy Bulletin

Number: 04.1
Topic: Non-Market Economy Surrogate Country Selection Process

Approved: _____

       James Jochum
       Assistant Secretary
         for Import Administration

_____
Date

Statement of Issue

This policy bulletin provides guidance regarding the Department's selection of surrogate market economy countries in non-market economy ("NME") cases.

Background

The statute provides broad discretion in the selection of surrogate market economy countries to value NME factors of production. In particular, section 773(c)(1)(B) of the Act reads:

> ...the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

Section 773(c)(4) of the Act adds:

The administering authority shall utilize *to the extent possible* ... prices ... in one or more market economy countries that are -

> 1. at a level of economic development comparable to that of the nonmarket economy country, and

> 2. a significant producer of comparable merchandise.

The terms "comparable level of economic development," "comparable merchandise," and "significant producer" are not defined in the statute. However, the Department's regulations attempt to clarify the statute's general guidance regarding surrogate country selection. In determining economic comparability, section 351.408 of the regulations places primary emphasis on per capita income, although other information can be considered. Some clarification is also provided in the Conference Report to the 1988 Omnibus Trade and Competitiveness Act, which added to the statute the current NME provisions and states that "significant producer" includes any country that is a "significant net exporter."[1] Section 351.408 of the regulations also makes clear that the relative weight attached to each of the two selection criteria, described above, is unspecified because the relative importance that the Department attaches to each will necessarily vary depending on the specific facts in each case.

The Conference Report also states that the Department should seek to use, if possible, data (in the surrogate market economy country) that reflect levels of technology and production volumes that are similar to the producers under investigation.

Statement of Policy

**Appx0064**

In each NME investigation and review, the team considers potential surrogate countries in terms of their economic comparability to the NME country, and whether they are significant producers of comparable merchandise. The team then designates one country as the primary surrogate in a memo to the file, which explains how that country satisfies the statutory selection criteria. The memo must give substantive reasons on the record for why it deems the country selected to be a "significant producer" of comparable merchandise. It must include more than mere assertions, and must separately address the significant producer and comparable merchandise requirements. If one or both of the statutory criteria cannot be met, the memo should explain why this is the case, and why the particular country was selected as the primary surrogate.

The statute does not require that the Department use a surrogate country that is at a level of economic development *most* comparable to the NME country and that is the *most* significant producer of comparable merchandise. The statute requires only that the Department use a surrogate market economy country that is at a level of economic development comparable to that of the NME country and that is a significant producer of comparable merchandise. Even these requirements are not binding, as the statute requires that they be met *only to the extent possible*. Accordingly, the Department has adopted the following approach of sequential consideration of the statutory elements.[2]

*Economic Comparability*

First, early in a proceeding, the operations team sends the Office of Policy ("OP") a written request for a list of potential surrogate countries. In response, OP provides a list of potential surrogate countries that are at a comparable level of economic development to the NME country.[3] OP determines economic comparability on the basis of per capita gross national income, as reported in the most current annual issue of the <u>World Development Report</u> (The World Bank).[4] The surrogate countries on the list are not ranked and should be considered equivalent in terms of economic comparability.[5] Both the team's written request and OP's response should be made available to interested parties by being placed on the record of the proceeding.

*Comparable Merchandise*

Second, the operations team identifies those countries with producers of comparable merchandise among the potential surrogates on OP's list. As noted above, "comparable merchandise" is not defined in the statute or the regulations, since it is best determined on a case-by-case basis. Even so, there are some basic rules that every team should follow. In all cases, if identical merchandise is produced,[6] the country qualifies as a producer of comparable merchandise. In cases where identical merchandise is not produced, the team must determine if other merchandise that is comparable is produced. How the team does this depends on the subject merchandise. For example, in some cases, *e.g.*, steel and textiles, physical form and the extent of processing/finishing essentially distinguish different products. In such cases, consideration of major inputs often is not required, as it is normally sufficient for the team to identify comparable merchandise on the basis of physical differences in the merchandise and whether the product is one of low or high value-added. Thus, if circular steel pipe and tube were the subject merchandise, rectangular steel pipe and tube, hot-rolled steel sheet and plate, steel wire rod, steel wire rope, steel bar, and structurals, all of which are low value-added products of roughly similar form (made by combining iron, energy, and further processing), would constitute comparable merchandise.

A similar approach can also be used in the case of industrial commodity chemicals and when the subject merchandise is part of a spectrum of light manufactured products, *e.g.*, paper clips, fireworks, wax candles, cased pencils, toys, shoes, gift boxes, folding metal tables and

chairs. In these cases, the large number, and generic nature, of the inputs makes input matching very complicated. Therefore, it may make more sense for the operations team to consider the physical characteristics of the merchandise, and the extent of further value-added process in identifying comparable merchandise.

