2023-1550

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

---

RISEN ENERGY CO., LTD.,
Plaintiff-Appellant,

TRINA SOLAR CO., LTD., et al.,
Plaintiffs,

CANADIAN SOLAR INC., CANADIAN SOLAR INTERNATIONAL LIMITED,
CANADIAN SOLAR MANUFACTURING (CHANGSHU), INC., CANADIAN
SOLAR MANUFACTURING (LUOYANG), INC., CSI CELLS CO., LTD.,
CANADIAN SOLAR (USA), INC.,
Plaintiffs-Appellees,

v.

UNITED STATES,
Defendant-Appellee,

SUNPOWER MANUFACTURING OREGON, LLC,
Defendant.

---

Appeal from the United States Court of International Trade in
Case No. 1:20-cv-03743, Judge Claire R. Kelly

---

**CORRECTED BRIEF OF DEFENDANT-APPELLEE UNITED STATES**

---

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
BRISHAILAH BROWN
Attorney
Office of the Chief Counsel
for Trade Enforcement & Compliance
U.S. Department of Commerce

JOSHUA E. KURLAND
Senior Trial Counsel
Department of Justice, Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone:  (202) 616-0477
Facsimile:  (202) 353-0461
Email:  Joshua.E.Kurland@usdoj.gov

November 2, 2023

*Attorneys for Defendant-Appellee*

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES.............................................................. 1

STATEMENT OF THE CASE............................................................... 1

STATEMENT OF FACTS ................................................................... 1

I.    Background Regarding Antidumping Proceedings ................................... 1

II.   Administrative Proceedings............................................................ 4

III.  Trial Court Proceedings ............................................................... 8

IV.   Remand Proceedings................................................................... 10

V.    Post-Remand Trial Court Proceedings ............................................ 11

SUMMARY OF THE ARGUMENT ...................................................... 12

ARGUMENT ................................................................................... 12

I.    Standard Of Review................................................................... 12

II.   Commerce's Selection Among Malaysia HTS Subheadings To Value
      Risen's Backsheet And EVA Is Supported By Substantial Evidence
      And Otherwise Lawful................................................................ 15

      A.    Commerce's Valuation Of Backsheet Is Supported By
            Substantial Evidence And Otherwise Lawful .............................. 16

      B.    Commerce's Valuation Of EVA Is Supported By Substantial
            Evidence And Otherwise Lawful ............................................ 24

      C.    Risen's Averaging Arguments Lack Merit .................................. 30

III.  Commerce's Surrogate Financial Ratios Calculation Is Supported By
      Substantial Evidence And Lawful .................................................. 31

CONCLUSION ................................................................................ 41

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
    618 F.3d 1316 (Fed. Cir. 2010) ........................................................... 3

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
    802 F.3d 1339 (Fed. Cir. 2015) ........................................................ 13

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ........................................................ 14

*Baoding Mantong Fine Chemistry Co. v. United States*,
    279 F. Supp. 3d 1321 (Ct. Int'l Trade 2017) .................................... 15

*Bristol Metals L.P. v. United States*,
    703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) .................................... 15

*Changzhou Trina Solar Energy Co. v. United States*,
    975 F.3d 1318 (Fed. Cir. 2020) ........................................................ 15

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007) ........................................................ 13

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ......................................................................... 13

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ......................................................................... 13

*Downhole Pipe & Equip. L.P. v. United States*,
    776 F.3d 1369 (Fed. Cir. 2015) ................................................ *passim*

*Gov't of Argentina v. United States*,
    542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) .................................... 20

*Haixing Jingmei Chem. Prod. Sales Co. v. United States*,
    335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018) ....................... 19-20, 23

*Home Meridian Int'l, Inc. v. United States*,
    772 F.3d 1289 (Fed. Cir. 2014) ........................................................ 14

*Hyundai Steel Co. v. United States,*
279 F. Supp. 3d 1349 (Ct. Int'l Trade 2017) .................................................... 37

*Jiaxing Brother Fastener Co. v. United States,*
380 F. Supp. 3d 1343 (Ct. Int'l Trade 2019) .................................................... 22

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
463 U.S. 29 (1983) ........................................................................................... 22

*Nation Ford Chem. Co. v. United States,*
166 F.3d 1373 (Fed. Cir. 1999) ........................................................ 3, 4, 14, 32

*Ningbo Dafa Chem. Fiber Co. v. United States,*
580 F.3d 1247 (Fed. Cir. 2009) .......................................................................... 3

*Nippon Steel Corp. v. United States,*
458 F.3d 1345 (Fed. Cir. 2006) ........................................................................ 14

*PSC VSMPO-Avisma Corp. v. United States,*
688 F.3d 751 (Fed. Cir. 2012) ............................................................. 32, 37, 40

*Qingdao Sea-Line Trading Co. v. United States,*
766 F.3d 1378 (Fed. Cir. 2014) ................................................................. 22, 30

*Risen Energy Co. v. United States,*
569 F. Supp. 3d 1315 (Ct. Int'l Trade 2022) ........................................... *passim*

*Risen Energy Co. v. United States,*
611 F. Supp. 3d 1384 (Ct. Int'l Trade 2022) ........................................... *passim*

*Rust v. Sullivan,*
500 U.S. 173 (1991) ......................................................................................... 22

*Shakeproof Assembly Components v. United States,*
268 F.3d 1376 (Fed. Cir. 2001) ............................................................. 4, 13, 14

*SmithKline Beecham Corp. v. Apotex Corp.,*
439 F.3d 1312 (Fed. Cir. 2006) ........................................................................ 31

*SolarWorld Americas, Inc. v. United States,*
910 F.3d 1216 (Fed. Cir. 2018) ................................................................. 32, 40

*Torrington Co. v. United States,*
68 F.3d 1347 (Fed. Cir. 1995) ......................................................................... 13

*U.S. Steel Corp. v. United States*,
    621 F.3d 1351 (Fed. Cir. 2010) ........................................................ 2

*Union Steel v. United States*,
    713 F.3d 1101 (Fed. Cir. 2013) ....................................................... 12

*United States v. Eurodif*,
    555 U.S. 305 (2009) ........................................................................ 13

*Zhejiang DunAn Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011) ....................................................... 15

## STATUTES & REGULATIONS

19 U.S.C. § 1673 .................................................................................... 1

19 U.S.C. § 1675(a) ............................................................................... 2

19 U.S.C. § 1677b(a) ............................................................................. 2

19 U.S.C. §1677b(c) ................................................................... 3, 14, 32

28 U.S.C. § 2639(a) .............................................................................. 13

19 C.F.R. § 351.408 .............................................................................. 32

## ADMINISTRATIVE DETERMINATIONS

*Antidumping or Countervailing Duty Order, Finding, or Suspended*
    *Investigation; Opportunity To Request Administrative Review*,
    83 Fed. Reg. 62,294 (Dep't of Commerce Dec. 3, 2018) ................................. 4

*Certain Activated Carbon From China*,
    85 Fed. Reg. 23,947 (Dep't of Commerce Apr. 30, 2020) ............................ 37

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into*
    *Modules, From the People's Republic of China*,
    77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012) ................................. 4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into*
    *Modules, From the People's Republic of China*,
    82 Fed. Reg. 29,033 (Dep't of Commerce June 27, 2017) ............................ 22

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China,*
 85 Fed. Reg. 7,531 (Dep't of Commerce Feb. 10, 2020) ................................. 6

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
 85 Fed. Reg. 62,275 (Dep't of Commerce Oct. 2, 2020) ................................. 4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
 85 Fed. Reg. 79,165 (Dep't of Commerce Dec. 9, 2020) ............................. 4, 8

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
 86 Fed. Reg. 58,871 (Dep't of Commerce Oct. 25, 2021) ................. 18, 23, 30

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*,
 87 Fed. Reg. 38,379 (Dep't of Commerce June 28, 2022) ................. 18, 23, 30

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
 84 Fed. Reg. 9,297 (Dep't of Commerce Mar. 14, 2019) ................................. 5

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Rule 47.5 of this Court's Rules, counsel for defendant-appellee states that he is unaware of any other appeal from this civil action that previously has been before this Court or any other appellate court under the same or similar title.  Counsel is also unaware of any case pending in this or any other court or agency that may directly affect or be affected by the decision in this appeal.  At the same time, counsel for the United States is aware of an action before the Court of International Trade that counsel understands is not "related" within the meaning of the Court's rule, but involves similar legal issues as this appeal (in the context of the separate record of that case).  That action is *Jinko Solar Import and Export Co. Ltd., et al. v. United States*, Consol. Ct. Int'l Trade No. 22-00219, which also challenges the Department of Commerce's reliance on Malaysian data from certain tariff headings to value Risen Energy Co., Ltd.'s backsheet and ethyl vinyl acetate (EVA) inputs in a China Solar antidumping administrative review.