In other cases, however, where there are major inputs, *i.e.*, inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products, comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate.

*Significant Producer*

Third, the operations team determines whether any of the countries which produce comparable merchandise are "significant" producers of that comparable merchandise. The extent to which a country is a *significant* producer should not be judged against the NME country's production level or the comparative production of the five or six countries on OP's surrogate country list. Instead, a judgement should be made consistent with the characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics). Since these characteristics are specific to the merchandise in question, the standard for "significant producer" will vary from case to case. For example, if there are just three producers of comparable merchandise in the world, then arguably any commercially meaningful production is significant. Intermittent production, however, would not be significant. If there are ten large producers and a variety of small producers, "significant producer" could be interpreted to mean one of the top ten. If, in the example above, there is also a middle-size group of producers, then "significant producer" could be interpreted as one of the top ten or middle group. In another case, there may not be adequate data available from major producing countries. In such a case, "significant producer" could mean a country that is a net exporter, even though the selected surrogate country may not be one of the world's top producers. Because the meaning of "significant producer" can differ significantly from case to case, fixed standards such as "one of the top five producers" have not been adopted. For example, South Korea is, by almost any measure, a significant producer of steel, even though in 2001 it was not one of the top five producers overall.

Given that the decision as to what constitutes "significant production" in a particular case depends on available (often scarce) data, the specific criteria and supporting factual information used to determine whether a potential surrogate country is a significant producer is left to the discretion of the operations team. The operations team may consult with U.S. Government experts who have made their own assessments of the world's producers of comparable merchandise or who can supply the team with country production or trade data. Other possible sources of data supporting the "significant production" decision may include non-governmental organizations or international trade/industry association publications and similar sources.

Sometimes, none of the countries identified as being economically comparable are a significant producer of comparable merchandise, as defined above. Or, it may happen that some countries meet both criteria, but sufficient data (with respect to quantity and quality) are not available to enable the Department to use any of those countries as the primary surrogate. In such cases, the team should request a second list of potential surrogate countries from OP, and then follow the country selection procedure described above.

*Data Considerations*

**Appx0066**

Fourth, if more than one country has survived the selection process to this point, the country with the best factors data is selected as the primary surrogate country.[7] Even if no issues arise regarding economic comparability and significant production, data quality is a critical consideration affecting surrogate country selection. After all, a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable. Limited data availability sometimes is the reason why the team will "go off" the OP list in search of a viable primary surrogate country.

In assessing data and data sources, it is the Department's stated practice to use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data.

*Exceptions to the Sequencing Procedure*

Occasionally, there are also cases in which it is more appropriate for the team to address economic comparability only *after* the significant producer of comparable merchandise requirement is met. Cases where particular emphasis on "significant producer of comparable merchandise" is warranted are generally those that involve subject merchandise that is unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production), *e.g.*, crawfish, which is produced by only a few countries. See *Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Preliminary Results of Antidumping Duty Administrative Review*, 67 FR 63877 (October 16, 2002). Particular emphasis on "significant producer of comparable merchandise" is also generally warranted where major inputs are not widely traded internationally, *e.g.*, electricity, which is used intensively in the production of magnesium. See *Notice of Preliminary Results of Antidumping Duty Administrative Review: Pure Magnesium from the Russian Federation*, 59 FR 55427 (November 7, 1994).[8]

The significant producer requirement is particularly important in these cases because the Department wants to avoid selecting a surrogate country in which the relative scarcity (either through domestic sources or through imports) of a major non- or little-traded input precludes the country from being a competitive producer of comparable merchandise. For example, in the *Notice of Preliminary Determination of Sales at Less Than Fair Value: Urea Ammonium Nitrate Solutions From the Russian Federation*, 67 FR 62008 (October 3, 2002), the Department placed particular emphasis on the significant producer requirement in light of the gas-intensive nature of urea ammonium nitrate production, and the fact that natural gas is not commonly imported into the countries being considered as surrogate countries.

In cases in which the significant producer of comparable merchandise criterion is particularly important, the team should first ensure, on the basis of in-house research (including possible communications with other U.S. Government experts) and any interested party comments, that the significant producer of comparable merchandise requirement is met. Only after this requirement is met should the team consider economic comparability. If the competing significant producer countries are at disparate levels of economic development, and the necessary factors data is available in these countries, then the team should use the country closest to the NME country in terms of per capita GNI. On the other hand, if the significant producer countries are at closely similar levels of economic development, as are the countries on a surrogate country selection list, the team should use the country with the best factor price data. Where only one country satisfies the significant producer and data requirements, that country will normally be used.