## STATEMENT OF THE ISSUES

1.     Whether Commerce's surrogate valuations of appellant Risen Energy Co., Ltd.'s backsheet and ethyl vinyl acetate (EVA) inputs using certain Malaysian Harmonized Tariff Schedule (HTS) data are supported by substantial evidence and otherwise lawful.

2.     Whether Commerce's calculation of surrogate financial ratios for this administrative review is supported by substantial evidence and otherwise lawful.

## STATEMENT OF THE CASE

This appeal concerns the Department of Commerce's (Commerce's) sixth administrative review of its antidumping duty order concerning solar cells from China.  Appellant Risen Energy Co., Ltd. (Risen), a respondent in the review, appeals aspects of Commerce's determination in the review and redetermination on remand, which were sustained by the trial court in *Risen Energy Co. v. United States*, 569 F. Supp. 3d 1315 (Ct. Int'l Trade 2022) (*Risen I*), and *Risen Energy Co. v. United States*, 611 F. Supp. 3d 1384 (Ct. Int'l Trade 2022) (*Risen II*).[1]

## STATEMENT OF FACTS

### I.     Background Regarding Antidumping Proceedings

The antidumping statute authorizes Commerce to apply remedial duties to foreign goods sold in the United States at less than fair value.  19 U.S.C. § 1673.

---

[1] Other foreign respondent plaintiffs from the trial court proceedings, such as Canadian Solar Inc., have appeared in the appeal without filing a substantive brief.

Once Commerce investigates a dumping allegation and issues an order, the agency, if requested, conducts annual reviews to determine the amount of dumping and duties owed for the review period. 19 U.S.C. §§ 1675(a)(1)(B), (2)(A). To do so, Commerce calculates a "dumping margin" for each entry of merchandise subject to review. 19 U.S.C. § 1675(a)(2)(A)(ii). A dumping margin is the amount by which "normal value" (the home market price) exceeds the United States "export price." *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A)). Generally, if home market prices are lower compared to export prices, the analysis results in a lower dumping margin. Conversely, higher-priced home market sales relative to exports result in higher dumping margins.

"Normal value," in most circumstances, is the price at which a foreign like product is first sold (or, in the absence of a sale, offered) for consumption in the exporting country, in the usual commercial quantities and ordinary course of trade. 19 U.S.C. § 1677b(a)(1). If, however, the proceeding concerns a non-market economy (NME) country, such as China, and Commerce determines that available information does not permit a standard normal value calculation, then Commerce determines normal value using surrogate values for "the factors of production utilized in producing the merchandise" plus "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1)(B). Commerce uses this framework "to construct a hypothetical

2

market value" of the subject merchandise in the non-market economy country. *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

In valuing factors of production, Commerce relies upon prices or costs of the factors of production (also referred to as inputs) from a surrogate market economy country that is at a comparable level of economic development to that of the non-market economy country at issue and is a significant producer of comparable merchandise. 19 U.S.C. § 1677b(c)(4). Commerce selects a surrogate value for each input used in production of the subject merchandise, consistent with the statute's instruction that valuation of the factors of production shall be based on the "best available information" regarding the values of the inputs in an appropriate market economy country. 19 U.S.C. §1677b(c)(1)(B); *see generally Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1250-51 (Fed. Cir. 2009). In addition, "Commerce values certain factors of production, such as selling, general, and administrative expenses, factory overhead, and profit, by using financial ratios derived from financial statements of producers of comparable merchandise in the surrogate country." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1319 (Fed. Cir. 2010) (citations omitted).

Within this general framework, the statute "accords Commerce wide discretion in the valuation of factors of production in the application of {the

statute's} guidelines." *Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001) (quoting *Nation Ford*, 166 F.3d at 1377).

## II.  <u>Administrative Proceedings</u>

This case arises out of Commerce's antidumping duty order covering certain crystalline silicon photovoltaic cells from China.  *See generally Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012).  The administrative determination at issue is Commerce's sixth administrative review of that order, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 85 Fed. Reg. 62,275 (Dep't of Commerce Oct. 2, 2020) (Final Results), and the accompanying Issues & Decision Memorandum *amended by* 85 Fed. Reg. 79,165 (Dep't of Commerce Dec. 9, 2020) (Amended Final Results).  Appx7085-7136; Appx7150-7153; Appx7168-7172.

In December 2018, Commerce issued a notice of opportunity to request an administrative review for the period from December 2017 to November 2018. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review*, 83 Fed. Reg. 62,293, 62,294 (Dep't of Commerce Dec. 3, 2018).  At the request of interested parties, including Risen, Commerce initiated a review of 54 companies and subsequently selected Risen and Trina Solar Co., Ltd., *et al.* (Trina) as mandatory respondents because

they were the largest Chinese exporters during the review period.  Appx110-111;

Appx114-119; *Initiation of Antidumping and Countervailing Duty Administrative*

*Reviews*, 84 Fed. Reg. 9,297 (Dep't of Commerce Mar. 14, 2019).

Risen and Trina had participated as respondents in previous administrative

reviews of Commerce's order.  As two of the largest Chinese producers/exporters,

Risen and Trina were respondents in the 2011 antidumping duty investigation and

four of six previous administrative reviews, including both being mandatory

respondents in the previous review.  Appx7095.

Because China is a non-market economy country, Commerce was required

to rely on its surrogate valuation methodology, described above, to calculate a

normal value for solar cells in China.  This required Commerce to select a primary

surrogate country and individual surrogate values for each of the inputs that the

respondents used in producing solar cells, as well as a surrogate financial statement

to calculate the various financial ratios included in the surrogate value figure.

To select a primary surrogate country, Commerce in July 2019 issued a list

of potential surrogate countries "at the same level of economic development as

China" based on 2017 per capita gross national income (GNI).  Appx2801-2810

(containing memorandum on surrogate countries for antidumping investigations

and reviews for merchandise from China).  The list included Brazil, Kazakhstan,

Malaysia, Mexico, Romania, and Russia, and Commerce invited comments and the submission of surrogate value data (which Risen did). *Id.*

In February 2020, Commerce published the preliminary results of its review. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from China*, 85 Fed. Reg. 7,531 (Dep't of Commerce Feb. 10, 2020) (Preliminary Results), and accompanying Prelim. Decision Memorandum (PDM) (Appx6803-6834). Commerce preliminarily assigned antidumping duty rates of 75.23 percent and 46.64 percent to Risen and Trina, respectively, and a rate of 60.94 percent, based on the average of Risen's and Trina's rates, to non-mandatory respondents eligible for separate rates. Preliminary Results, 85 Fed. Reg. at 7,533-34.

In the preliminary results, Commerce selected Malaysia as the primary surrogate country for the review. Appx6819-6820. Commerce preliminarily determined that Malaysia's data quality surpassed other countries because "not only solar module assemblers, but also solar cell manufacturers are located in Malaysia." Appx6819. Commerce also preliminarily determined that Malaysian data were superior because "it is more likely these data are specific to the inputs that {Commerce is} valuing given there is a manufacturer in {Malaysia} that could be importing inputs actually used in the production of solar cells." Appx6820. Commerce thus relied on Malaysian Global Trade Atlas (GTA) import data as the surrogate values for a number of the respondents' inputs, including backsheet, and

ethyl vinyl acetate (EVA).  Appx6825; Appx6835-6836.[2]  Commerce likewise

selected financial statements from Malaysian solar cell and module producer

Hanwha QCells to calculate the surrogate financial ratios.  Appx6829-6830; *see*

Appx6634-6725 (Hanwha QCells financial statement).