1. A net exporter is defined as a country whose exports exceed its imports.

2. An alternative approach that the Department has considered, but rejected as administratively unfeasible would be to assess the extent to which each country "grades out" *overall* with respect to the two statutory criteria. For example, each country would be assessed with respect to economic comparability and the extent to which it was a significant producer of comparable merchandise. These two grades would then be weighted together to arrive at a composite grade for each country. Teams would then have to combine with this composite grade an assessment or grading of factors data quality and completeness in the country. The best surrogate would then be selected on the basis of this overall grade.

3. OP excludes non-market economy countries from the list of potential surrogate countries, and also excludes countries that technically are presumed to be market economies, but which in OP's judgement are unsuitable sources for factor values (*e.g.*, Cuba).

4. In the past, the OP memos also referenced growth rates and the national distribution of labor between the agriculture and non-agriculture sectors. However, since these factors are not determinative in the selection of an economically comparable surrogate country, they will no longer be included in future OP memos.

5. IA's current practice reflects in large part the fact that the statute does not require the Department to use a surrogate country that is at a level of economic development *most* comparable to the NME country.

6. If considering a producer of identical merchandise leads to data difficulties, the operations team may consider countries that produce a broader category of reasonably comparable merchandise.

7. An additional surrogate is sometimes used to fill factor price "holes" in the primary surrogate.

8. For example, concerns were raised in *Pure Magnesium from the Russian Federation* about the electricity-intensive nature of magnesium production and the fact that electricity, as a general rule, is not significantly traded into potential surrogate countries. These concerns made clear the importance, from an electricity valuation standpoint, of selecting a surrogate that was a significant producer of magnesium or some other comparable electricity-intensive product. However, none of the countries on OP's initial surrogate country list produced "comparable merchandise," even after that had been more broadly defined. (After consulting with experts at the U.S. Bureau of Mines and the DOC Trade Development Metals Division, the Department concluded in that case that "comparable merchandise" comprised magnesium and aluminum because both are "light metals" in terms of weight, are electricity-intensive products, are produced using an electrolytic process, and share some common end-uses. The Department, with the help of the U.S. Bureau of Mines, identified four significant producers of such "comparable merchandise," defining significant production as production exceeding 100,000 metric tons per year. Venezuela, Argentina, Brazil and South Africa were found to be "significant producers" of either magnesium or aluminum. Because only Brazil produced magnesium, the Department selected Brazil as the primary surrogate country.

 

Home > Issued Standards > IFRS Standards Navigator > IAS 2 Inventories

# IAS 2 Inventories

Follow

Standard 2021 Issued

---

**SHOW SECTIONS**

---

## About

IAS 2 provides guidance for determining the cost of inventories and the subsequent recognition of the cost as an expense, including any write-down to net realisable value. It also provides guidance on the cost formulas that are used to assign costs to inventories. Inventories are measured at the lower of cost and net realisable value. Net realisable value is the estimated selling price in the ordinary course of business less the estimated costs of completion and the estimated costs necessary to make the sale.

The cost of inventories includes all costs of purchase, costs of conversion (direct labour and production overhead) and other costs incurred in bringing the inventories to their present location and condition. The cost of inventories is assigned by:

- specific identification of cost for items of inventory that are not ordinarily interchangeable; and
- the first-in, first-out or weighted average cost formula for items that are ordinarily interchangeable (generally large quantities of individually insignificant items).

When inventories are sold, the carrying amount of those inventories is recognised as an expense in the period in which the related revenue is recognised. The amount of any write-down of inventories

<u>**Appx0070**</u>

to net realisable value and all losses of inventories are recognised as an expense in the period the write-down or loss occurs.

## Standard history

In April 2001 the International Accounting Standards Board (Board) adopted IAS 2 *Inventories*, which had originally been issued by the International Accounting Standards Committee in December 1993. IAS 2 *Inventories* replaced IAS 2 *Valuation and Presentation of Inventories in the Context of the Historical Cost System* (issued in October 1975).

In December 2003 the Board issued a revised IAS 2 as part of its initial agenda of technical projects. The revised IAS 2 also incorporated the guidance contained in a related Interpretation (SIC-1 *Consistency—Different Cost Formulas for Inventories*).

Other Standards have made minor consequential amendments to IAS 2. They include IFRS 13 *Fair Value Measurement* (issued May 2011), IFRS 9 *Financial Instruments* (Hedge Accounting and amendments to IFRS 9, IFRS 7 and IAS 39) (issued November 2013), IFRS 15 *Revenue from Contracts with Customers* (issued May 2014), IFRS 9 *Financial Instruments* (issued July 2014) and IFRS 16 *Leases* (issued January 2016).