In October 2020, after considering the parties' administrative case briefs,

Commerce issued its final results.  Commerce continued to select Malaysia as the

primary surrogate country using 2017 GNI data (notwithstanding challenges from

certain of the respondents).  Appx7111-7118.  Further, although it made certain

changes to its surrogate valuations, Commerce continued to rely on Malaysian

import data to value backsheet and EVA, using the same Harmonized Tariff

Schedule (HTS) subheadings as in the preliminary results.  Appx7129-7130.  In

doing so, Commerce explained that it had relied on data from tariff categories for

"sheet" rather than "film" based on the record evidence concerning the nature of

the backsheet and EVA inputs, and that Risen's reference to Commerce's prior

surrogate value selections for the inputs did not outweigh that record evidence.  *Id.*

Likewise, Commerce continued to rely on the Malaysian solar producer Hanwha

QCells' financial statement to calculate the financial ratios.  Appx7122-7124.

---

[2] The factors of production to produce solar cells and modules include hundreds of inputs.  In previous reviews, Commerce selected Thailand as the primary surrogate country and valued inputs such as backsheet and EVA using Thai data.

Based on the final results, and after correcting for ministerial errors in the amended final results, Commerce assigned antidumping duty rates of 100.79 and 92.52 percent to Risen and Trina, respectively, and a rate of 95.50 percent to the separate rate respondents.  Amended Final Results, 85 Fed. Reg. at 79,166.

## III.   <u>Trial Court Proceedings</u>

Risen and other plaintiffs challenged multiple aspects of Commerce's determination, including Commerce's selection of Malaysia as the primary surrogate country, Commerce's determination to apply an adverse inference in relying on the facts otherwise available to calculate missing factor of production data, Commerce's selection of several surrogate values (including backsheet and EVA), Commerce's calculation of the surrogate financial ratio based on the Hanwha QCells financial statement, and Commerce's calculation of the dumping rate for separate rate respondents (this final claim was derivative of the other challenges to Commerce's determination, since the separate rate is based on a weighted average of the rates calculated for the mandatory respondents).

Specifically, regarding backsheet and EVA, the plaintiffs disputed Commerce's use of Malaysian data corresponding to tariff categories for sheet rather than film.  Regarding the financial ratio calculations, the plaintiffs objected to Commerce's treatment, based on Commerce's interpretation of certain notes in

the Hanwha QCells financial statement, of a part of Hanwha QCells' cost of sales as overhead costs rather than as costs for materials, labor, and energy (MLE).

The trial court sustained Commerce's selection of Malaysia as the primary surrogate country, as well as Commerce's calculation of the surrogate financial ratios based on the Hanwha QCells financial statement. *Risen I*, 569 F. Supp. 3d at 1338. Regarding the surrogate financial ratios in particular, the court held that Commerce's citations to the notes in the Hanwha QCells financial statement indicated that Commerce had reasonably concluded that Hanwha QCells included labor and energy costs in its inventory cost (consistent with International Financial Reporting Standards (IFRS)), and thus that Commerce had reasonably allocated the remainder of Hanwha QCells' cost of sales to overhead. *Id.* at 1332-34.

Conversely, the trial court remanded as unsupported by substantial evidence Commerce's application of an adverse inference (based on allegation of Risen's and Trina's non-cooperation) in relying on facts otherwise available to calculate missing factor of production data, Commerce's selection of surrogate values for silver paste, backsheet, and EVA, and Commerce's calculation of the separate rate. *Id.* at 1338. Regarding backsheet and EVA, the court held that Commerce was required to address evidence detracting from its determination and to explain its departure from its past treatment of the inputs. *Id.* at 1331-32. Hence, the court remanded these issues for further explanation or reconsideration. *Id.* at 1338.

IV.    **Remand Proceedings**

On remand, Commerce reconsidered its application of partial adverse facts available (under respectful protest), modified its surrogate value selection for silver paste, and further explained its use of Malaysian import data to value backsheet and EVA, revising its separate rate calculation accordingly.

As part of the remand, Commerce placed additional factual information on the record consisting of American Society for Testing and Materials (ASTM) abstracts relevant to classifying the backsheet and EVA.  Appx7400-7424.  These included ASTM D6988, consisting of a "Standard Guide for Determination of Thickness of Plastic Film Test Specimens," and ASTM D4801, consisting of a "Standard Specification for Polyethylene Sheeting in Thickness of 0.25 mm (0.010 in.) and Greater."  *Id.*  Commerce provided interested parties the opportunity to comment on and to submit information to rebut, clarify, or correct the factual information, to which Risen and other plaintiffs responded.  *Id.*; Appx7425-7426; Appx7497-7498; Appx10731-10732.  Parties likewise commented on Commerce's draft remand results, and Commerce addressed the comments in its final remand results filed with the trial court.  Appx10759; *see generally* Appx10757-10786.

With respect to the backsheet and EVA issues, Commerce explained that the ASTM materials draw a distinction between "film," defined as a product no greater than 0.25 mm in thickness, and "sheet," defined as a product of greater thickness.

Appx10768-10783.  Commerce also complied with the trial court's remand

instructions by addressing the detracting evidence that Risen and the other

plaintiffs cited and explaining its departure from its past treatment of backsheet

and EVA when using Thai data to value those inputs in previous proceedings.  *Id.*

Based on its analysis of the record as a whole, Commerce concluded that the

Malaysian data corresponding to sheet, rather than film, remained the best

available information for valuing backsheet and EVA.  *Id.*

Based on these determinations, Commerce on remand calculated a 19.20

percent dumping margin for Risen, and a 25.18 percent dumping margin for Trina.

Appx10785.  Commerce also explained that it reconsidered its separate rate

calculation in light of its changes to the mandatory respondents' dumping margins,

and revised the separate rate respondents' dumping margin to 23.02, for those

companies participating in the litigation.  Appx10783-10785.

## V.    **Post-Remand Trial Court Proceedings**

The trial court sustained Commerce's remand determination.  *Risen II*, 611

F. Supp. 3d 1384.  Addressing the plaintiffs' renewed challenges to Commerce's

selection of surrogate values, the court held that Commerce's determinations were

reasonable and that Risen's counterarguments at best provided an alternative view

that did not negate the substantial evidence supporting Commerce's findings.  *See*

*id.* at 1392-94.  This appeal followed.

11

## SUMMARY OF THE ARGUMENT

Commerce's determinations should be sustained because they are supported by substantial evidence and otherwise lawful.  Commerce reasonably selected Malaysian HTS 3920.62.1000 (covering polyethylene sheet) to value backsheet, and Malaysian HTS 3920.10.1900 (covering ethylene polymer sheet: other than rigid) to value EVA, because both HTS categories best correspond to the inputs that Risen used in solar cell production.  Commerce also lawfully calculated the surrogate financial ratios by allocating materials, labor, and energy (MLE) costs identified in the Hanwha QCells financial statement to the denominator, while attributing the remaining "cost of sales" to the numerator as overhead expenses.  Although RM257,063 of the RM2.003 million total cost of sales was unidentified in the financial statement, Commerce reasonably concluded that this remainder reflects manufacturing overhead, and not MLE expenses, because the financial statement identifies MLE within "inventories" totaling RM1.648 million that Commerce had already subtracted from the cost of sales.