---

**Related active projects**

**Related completed projects**

Classification of Servicing Equipment (Amendments to IAS 16)

Costs Necessary to Sell Inventories (IAS 2)

Holdings of Cryptocurrencies

Stripping Costs in the Production Phase of a Surface Mine

**Related IFRS Standards**

**Related IFRIC Interpretations**

IFRIC 20 Stripping Costs in the Production Phase of a Surface Mine

**Unconsolidated amendments**

**Implementation support**

IAS 2 Inventories

Appx0071

Share

About us

News and events

Around the world

Projects

Contact us

Shop

Funding

Speaking requests

Issued Standards

Products and services

Jobs

Supporting implementation

Academics

National standard-setters

Accounting profession

Preparers

Investors

Regulators

Media

Students

**Stay in touch**

Register for news alerts

The IFRS Foundation's logo and the *IFRS for SMEs*® logo, the IASB® logo, the 'Hexagon Device', eIFRS®, IAS®, IASB®, IFRIC®, IFRS®, *IFRS for SMEs*®, IFRS Foundation®, International Accounting Standards®, International Financial Reporting Standards®, NIIF® and SIC® are registered trade marks of the IFRS Foundation, further details of which are available from the IFRS Foundation on request.

The International Financial Reporting Standards Foundation is a not-for-profit corporation incorporated in the State of Delaware, United States of America, with the Delaware Division of Companies (file no: 3353113), and is registered as an overseas company in England and Wales (reg no: FC023235). Head office: Columbus Building, 7 Westferry Circus, Canary Wharf, London E14 4HD, UK.

**Appx0072**

© IFRS Foundation 2021

Accessibility   |   Privacy   |   Terms and Conditions   |   Trade mark guidelines   |   All legal information   |   Using our website

**Appx0073**

Case 23-0503-CR Document 17 Page: 108 Filed 05/18/2023 of 3

                                                          

Home  >  About us

# About us

The IFRS® Foundation is a not-for-profit international organisation responsible for developing a single set of high-quality global accounting and sustainability disclosure standards, known as IFRS Standards.

Our mission is to develop standards that bring transparency, accountability and efficiency to financial markets around the world. Our work serves the public interest by fostering trust, growth and long-term financial stability in the global economy.

International organisations responsible for the wellbeing of the global economy support our work, including the G20, the Financial Stability Board and the World Bank.

IFRS Accounting Standards are now required in more than 140 jurisdictions, with many others permitting their use.

---

**Who we are**

Find out more about who we are and what we do, our history and our Constitution

---

## How we set IFRS Standards

How do we develop Standards and Interpretations? What processes do we follow?

---

## Our structure

Find out about our three-tier structure and how the IFRS Foundation is governed.

---

## Our consultative bodies

Our work depends on input from-and collaboration with-a wide range of groups. Find out more about those groups here

---

## Working in the public interest

How we serve the public interest and the interaction between IFRS Standards and long term investment and financial stability

---

## Contact Us

Career opportunities, licensing, organise speaking engagements and contact us

**Share**

---

About us

Around the world

Contact us

Funding

Issued Standards

Jobs

News and events

Projects

Shop

Speaking requests

Products and services

Supporting implementation

Academics

Accounting profession

Investors

Media

National standard-setters

Preparers

Regulators

Students

**Stay in touch**

Register for news alerts

---

The IFRS Foundation's logo and the *IFRS for SMEs*® logo, the IASB® logo, the 'Hexagon Device', eIFRS®, IAS®, IASB®, IFRIC®, IFRS®, *IFRS for SMEs*®, IFRS Foundation®, International Accounting Standards®, International Financial Reporting Standards®, NIIF® and SIC® are registered trade marks of the IFRS Foundation, further details of which are available from the IFRS Foundation on request.

The International Financial Reporting Standards Foundation is a not-for-profit corporation incorporated in the State of Delaware, United States of America, with the Delaware Division of Companies (file no: 3353113), and is registered as an overseas company in England and Wales (reg no: FC023235). Head office: Columbus Building, 7 Westferry Circus, Canary Wharf, London E14 4HD, UK.

© IFRS Foundation 2021

Accessibility | Privacy | Terms and Conditions | Trade mark guidelines | All legal information | Using our website

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  2023-1550

**Short Case Caption:**  Risen Energy Co., Ltd. v. US

---

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

---

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑  the filing has been prepared using a proportionally-spaced typeface and includes  5,594  words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 05/16/2023            Signature:  /s/ Gregory S. Menegaz

                            Name:  Gregory S. Menegaz

**FORM 31. Certificate of Confidential Material**

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2023-1550

**Short Case Caption:** Risen Energy Co., Ltd. v. US

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains ___4___ number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 05/16/2023

Signature: /S/ Gregory S. Menegaz

Name: Gregory S. Menegaz