## ARGUMENT

### I.    Standard Of Review

The Court upholds Commerce's determinations unless they are unsupported by substantial record evidence or otherwise unlawful.  *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)); *see*

*United States v. Eurodif*, 555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which {Commerce} relies . . . are conclusive unless unsupported by substantial evidence."). Although this amounts to repeating the trial court's work, the Court "will not ignore the informed opinion of the {CIT}." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (citations omitted). The Court also recognizes "Commerce's special expertise" as "master" of the antidumping laws. *Shakeproof*, 268 F.3d at 1381; *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995). Indeed, Commerce's determinations are "presumed to be correct." 28 U.S.C. § 2639(a)(1).

Substantial evidence connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Hence, "{i}t is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew." *Downhole Pipe & Equip. L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015) (citation omitted); *see Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (Court cannot overturn decision "simply because {it} would have reached a different conclusion based on the same record" (citations omitted)).

A party disputing Commerce's determination under the substantial evidence standard thus "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains a determination if it is reasonable and supported by the record as a whole, including any detracting evidence. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

Finally, Commerce receives particular deference in making determinations regarding the "best available information" to value factors of production in non-market economy proceedings under 19 U.S.C. § 1677b(c)(1). *Nation Ford*, 166 F.3d at 1377 ("While § 1677b(c) provides guidelines to assist Commerce in this process, this section also accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines." (citations omitted)); *Shakeproof*, 268 F.3d at 1381 ("The process of constructing foreign market value for a producer in a non-market economy country is difficult and necessarily imprecise."). The data Commerce utilizes need not be perfect, *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014), nor is Commerce required to duplicate a non-market economy producer's experience. *Nation Ford*, 166 F.3d at 1377. Instead, Commerce relies on record data that "most accurately represents the fair market value" of the inputs. *Id*. Ultimately, given Commerce's discretion and the fact-specific nature of this inquiry, the question for the Court is

14

"not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citation omitted).

## II.    Commerce's Selection Among Malaysia HTS Subheadings To Value Risen's Backsheet And EVA Is Supported By Substantial Evidence And Otherwise Lawful

Commerce's practice when selecting the best available information to value factors of production is to select, to the extent practicable, surrogate values that are product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review, and free of any taxes or duties. *See, e.g.*, *Baoding Mantong Fine Chemistry Co. v. United States*, 279 F. Supp. 3d 1321, 1328 (Ct. Int'l Trade 2017); *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1331 (Fed. Cir. 2020).  When Commerce provides a reasoned basis for finding that the chosen data satisfy its criteria and constitute better data than alternatives, courts are "reluctant to substitute {their} own evidentiary evaluation for Commerce's{.}" *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1376 (Ct. Int'l Trade 2010) (citation and quotation marks omitted).  Indeed, as we showed above, the Court looks to whether Commerce's selection was reasonable, rather than evaluating directly whether the information that Commerce used was the best available.  *See Zhejiang DunAn*, 652 F.3d at 1341.

15

In this case, based on its evaluation of the record, Commerce relied on data from Malaysian HTS subheadings to value Risen's backsheet and EVA inputs. *See* Appx7129-7130 (final determination); Appx10768-10783 (remand determination). Commerce's selections are supported by substantial evidence because Commerce reasonably considered Risen's descriptions of its inputs, the full scope of record evidence (including the ASTM standards that Commerce placed on the record), the available Malaysian HTS subheadings, and Risen's arguments, in selecting the best available information. Risen's contentions disputing Commerce's surrogate value selections improperly invite the Court to reweigh the evidence that was before the agency, which is contrary to the Court's role under the deferential standard of review and should thus be rejected. *See Downhole Pipe*, 776 F.3d at 1376-77.

## A.  Commerce's Valuation Of Backsheet Is Supported By Substantial Evidence And Otherwise Lawful

To value backsheet, Commerce was required to select between Malaysian HTS 3920.62.1000 ("Of poly(ethylene terephtalate): Plates and sheets"), proposed by the domestic industry, and Malaysian HTS 3920.62.9000 ("Of poly(ethylene terephtalate): Other"), proposed by Risen. Appx7129; *see also* Appx6472-6473. Commerce initially found that Malaysian HTS 3920.62.1000 covering "Plates and sheets" was the subheading that best corresponded to Risen's backsheet because the record evidence pointed to the backsheet having a protective function, whereas the film covered by Risen's preferred "Other" subheading is a lighter, less-rigid

product that would not serve as a protective backsheet. Appx7130. The trial court found this explanation inadequate and remanded for further explanation. *See Risen I*, 569 F. Supp. 3d at 1331-32. On remand, Commerce further explained why it found Malaysian HTS 3920.62.1000 data to be the best available information for valuing backsheet and addressed Risen's detracting evidence. Appx10768-10776.

Because there was nothing on the record that defined plate, sheet, or film, Commerce placed on the remand record ASTM abstracts that define sheet and film. Appx10769. Specifically, Commerce added ASTM D6988, the standard guide concerning the thickness of plastic film test specimens, and ASTM D4801, the standard specification for polyethylene sheeting in thickness of 0.25 mm (0.010 in.) and greater. Appx7417-7424 (specifying that ASTM D4801 is from ASTM Book of Standards Volume 08.02 and ASTM D6988 is from the ASTM Book of Standards Volume 08.03). The ASTM abstracts distinguish "film" and "sheet" based on thickness—indicating that film is an "optional term for sheeting having a nominal thickness no greater than 0.25 mm (0.010 in)" and that polyethylene plastic materials with a thickness of 0.25 mm or greater are considered sheets. Appx10769, Appx10773 (discussing Appx7418, Appx7421-7422).

Commerce explained that Risen's backsheet meets the ASTM definition of polyethylene plastic "sheet" having a thickness of 0.25 mm or greater, as opposed to the ASTM definition for "film" having a thickness no greater than 0.25 mm.

17

*See* Appx10769-10770.  Moreover, despite Commerce re-opening the record, no party submitted evidence rebutting the ASTM abstracts, nor did any party submit evidence on remand or in the original administrative review regarding the meaning of plates, sheets, or film as used in the Malaysia HTS.  Appx10770.

Commerce also addressed issues concerning its determinations in previous segments of this proceeding and parties' arguments claiming that information that Risen had placed on the record trumped the ASTM standards.  Appx10770-10771, Appx10773-10776.  For example, Commerce explained that, although it did not use data for plates and sheets to value backsheets in the previous administrative review, "in that review, unlike this remand, we did not have the ASTM definition of film on the record{,}" and that it used the Malaysian HTS category for plates and sheets in this review "{b}ecause we now have the ASTM definition of film on the record and Risen's backsheets do not meet that definition{.}"  Appx10775.[3] Likewise, regarding Risen's submission of marketing materials as alleged rebuttal

---

[3] Commerce's remand determination was also consistent with its reliance on ASTM materials to inform its backsheet and EVA surrogate value selections in Commerce's two successive administrative reviews of its antidumping duty order. *See* Appx10775-10776 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 86 Fed. Reg. 58,871 (Dep't of Commerce Oct. 25, 2021), at IDM Cmt. 13 (*Seventh Review*); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 87 Fed. Reg. 38,379 (Dep't of Commerce June 28, 2022), at IDM Cmt. 10 (*Eighth Review*) (CIT litigation pending)).  Both determinations predate Commerce's issuance of the remand results in this case.

information, there was no evidence that the terms used in the marketing materials correspond to the terms "sheet" and "film" in the Malaysian HTS.  Appx10770.

Thus, Commerce continued to value Risen's backsheets using data from Malaysian HTS 3920.62.1000.  Appx10771.  Correspondingly, the trial court found in *Risen II* that "{t}he ASTM abstracts support Commerce's analysis based on thickness, not flexibility" and that the marketing materials that Risen had submitted "do not rebut Commerce's definition of sheet as plastic products 0.25 mm thick and greater, nor do they demonstrate that Commerce's determination is unreasonable."  611 F. Supp. 3d at 1392.

Risen nonetheless continues to dispute Commerce's determination because, in Risen's view, Commerce based its determination on an "unsupported definition of the thickness difference between film and sheet."  Risen Br. 10.  In doing so, Risen maintains its argument that the abstracts that Commerce placed on the record from ASTM (an authoritative standards organization) are trumped by marketing materials that Risen submitted showing that certain companies in the solar industry refer to backsheet as "film."  *Id.* at 12-13.  As the trial court explained, however, "these materials provide a competing definition at best" and do not negate the reasonableness of Commerce's determination.  *Risen II*, 611 F. Supp. 3d at 1392.

The trial court's ruling is correct because Risen's marketing materials do not invalidate the weight that Commerce placed on the ASTM standards.  *Cf. Haixing*

*Jingmei Chem. Prod. Sales Co. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018) ("mere disagreement" with Commerce's weighing of evidence insufficient basis for challenge); *Gov't of Argentina v. United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021) (same).  First, the specifications that Risen provided in its purchase records do not specifically identify the backsheet as sheet or film but simply describe the product as multilayered backsheet.  Appx10774 (citing Appx2765-2793).  Further, as Commerce explained, there is no evidence that the terms used in the marketing materials correspond to the terms "sheet" and "film" in the Malaysian HTS or other generally recognized authoritative sources such as an industry or trade association, a professional organization, or standards organization.  Appx10770 (observing that no party submitted information rebutting ASTM standards).  Moreover, the marketing materials provide no indication that companies in the solar industry adhere to the technical definitions of "film" and "sheet," as opposed to using "film" based on the general notion that it connotes thin flexible plastic.  *See* Appx10774-10775 (citing Appx10711-10730).  The marketing materials also appear to distinguish between multilayered "backsheet" and the "film" components comprising the backsheet.  *See id.*  Thus, the marketing materials are not dispositive of the matter.

A precise definition is critical when the record contains two surrogate value options for products distinguished by millimeters.  *See* Appx10768-10769.  Unlike

the materials that Risen placed on the record, the ASTM abstracts are from an authoritative standards organization and provide a clear technical definition of film, based on thickness of the plastic. *See* Appx10775. Therefore, Risen's information does not negate the weight of the ASTM evidence, which shows that, between two measurably close options, the specifications for Risen's backsheet are consistent with the record definition of sheet rather than film.

Although Risen additionally contends that the ASTM abstracts are less specific to the backsheets used in solar modules than its purchasing records and the solar industry marketing materials, *see* Risen Br. 17-18, ASTM's definition of film does not originate from the ASTM D6988 or D4801 abstracts but from ASTM "Terminology D883." Appx10774 (discussing Appx7418). Terminology D883 applies to plastics in general, and Risen fails to cite to any information to support that this standard would not cover plastic materials used by the solar industry as backsheet in solar modules. *See id.*; Appx7419 (listing D883 as "Terminology Relating to Plastics"). Accordingly, Commerce reasonably found that the ASTM standards are the best information on the record to distinguish film from sheet in selecting an appropriate surrogate value for backsheet. *See* Appx10775.

Risen additionally contends that Commerce's surrogate value selection for backsheet is unsupported because Commerce used a Thai HTS "Other" category (meaning a category covering items not covered by another HTS category, such as

21

film) in prior administrative reviews. *See* Risen Br. 14-16. It is well-established,

however, that each administrative review stands on its own record, which may

require different results. *See Qingdao Sea-Line Trading Co. v. United States*, 766

F.3d 1378, 1387 (Fed. Cir. 2014) ("each administrative record is a separate

exercise of Commerce's authority that allows for different conclusions based on

different facts in the record"). Commerce may also depart from a prior practice in

implementing the antidumping duty statute if it offers a reasoned explanation for

its change. *See id.*; *Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d

1343, 1365 (Ct. Int'l Trade 2019) (citing *Rust v. Sullivan*, 500 U.S. 173, 187

(1991); *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983)).

Commerce adhered to these principles, explaining that, when it previously

relied on Thai HTS "Other" category, it did not have the ASTM definition of film

on the record. *See* Appx10775. That is, the records in prior reviews contained

different facts upon which Commerce based its conclusions and surrogate value

selections. *See id.*[4] On remand in this review, by contrast, the record included the

ASTM standards for sheet and film, defined by thickness, enabling Commerce to

---

[4] Indeed, in prior reviews, Commerce primarily based its surrogate valuation for
backsheet on the material composition of the plastic product, rather than the more
specific distinction between a product that is sheet versus "other than sheet." *See*,
*e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into
Modules, From the People's Republic of China*, 82 Fed. Reg. 29,033 (Dep't of
Commerce June 27, 2017), at IDM Cmt. 11 (selection based on "the type of plastic
sheet which most closely corresponds to the composition of the backsheets").

distinguish between the two surrogate value options offered by Malaysian import data.  Commerce explained that "{b}ecause we now have the ASTM definition of film on the record and Risen's backsheets do not meet that definition, we valued Risen's backsheets in this remand using import data for plates and sheets of plastic (Malaysian HTS 3920.62.1000)." *Id.*  Commerce thus provided a reasoned explanation for its change from its previous selection of the Thai HTS "Other" category, and Risen's contentions that Commerce's determination is unsupported because of its departure from prior reviews should be rejected.  *See Risen II*, 611 F. Supp. 3d at 1392-93 (holding that Commerce had "explained its deviation from its prior determination and supported its determination with record evidence").[5]

In short, contrary to its claims, Risen merely disagrees with Commerce's weighing of the record evidence, which is not a proper basis for a legal challenge. *See Haixing Jingmei*, 335 F. Supp. 3d at 1346 (holding that "mere disagreement with Commerce's weighing of the evidence . . . mistakes the function of the court, which is to determine whether the {determination is} supported by substantial evidence," citing *Downhole Pipe*, 776 F.3d at 1377 (additional citations omitted)).

---

[5] Risen also omits that Commerce's remand determination is consistent with its surrogate value determinations for backsheet and EVA in the next two successive administrative reviews of its antidumping duty order, both of which had records that included ASTM information and issued prior to the remand results in this case. *See* Appx10775-10776; *Seventh Review*, 86 Fed. Reg. 58,871, at IDM Cmts. 12-13; *Eighth Review*, 87 Fed. Reg. 38,379, at IDM Cmts. 10-11.

### B.    Commerce's Valuation Of EVA Is Supported By Substantial Evidence And Otherwise Lawful

For similar reasons, the Court should reject Risen's challenge to Commerce's surrogate valuation of EVA.  *See Risen II*, 611 F. Supp. 3d at 1393-94 (sustaining EVA determination).  Risen, on appeal, combines its contentions concerning backsheet and EVA such that many of the same arguments apply.

To value EVA, Commerce was required to select between the domestic industry petitioner's submission of Malaysian HTS 3920.10.1900 (Polymers of Ethylene: Plates and Sheets: Other Than Rigid), and Risen's submission of Malaysian HTS 3920.10.9000 (Polymers of Ethylene: Other Than Plates and Sheets).  Appx7130; *see also* Appx6471.  Commerce selected HTS 3920.10.1900 (Polymers of Ethylene: Plates and Sheets: Other Than Rigid) based on Risen's description of EVA as "Ethylene vinyl acetate sheet" in its submissions and the product's thickness of more than 0.5 mm.  Appx7130; *see also* Appx2122, Appx2128, Appx2142, Appx2147, Appx2151; Appx5234-5236.

As with backsheet, the trial court remanded Commerce's EVA valuation for reconsideration or additional explanation.  *Risen I*, 569 F. Supp. 3d at 1331-32.  In doing so, the trial court held that Commerce had failed to address certain detracting record evidence and to explain why its valuation of EVA with import data for plates and sheets was reasonable in light of evidence showing that Risen's EVA is flexible and described as film.  *See id*.  The trial court also directed that, if

Commerce continued to value EVA using Malaysian HTS 3920.10.1900, it should

explain its departure from its historical treatment of EVA. *See id.*

On remand, Commerce continued to value EVA using Malaysian import

data under HTS 3920.10.1900—corresponding to flexible sheet rather than film—

after placing the ASTM abstract standards defining film and sheet on the record

and determining that Risen's EVA has a thickness consistent with sheet, rather

than film. *See* Appx10776-10783. Indeed, Risen concedes that the EVA has a

thickness of 0.45 to 0.9 mm, essentially twice as thick (or more) compared to the

maximum thickness of film defined by ASTM. *See* Risen Br. 13; Appx10777

(citing Appx5236, listing input as "ethylene-vinyl acetate sheet . . . with thickness

over 0.5mm"). Commerce also addressed detracting evidence and explained its

change from its past treatment of EVA. *See* Appx10776-10783. Nevertheless,

Risen argues that Commerce's determination is unlawful because it is based on an

"unsupported definition of the thickness difference between film and sheet." Risen

Br. 10. For the same reasons discussed above regarding backsheet, Commerce's

determination to rely on the ASTM definitions in selecting surrogate value

information for EVA is reasonable and supported by substantial evidence.

Risen contends that the ASTM thickness standards on which Commerce

relied are merely guidance that is not specific to the Malaysian HTS or the solar

industry. *See* Risen Br. 16-18. As we explained above, however, the definition of

film that Commerce placed on the record stems from ASTM Terminology D883 encompassing "Terminology Relating to Plastics"—which, as its title indicates, is a broad standard covering plastics. *See* Appx7418-7419; Appx10780. These is no record evidence that the ASTM standard is limited to only certain types of plastics or that it does not cover plastic materials when used by the solar industry. *See id*. Additionally, the ASTM abstract specifically states that "{f}ilm is *defined* . . . as an *optional term for sheeting* having a nominal thickness of no greater than 0.25 mm (0.010 in)." Appx10780-10781 (quoting Appx7418 (emphasis by Commerce). Thus, contrary to Risen's argument, ASTM standard D883 provides a *definition* of film based on the thickness of the plastic. *See id*. The fact that ASTM standards are not specific to the Malaysian HTS does not negate Commerce's weighing of this evidence because the record is devoid of any information as to how film and sheet are defined in the Malaysian HTS. *See* Appx10781; *Risen II*, 611 F. Supp. 3d at 1393 n.8 (rejecting Risen's argument as request to reweigh evidence).

Risen next claims that specification sheets for Risen's EVA purchases and industry materials that it submitted show that Commerce should classify EVA as film. Risen Br. 13, 18. This claim is based on the name for the product Risen purchases, described as "EVA film," and references to EVA as "film" by solar entities. *Id*. But the materials that Risen submitted are not dispositive because they describe EVA as both "EVA film" and "EVA sheets." Appx10778,

Appx10781 (citing Appx10699-10710). Indeed, the marketing materials that Risen submitted state "{o}nce the EVA *sheets* have been laminated, the ethylene vinyl acetate *sheets* play an important role in preventing humidity and dirt penetrating the solar panels." Appx10781 (quoting Appx10703 (emphasis added)). Likewise, in the review, Risen repeatedly described its EVA as "sheet," rather than "film," which provides further indication of the informal and imprecise nature of the terms "sheet" and "film" when used in commercial activity. *See* Appx10778, Appx10781 (discussing Appx2122, Appx2128, Appx2142, Appx2147, Appx2151); Appx7130 (discussing Appx5236).

Commerce also explained that "the term 'film' in marketing materials or on product packaging, and the term 'film' as used by Risen to describe its EVA product{,} may not correspond to the term 'film' used in the Malaysian HTS or in other generally recognized authoritative sources such as an industry or trade association, a professional organization, or a standards organization." Appx10778. Thus, the materials that Risen submitted merely show that Risen and some solar companies have called EVA "film." Without more, Risen's contention does not negate Commerce's finding based on the overall record.

Instead of determining whether the input is best classified as sheet or film based on its name alone, Commerce relied on the ASTM abstracts that identify a clear technical definition of film, based on the thickness of the plastic, according to

a standards organization. Commerce placed the ASTM standards on the record to provide definitions distinguishing sheet and film precisely because nothing on the record defined the terms beyond general descriptions and imprecise references. *See* Appx10769, Appx10777; *see also* Appx10778 ("{O}ther than the ASTM Abstracts discussed above, there is no other definition of sheet and film on the record."). Thus, Commerce reasonably determined that the best information on the record for distinguishing film from sheet is the ASTM information that comes from an authoritative standards organization. *See* Appx10781. Based on those precise definitions, Commerce lawfully determined that Risen's EVA is consistent with sheet rather than film because its thickness is greater than 0.5 mm, and that no other physical characteristic of the EVA signaled that it should be classified as film rather than sheet. *See* Appx7130; Appx10777, Appx10781-10782; *Risen II*, 611 F. Supp. 3d at 1393 (finding Commerce's determination on remand reasonable).

Relatedly, and contrary to Risen's suggestion that the flexibility of its EVA requires the EVA to be treated as film (Risen Br. 11, 16), Commerce specifically observed that the Malaysian HTS category that it selected to value EVA covers "Polymers Of Ethylene: Plates And Sheets: *Other Than Rigid*." Appx10777 (emphasis added by Commerce). Likewise, the fact that Risen's EVA comes in rolls (Risen Br. 13) does not demonstrate that it is film rather than sheet because the tariff category that Commerce selected includes non-rigid products. *See id.*

Regarding Commerce's historical treatment of EVA, Risen correctly asserts that Commerce used Thai HTS 3920.10.000.90 to value Risen's EVA in the previous administrative review.  Risen Br. 14; *see also* Appx10782.  However, Risen incorrectly asserts that Commerce's determination in this case is a departure from its past valuation of EVA such that EVA should be valued using Malaysian HTS 3920.10.9000, which Risen claims is equivalent to Thai HTS 3920.10.000.90.  *See* Risen Br. 14-15 & n.4; Appx10782-10783.  As Commerce explained, Thai HTS 3920.10.000.90 is an "Other" HTS category that covers *plates, sheets, film*, foil, and strips of polymers of ethylene.  Appx10782.  By contrast, Malaysia HTS 3920.10.9000 is an "Other" HTS category that covers ethylene polymers in forms *other than* plates and sheets (*i.e.*, it covers film, but not plates and sheets).  *Id.* Accordingly, in the prior administrative review, Commerce did not use a Thai HTS category that covered film, and not plates and sheets, "but rather, it used a Thai HTS category that encompassed plates, sheets and film, etc."  *Id*.

Thus, the history of Commerce's classification practice with respect to EVA does not support valuing Risen's EVA as film under Malaysian HTS 3920.10.9000 because Malaysia, unlike Thailand, has separate HTS categories for polymers of ethylene in plates and sheets and polymers of ethylene – other (which covers film). *See* Appx10782-10783; *Risen II*, 611 F. Supp. 3d at 1394 ("Commerce's reliance on Malaysia's HTS 3920.10.1900 is not inconsistent with its past practice").  In

any event, given that Risen's EVA exceeds the record definition of film,

Commerce lawfully used Malaysian HTS 3920.10.1900 covering ethylene polymer

plates and sheets, rather than a category covering film but not sheets. *See*

*Quingdao Sea-Line*, 766 F.3d at 1387 ("Commerce may change its conclusions

from one review to the next based on new information and arguments, as long as it

does not act arbitrarily and it articulates a reasonable basis for the change").[6]

Overall, Commerce reasonably considered the information that Risen

proffered, its historical practice, and the ASTM standards information that it had

placed on the record to conclude that Risen's EVA should be treated as sheet rather

than film. That Risen prefers the subheading for "other than plates and sheets"

fails to render Commerce's determination unreasonable. *See Downhole Pipe*, 776

F.3d at 1376-77 (Court will not reweigh evidence).

### C.    Risen's Averaging Arguments Lack Merit

Alternatively, Risen argues that if the record is inconclusive as to whether

Risen's inputs constitute sheet or film, Commerce should average the competing

HTS categories together to account for this ambiguity. *See* Risen Br. 12, 19. As

---

[6] Risen's argument also omits that Commerce's determination in this case is consistent with its valuation of EVA in the next two administrative reviews of the China solar antidumping duty order, both of which had records that included ASTM information and predated the remand results in this case. *See* Appx10783 (citing *Seventh Review*, 86 Fed. Reg. 58,871, at IDM Cmt. 12; *Eighth Review*, 87 Fed. Reg. 38,379, at IDM Cmt. 11 (CIT litigation pending)).

an initial matter, Risen failed to develop this argument before the trial court, and it is therefore forfeited or waived. *See* Appx10792, Appx10794-10795 (raising issue only in passing before trial court); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (citation omitted)).

Regardless, Risen's averaging argument is meritless because Commerce affirmatively determined that Risen's inputs are best characterized as sheet, and the trial Court persuasively held that Commerce's determinations are reasonable. *See* Appx10768-10783; *Risen II*, 611 F. Supp. 3d at 1392-94. Risen's alternate interpretation of the record fails to render Commerce's selection unreasonable when Commerce has considered all of the evidence for and against its selection, and it has provided a reasoned basis for its determination. *See Downhole Pipe*, 776 F.3d at 1376-77. Thus, contrary to Risen's arguments, Commerce's surrogate value determinations should be sustained.

## III.   Commerce's Surrogate Financial Ratios Calculation Is Supported By Substantial Evidence And Lawful

Commerce lawfully calculated the surrogate financial ratios using the financial statement of Malaysian solar cell producer Hanwha QCells. Appx7131-7133. Risen challenges Commerce's financial ratios calculation, arguing that Commerce should have applied a different method with respect to its allocation of

31

the remainder of Hanwha QCells' "cost of sales" (which Commerce allocated to overhead rather than materials, labor, and energy (MLE) costs). Risen Br. 20-27. Risen's claim is baseless. The statute and regulations are silent about the method that Commerce must apply to calculate surrogate financial ratios. *See* 19 U.S.C. § 1677b(c)(1); 19 C.F.R. § 351.408(c)(4); *Nation Ford*, 166 F.3d at 1377 (stating that statute accords Commerce "wide discretion" in applying guidelines to value factors of production). Commerce reviewed the record and made a well-reasoned calculation based on the lawful exercise of its discretion to select an appropriate methodology. *See SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1226 (Fed. Cir. 2018) ("{t}he decision to select a particular methodology rests solely within Commerce's sound discretion" (citation omitted)); *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (Court affords Commerce "tremendous deference" when Commerce exercises technical expertise to make "complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts" (citation omitted)).

Commerce cogently explained its reasoning for the surrogate financial ratio calculation. Appx7131-7133; Appx7165-7166 (addressing Risen's ministerial allegations based on this issue). Specifically, Commerce explained that it made its final overhead ratio calculation based on information in Hanwha QCells' financial statement. *See* Appx7131. Commerce considered information contained in Notes

17 and 2.12 of the financial statement stating that Hanwha QCells' 2018 total

"Cost of sales" of RM2.003 million included "Inventories" of RM1.648 million,

and that the "Inventories" include "costs of direct materials and labour and a

proportion of manufacturing overheads based on normal operating capacity." *Id.*;

Appx6648, Appx6666, Appx6688; *see also* Risen Br. 20-21 (acknowledging that

Commerce uses notes to interpret financial statements). Given this information,

Commerce "determined that labor and energy, as well as material costs, were

included in the {'Inventories'} category{.}" Appx7165. Commerce explained:

> We believed the "proportion of manufacturing overheads
> based on normal operating capacity" to be a reference
> largely to energy costs. . . . Because we concluded that
> labor and energy were included in "Inventories," in
> calculating the surrogate financial ratios, we treated the
> "Inventories" expense as materials, labor, and energy
> {MLE} expenses which we included in the denominator
> of the surrogate financial ratios.

Appx7165-7166. Commerce thus found the specifically identified direct product

costs of RM1.648 million to be an appropriate reflection of Hanwha QCells' MLE

costs, and included the relatively small RM257,063 remainder from Hanwha

QCells' cost of sales in overhead. *Id.*; Appx7131-7133.[7]

---

[7] Commerce's determination in this regard represented an adjustment compared to
Commerce's calculation of MLE expenses in the preliminary results based on a
constructed value. *See* Appx7131 (explaining this adjustment based on petitioner's
highlighting of information in the financial statement's notes). Risen does not
challenge Commerce's determination to move from a constructed value to a

Additionally, Commerce reasonably explained why it declined to treat the remaining, unidentified RM257,063 from "Cost of sales" as MLE expenses when the Hanwha QCells financial statement already accounts for MLE. *See* Appx7131-7132; Appx7165-7166; *see also* Appx7137-7138 (explaining that Commerce "treated the difference between the total manufacturing costs and MLE as overhead costs"). Commerce explained that the financial statement explicitly identifies sales, general, administrative, and interest costs as separate line items, making it appropriate to treat the remaining cost of sales as overhead. *See* Appx7132. Commerce also explained that the "Inventories" of RM1.648 million it used as the MLE denominator include labor and energy because Note 2.12 of Hanwha QCells' financial statement states that "Inventories" encompass both labor costs and "a proportion of manufacturing overheads based on normal operating capacity," which Commerce understands to include energy. *See* Appx7131-7132; Appx7165-7166; *see also* Appx6666, 6688.

Further, it was reasonable for Commerce to understand that the financial statement's reference to "Inventories" including "a proportion of manufacturing overheads based on normal operating capacity" indicated that the inventory figure includes energy expenses (in addition to materials and labor). Specifically, as the

---

calculated value for MLE between the preliminary and final results but claims that Commerce should have allocated to MLE, rather than to overhead, the remaining amount from Hanwha QCells' cost of sales after subtracting "Inventories."

trial court agreed based on our responses to its oral argument questions, Hanwha

QCells' financial statement is prepared in accordance with International Financial

Reporting Standards (IFRS).[8]  *See Risen I*, 569 F. Supp. 3d at 1333; Appx6653

("The financial statements . . . have been prepared in accordance with Malaysian

Financial Reporting Standards ("MFRS"), International Financial Reporting

Standards ("IFRS") and the Companies Act 2016 in Malaysia").  IFRS Standard

IAS 2 requires financial statements to expense variable costs—which would

include energy (but not fixed overhead)—in inventory costs.  *See Risen I*, 569 F.

Supp. 3d at 1334 (citing International Financial Reporting Standards Foundation,

IAS 2 Inventories, About, https://www.ifrs.org/issued-standards/list-of-

standards/ias-2-inventories/ (last visited July 29, 2023) (IAS 2)).

As a result, Commerce's citation to Notes 2.12 and 17 in the Hanwha QCells

financial statement, and its explanation regarding its interpretation of the notes,

reflect Commerce's understanding that, because Hanwha's financial statement is

compliant with IFRS, it includes labor and energy in the inventory costs.  *See*

Appx7131; Appx7165-7166 (repeatedly referencing Commerce's interpretation of

notes).  Indeed, reflecting the language of IAS 2, Note 2.12 explains that Hanwha

---

[8] The IFRS foundation is a not-for-profit international organization responsible for developing high-quality accounting and disclosure standards to promote transparency, accountability and efficiency in global financial markets.  *See Risen I*, 569 F. Supp. 3d at 1333 n.29 (citing International Financial Reporting Standards Foundation, About Us, https://www.ifrs.org/about-us/ (visited Mar. 30, 2022)).

QCells' inventory costs include the costs associated with "bringing the inventories to their present location and condition," which would include energy.  Appx6666; *cf.* IAS 2, https://www.ifrs.org/issued-standards/list-of-standards/ias-2-inventories/ (last visited July 29, 2023) (similar language).  Further, in an energy-intensive industry such as solar cell and module production, it is unlikely that the relatively small remainder of RM257,063 out of a total "Cost of sales" of RM2.003 million would constitute Hanwha QCells' energy costs.  Rather, energy expenses would be a significant portion of the RM1.648 million in inventory costs that Commerce already allocated to MLE based on Notes 2.12 and 17.

Based on the foregoing, Commerce calculated the financial ratios for the final results using RM1.648 million as the total MLE value ("H").  *See* Appx7132.  Commerce further treated the difference between total manufacturing costs (RM2.003 million) and MLE (RM1.648 million) as overhead costs ("I").  *Id.* Therefore, Commerce properly calculated the overhead ratio ("I/H") as 21.70 percent, the SGA ratio ("M/(H+G+I)") as 9.73 percent, and the profit ratio ("N/(G+H+L+M)") as 3.48 percent using these identified values.  *See* Appx7132-7133; Appx7138.  The trial court agreed that Commerce's calculation was reasonable and supported by the information in the Hanwha QCells financial statement.  *See Risen I*, 569 F. Supp. 3d at 1334 ("Having accounted for MLE, depreciation, and the change in finished goods balance, Commerce reasonably

allocated the remaining amount of the cost of sales balance to overhead."); *see also*, *e.g.*, *Avisma*, 688 F.3d at 764 (discussing "tremendous deference" to Commerce's exercise of its accounting expertise).

Risen nonetheless contends that Commerce's financial ratio calculation methodology was contrary to agency practice and to the record. *See* Risen Br. 21-22. With respect to agency practice, Commerce explained in the final results that it is "unaware of any such practice {to automatically classify unidentified costs of sales as MLE.}" Appx7133. Risen's assertion is misplaced in the context of Commerce construing a financial statement, which necessarily depends on the specific facts. *Cf. Hyundai Steel Co. v. United States*, 279 F. Supp. 3d 1349, 1372 (Ct. Int'l Trade 2017) ("Commerce is not bound by decisions made in different segments of a proceeding, let alone decisions made in different proceedings." (citation omitted)). Indeed, the cases that Risen cites differ from this one because Hanwha QCells' financial statement specifies that MLE costs are included in the "Inventories" portion of the "Cost of sales," so Commerce reasonably determined that the remaining, unidentified costs of sales were not MLE but rather overhead. *See* Appx7131. The proceedings Risen cites did not involve financial statements that broke out MLE costs in this way. *See, e.g., Certain Activated Carbon From China*, 85 Fed. Reg. 23,947 (Dep't of Commerce Apr. 30, 2020), at PDM at 16 ("none of the {selected financial statements} have separate line items breaking

37

down the cost of raw material, labor and energy"); Appx7166 ("None of the cases to which Risen cited indicate that the surrogate financial statements used by Commerce in those cases specified that energy and/or labor were included in a specific line item in the financial statements.").

Risen also asserts that "Cost of sales" typically includes mostly MLE, so the remaining amount of "Cost of sales" should be allocated to MLE expenses. *See* Risen Br. 21, 25. Under the methodology that Commerce used the "Cost of sales" *does* include mostly MLE (RM1.648 million out of RM2.003 million). Commerce appropriately declined to also allocate the remaining "Cost of sales" to MLE when doing so would be contrary to the record, in effect, creating an inaccurate MLE figure by inflating it with overhead. *See* Appx7133; Appx7166 (rejecting Risen ministerial error allegation). Ultimately, out of the total RM2.003 million "Cost of sales," Commerce determined that only RM357,156 constitute overhead expenses, of which RM100,093 are specifically identified as property depreciation, leaving RM257,063 as unidentified expenses. *See id.*; Risen Br. 22.[9]

---

[9] Before the trial court, Risen also alleged that Commerce improperly "double-counted" energy and labor expenses in the financial ratios. That claim is merely derivative of Risen's disagreement with Commerce's finding that Hanwha QCells' inventory figure includes labor and energy. Because Commerce did break out MLE costs from the total "Cost of sales," in accordance with Notes 17 and 2.12, and allocated these costs to the denominator in the overhead ratio, there is no basis to claim that labor and energy were double counted. *See* Appx7132-7133 (setting forth Commerce's calculation, including MLE expenses designated as "H"); *see also Risen I*, 569 F. Supp. 3d at 1334-35 (rejecting double-counting argument).

Risen further claims that general accounting principles regarding calculation of manufacturing costs prevent Commerce from being able to separate MLE and overhead costs based on the notes in Hanwha QCells' financial statement.  *See* Risen Br. 23-25.  There are several flaws in Risen's contention.  First, Risen's references to general accounting principles do not trump the information set forth explicitly in the Hanwha QCells financial statement on which Commerce relied.  The financial statement specifically states that it is prepared in accordance with IFRS, that the RM2.003 million total "Cost of sales" includes "Inventories" of RM1.648 million, and that the "Inventories" figure includes "costs of *direct materials* and *labour*" and "a proportion of manufacturing overheads based on normal operating capacity," which includes energy under IFRS.  Appx6653, Appx6666, Appx6688.  The financial statement also says that the inventories figure includes both "{f}inished goods and work-in-progress" in the "{c}osts incurred in bringing the inventories to their present location and condition."  Appx6666.  Commerce's financial ratio calculation reflects this information.

Moreover, Commerce's calculation is consistent with the general formulae that Risen references.  *See* Risen Br. 23-24.  Consistent with the information in the Hanwha QCells financial statement, the formulae indicate that a portion of factory overhead constitutes energy costs.  *See id.*; Appx6666.  Likewise, consistent with the formulae, Commerce "accounted for the change in finished goods inventories"

in its calculations.  Appx7132; *see also Risen I*, 569 F. Supp. 3d at 1334 n.33 (observing that no party disputed this adjustment).  In contrast, Risen baldly claims that "{b}y definition, {work-in-progress} and finished goods inventories are not recognized as an expense in cost of sales," Risen Br. 24, even though the financial statement explicitly states that the inventories figure reflects "{f}inished goods and work-in-progress" as part of the "{c}osts incurred in bringing the inventories to their present location and condition."  Appx6666.  Also, if Risen were correct and labor and energy are excluded from the inventories figure (Risen Br. 24)—despite the statement to the contrary in Note 2.12 (Appx6666)—the remaining RM257,063 would be an unrealistically low amount to account for Hanwha QCells' labor and energy costs.[10]

Ultimately, Risen's disagreement with Commerce's interpretation of the Hanwha QCells financial statement is not a valid basis to overturn Commerce's reasonable accounting determination.  Commerce lawfully exercised its broad technical discretion in calculating the financial ratios.  *See SolarWorld*, 910 F.3d at 1226; *Avisma*, 688 F.3d at 764 (discussing Commerce methodological discretion).  Commerce's determination should thus be upheld.

---

[10] Risen is similarly incorrect to assert that the inventories figure would be equal to the total cost of sales if it included labor and energy, *see* Risen Br. 25, because the total cost of sales *also* includes certain overhead costs, reflected in Commerce's determination to treat the RM257,063 remainder as overhead, after it removed MLE and other deductions.

# **CONCLUSION**

For these reasons, we respectfully request that this Court affirm the

judgment of the trial court in this case.

<div style="margin-left: 50%">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

</div>

| | |
|---|---|
| OF COUNSEL | /s/ Joshua E. Kurland |
| BRISHAILAH BROWN | JOSHUA E. KURLAND |
| Attorney | Senior Trial Counsel |
| Office of the Chief Counsel | Department of Justice, Civil Division |
| for Trade Enforcement & Compliance | Commercial Litigation Branch |
| U.S. Department of Commerce | P.O. Box 480, Ben Franklin Station |
| Washington, D.C. 20230 | Washington, D.C. 20044 |
| | Telephone:  (202) 616-0477 |
| | Facsimile:  (202) 353-0461 |
| | Email:  Joshua.E.Kurland@usdoj.gov |
| November 2, 2023 | *Attorneys for Defendant-Appellee* |

41

CERTIFICATE OF COMPLIANCE
PURSUANT TO FED. R. APP. P. 32(g)(1)

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1). The brief contains 8,581 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

August 3, 2023                    /s/ Joshua E. Kurland